UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
ADVANCED GLOBAL TECHNOLOGY, LLC,
:
                Plaintiff,
:   No. 07 cv 3654 (JSR)
       v.                         ECF CASE
:
XM SATELLITE RADIO INC.,
:
                Defendant.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT**

Advanced Global Technology, LLC, by its attorneys Debevoise & Plimpton LLP, for its complaint against Defendant XM Satellite Radio Inc., alleges as follows:

**Jurisdiction and Venue**

1.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because the action is between citizens of different states and the amount in controversy exceeds $75,000.

2.    Venue in this Court is proper under 28 U.S.C. § 1391(a) and (c) because XM is a corporation that is subject to personal jurisdiction in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**The Parties**

3.    Plaintiff Advanced Global Technology, LLC ("AGT"), is a limited liability corporation organized under the laws of New York and doing business at 105 Madison Avenue, New York, New York. AGT designs, develops and distributes a range of innovative consumer electronics.

22441280

4.       Defendant XM Satellite Radio Inc. ("XM"), on information and belief, is a corporation organized under the laws of Delaware with its principal place of business in Washington, DC. XM is in the business of providing a digital audio radio service of over 150 channels of digital radio content delivered via satellite.

**Introduction**

5.       This claim arises out of XM's unlawful plan to eliminate AGT's contractual rights to develop and distribute receivers compatible with the XM Service over a four-year term. The agreement between AGT and XM assured AGT's equal access – on a basis equivalent to that afforded any third party – to XM's most current receiver technology. The agreement also gave "most favored nation" rights to AGT and its products.

6.       In reliance upon this agreement, AGT invested millions of dollars to design, import, market, and distribute XM receivers. But since executing the agreement with AGT, XM has continuously and steadfastly backed away from its contractual commitments and ultimately declined to continue the contractual relationship. XM's actions essentially have put AGT out of the satellite radio business.

7.       In violation of key terms of the agreement between the parties, XM has withdrawn support from, and completely undercut, AGT's ability to produce and market XM receivers and accessory products, and has unreasonably withheld approval of new products proposed by AGT while engaging AGT's competitors to produce and distribute similar products.

**The Master License Agreement**

8.  XM and AGT's principals began discussing the possibility of a partnership as early as June 2003. As part of those discussions, AGT provided XM with robust product plans that AGT was willing to support financially.

9.  AGT and XM executed a long-term Master License Agreement ("the Agreement"), dated October 17, 2005, a copy of which is attached as Exhibit A to the Complaint.

10. The Agreement between AGT and XM spells out the relationship between AGT and XM. The Agreement grants AGT a three-year license, with an automatic one-year renewal, "to design, develop and manufacture Licensed Products worldwide" and "to market, distribute and sell Licensed Products in the Licensed Markets for use in the XM Service Area." Agreement, ¶¶ 3.1.1, 10.1. The Agreement covers several types of products capable of receiving XM service, including portable receivers and receivers for use in both homes and businesses. Agreement, ¶¶ 1.13, 1.16.

11. The Agreement gives AGT the rights to all XM technology, data and content for the Licensed Products on a "most favored nations" basis. Specifically:

(a)  The Agreement provides that AGT "will have complete access to all present and future technology development by XM and its Affiliates (including XM chipsets)" and that AGT "will be advised by XM of any new development in technology in a reasonable time frame for [AGT] to prepare for integration and development." Agreement, ¶ 2.2.1.

(b)  The Agreement provides that AGT will receive all technical data that XM makes available to third parties, and that AGT "will also receive reasonable consulting services

from XM at no cost pertaining to all technical documents and product integration." Agreement, ¶ 2.2.2.

(c)     The Agreement provides that "XM shall make available for all of [AGT's] products complete access to all content on the XM Services" and that AGT, in turn, "will use its commercially reasonable efforts to produce Licensed Products that are of high quality, appropriately priced, and fulfill Customers' needs." Agreement, ¶ 2.3.

(d)     The Agreement provides that "[t]he Parties will schedule regular meetings to review [AGT's] progress in designing, developing, manufacturing and distributing Licensed Products." Agreement, ¶ 2.1.3.

(e)     The Agreement provides that so long as AGT's product prototypes pass XM's product tests, with "approval not to be unreasonably withheld," the products will be certified as "Licensed Products" under the Agreement. Agreement, ¶ 2.5.2. Moreover, under the Agreement XM's product tests are "intended to be expeditious and efficient." Agreement, ¶ 1.42.

12.     The Agreement contemplates that AGT and XM will work collaboratively to market AGT's Licensed Products, but gives AGT the rights to market Licensed Products. Specifically:

(a)     The Agreement provides that AGT and XM "will each use commercially reasonable efforts to market" AGT's products and that the parties "will use commercially reasonable efforts to coordinate their marketing efforts." Agreement, ¶ 4.1.

    (b)    XM agreed to "provide [AGT] with the results of any market research related to the Licensed Products conducted by XM at no cost to [AGT]" and to meet periodically to discuss AGT's sales and marketing plans. Agreement, ¶¶ 4.1.2, 4.6.

    (c)    Under the Agreement, AGT determines product quantities and inventory levels, subject only to a requirement that AGT and XM meet and agree upon volume if XM has a "reasonable business concern" that quantities are excessive. Agreement, ¶ 4.9.

13.    The Agreement also specifically provides that XM will maintain competitive pricing for AGT's products and guarantee AGT a specified profit margin on all Licensed Products:

    (a)    Although XM establishes the Manufacturer's Suggested Retail Price ("MSRP") for each of AGT's Licensed Products, it also agreed to "use commercially reasonable efforts to maintain competitive pricing for all [AGT] products that provide access to the XM Service." Agreement, ¶ 4.7.

    (b)    AGT is guaranteed a profit margin of at least 29 percent on all Licensed Products, and XM is required to "take such action as is necessary for [AGT] to achieve such margin, including the payment of increased subsidies." Agreement, ¶ 4.8.

14.    Most importantly, and consistent with AGT's "most favored nations" status, the Agreement provides that XM cannot discriminate against AGT and its products in favor of those from a competitive licensed supplier:

    (a)    The Agreement prohibits XM from providing other third-party manufacturers or distributors with subsidy payments (required to achieve AGT's guaranteed profit margin, among other things) "that are more favorable than those provided to [AGT] on the same product category with similar price points." Agreement, ¶ 6.9.2.

5

  (b) XM is prohibited from providing other third-party distributors or manufacturers "more favorable treatment than it provides [AGT] with regards to access to technical information about XM's technology 'roadmap' and chipset pricing and availability." Agreement, ¶ 6.9.3.

  (c) XM is required to "provide at least as much aggregate promotional support for [AGT]'s Licensed Products . . . as XM provides to any other third party with regard to the same distribution accounts for the same product category with same price points." Agreement, ¶ 6.9.6.

15. XM is also prohibited from taking any action or publishing any materials "that have the effect of disparaging [AGT's] . . . products or technology," Agreement, ¶ 4.1.3, and from competing with AGT through an affiliated third-party distributor, Agreement, ¶ 4.12.

16. The Agreement is governed by the substantive laws of New York. Agreement, ¶ 13.10.

17. The Agreement expressly permits AGT to seek equitable relief from a court for breach of XM's obligations. Agreement, ¶ 12.2.4.

**Initial Relations Between the Parties**

18. In reliance upon the long-term relationship provided for in the Agreement, AGT devoted significant time and capital to developing its initial XM receiver, then code named "Gypsy."

19. At a suggested retail price of $59.99, the product was initially positioned as the lowest-priced receiver in the XM family of receivers for the 2006 product year. In addition, XM and AGT agreed that the price of the "Gypsy" relative to other XM products would remain constant despite any promotions XM might undertake.

20. AGT intended to market the product with the name Tempo. XM insisted on the name Sportscaster. AGT objected to this choice because it believed the name could limit the product's customer appeal, and countered with proposed product names such as Pitch and Score. Ultimately, however, XM prevailed, and the product was named Sportscaster.

21. AGT committed to a substantial presentation and presence at the 2006 Consumer Electronics Show ("CES") in Las Vegas in the first week of January 2006, promoting XM and the Sportscaster exclusively. AGT spent approximately $750,000 in that effort. XM principals, including Chairman Gary Parsons, President and CEO Hugh Panero, and Executive Vice President of Engineering and Technology Stelios Patsiokas, visited the AGT booth at the CES and congratulated AGT on its display and a job well done.

22. On or about January 26, 2006, shortly after the 2006 CES, Ed Valenzuela of XM informed John Bohntinsky of AGT that, based on the enthusiasm expressed for the product at the CES, "we are confident that our Preferred Distributor network will bring you a significant amount of business."

23. In response to this encouragement, AGT engaged in substantial promotional efforts with retailers and spent over $1 million developing the Sportscaster.

24. Shortly after the CES, XM asked AGT to provide a forecast of product needs, by account and by month, for the Sportscaster receiver and its accessory kits. AGT and XM met on February 16, 2006 in Washington, DC to discuss AGT's forecast and allocation of the product to retailers. XM's Vice Presidents of Marketing and its Account Managers, who were responsible for maintaining relationships with various retailers, were among those who attended. At the meeting, AGT and XM agreed upon a sales projection for the year 2006 of 1.5 million

22441280

receivers and kits based on XM's subscriber goal and a variety of other sales indicators, including historic balance-of-sale, input from XM's Account Managers, conversations with retail accounts and forecasts provided by the accounts themselves.

25. In reliance upon the mutually-agreed-upon projections, AGT ordered 700,000 Sportscaster units from Flextronics, XM's primary receiver manufacturer, on or before March 3, 2006, in order to achieve an early Spring launch. However, XM and Flextronics experienced production delays with the Sportscaster. As a result, AGT was unable to ship the product volume it had planned to provide retailers in March of 2006 and, to preserve its relationships with its accounts, had to negotiate downward the number of receivers and kits retailers expected to receive at the beginning of April 2006.

26. At no time prior to June 30, 2006, did XM indicate to AGT that it did not continue to endorse and fully support the mutually-agreed-upon projection of 1.5 million Sportscaster units, which lead members of the XM Sales Team had reviewed on multiple occasions.

## XM's Recent Conduct

### XM Orders Shipment Stoppages of the Sportscaster

27. In May 2006, AGT learned that XM and Flextronics had failed to produce receivers that complied with Federal Communications Commission ("FCC") emissions regulations.

28. On or about May 26, 2006, XM ordered AGT to stop shipments of the Sportscaster to customers until XM had resolved the emissions issue with the FCC. Because of this, AGT could not implement promotional and sales plans with its retail accounts.

29.    On or about June 30, 2006, XM informed AGT that it did not intend to make available more than 450,000 chipsets for use in Sportscaster receivers in 2006 – less than one-third of the originally anticipated 1.5 million.

30.    At XM's direction, AGT resumed shipments of the Sportscaster on or about June 21, 2006. On or about July 15, 2006, however, XM again ordered that shipments be halted due to its continued failure to meet FCC emissions requirements. All Sportscasters, as well as car kit and home kit accessories, in AGT's warehouse and in transit to the warehouse had to be returned to the Flextronics factory in Malaysia to be reworked to conform to FCC emissions standards.

31.    The indeterminate span of this second halt in shipments left AGT once again unable to inform retail accounts when Sportscasters would become available, and to plan promotional activities. As a result, Sportscaster sales suffered.

32.    Shipments of the Sportscaster did not resume until late October 2006. This time XM advised AGT that it would provide chipsets for only 150,000 units of the Sportscaster for the fourth quarter of 2006 – less than one-fifth of the approximately 750,000 units the parties contemplated as of February 2006.

33.    AGT negotiated with XM to obtain additional chipsets, as promised pursuant to the parties' agreed-upon forecast, over the course of several weeks. AGT required product delivery to its warehouse by December 11, 2006 for sales prior to year-end. Although XM agreed to provide 185,000 chipsets, ultimately, only 150,000 units were delivered to AGT.

### XM Undercuts AGT's Ability to Sell and Market the Sportscaster

34. Despite the parties' agreement that the Sportscaster would be a low-priced XM receiver with high volume sales, XM has taken a number of steps to undermine the Sportscaster price position.

35. XM's sole competitor in the satellite radio market is Sirius Satellite Radio, Inc. ("Sirius"). XM failed to price the Sportscaster in a manner that would ensure its ability to compete with Sirius's lowest-priced product. Over AGT's objections, XM chose a suggested retail price of $59.99, which exceeded the $49.99 retail price of Sirius's entry level product by approximately 20 percent. Sportscaster sales suffered as a result.

36. Additionally, on information and belief, during the same period XM allocated chipsets for the "Bullwinkle," a receiver distributed by Audiovox and which XM also intended to sell at the entry price point, thereby providing AGT less favorable access to chipset technology than Audiovox. AGT understood that, as a result of this allocation, it would be unable to obtain the number of chipsets required to meet the projections for the Sportscaster.

37. XM's promotional activities for other competing products also had a deleterious effect on Sportscaster sales. In early April 2006, AGT learned that XM had implemented a $20 mail-in rebate on the Audiovox Xpress and Delphi Roady2 receivers, both initially priced at $79.99, for the April to June 2006 time frame – the exact time of the launch of AGT's Sportscaster product at a $59.99 retail price. The Sportscaster was not included in the April to June rebate.

38. The Xpress and Roady2 rebate program adversely affected the launch of the Sportscaster in the second quarter of 2006. Staples, Inc., one of the world's largest office products companies, informed AGT that, despite its interest in the Sportscaster, it would not bring in the

22441280

product to sell at $59.99 because it already had that price-point covered with the rebated Xpress and Roady2 products.

39. From July to September 2006, XM offered a $20 mail-in rebate on the Sportscaster for all accounts that use a rebate as part of their selling strategy. Some of the major retailers, such as Wal-Mart, Sam's Club and Target, do not use rebates. XM provided these retailers with a $10 promotional credit through the manufacturer but required AGT to cover half the cost of the credit. AGT spent approximately $235,000 covering unplanned promotional credits to these retailers, resulting in a decrease in AGT's guaranteed profit margin. AGT agreed to pay these costs in reliance upon the long-term nature of its contractual relationship with XM. On information and belief, XM has not demanded that other third-party distributors and manufacturers cover part of the cost of promotional credits.

40. Similarly, AGT learned in January 2007 that XM had implemented at Best Buy a $20 instant rebate on the Audiovox Xpress, which, taken with the $20 mail-in rebate already in place on this product, lowered its point-of-sale price to $39.99. No instant rebate was provided for the Sportscaster.

41. XM was also engaged in promotional activities to support the Xpress at Wal-Mart in January 2007. With this support, Wal-Mart sold the Xpress for $58 without rebate. Because Wal-Mart's Sportscaster promotional credit was no longer in force in January 2007, Wal-Mart was selling the Sportscaster at $59 retail. Wal-Mart advised AGT that it did not need two products at $59 and that Wal-Mart therefore was dropping the Sportscaster. Wal-Mart had been AGT's biggest customer for the Sportscaster. AGT has not shipped to Wal-Mart since the beginning of January 2007.

XM Abandons the Sportscaster

42. During the fourth quarter of 2006, AGT attempted on numerous occasions to obtain an understanding from XM of its plan for the Sportscaster in 2007. On December 13, 2006, AGT received an email from Lane Bruns at XM, in which Bruns indicated that the 2007 "rolling forecast" called for 32,000 Sportscaster units, all of which were to be manufactured in January, and that XM was "excited to move forward in 2007/2008" with AGT.

43. When, however, AGT representatives requested an opportunity to meet with XM representatives during the 2007 CES to obtain a more precise understanding of XM's long-term plans for the Sportscaster, their requests were ignored. While at the 2007 CES in early January 2007, John Bohntinsky, Mark Alford, Ben Lowinger and Philip Petracca visited the XM booth and again requested a meeting. Confronted in person, XM's Blair Kutrow and Lane Bruns agreed, and the group met that day.

44. During that meeting, AGT was told that the Sportscaster continued to figure in XM's plans in the year 2007. Kutrow informed AGT, however, that XM wanted only 35,000 Sportscaster units for the entire 2007 year and that XM needed all 35,000 units by the end of January 2007. XM promised to schedule a follow-up meeting in February at AGT's offices in New York. That meeting never took place.

45. Toward the end of January 2007, John Bohntinsky of AGT spoke with Dan Turak of XM about Wal-Mart sales. Turak advised Bohntinsky that XM planned to replace the Sportscaster with a new Audiovox product that would be available in retail markets in May 2007. Turak expressed surprise that AGT had not been aware that XM planned to drop the Sportscaster.

22441280

46.     Shortly after the conversation between John Bohntinsky and Dan Turak, AGT representatives began hearing from retail accounts that XM had advised them that the new Audiovox model would replace the Sportscaster. An AGT sales representative was informed by a Wal-Mart sales representative that Wal-Mart had known of the Audiovox replacement of the Sportscaster as early as November 2006.

47.     On January 24, 2007, XM's Dan Murphy sent a note to the XM sales team advising them that the Sportscaster was being discontinued.

### XM Repudiates Its Relationship With AGT

48.     AGT provided XM with a number of marketing and advertising proposals for the Sportscaster, most of which were not even acknowledged by XM. For instance, AGT proposed an advertising campaign using sportscasters of national baseball teams to promote the Sportscaster product. XM also failed to provide additional product opportunities to AGT. AGT attempted on numerous occasions to schedule meetings with XM to work on new products for 2007 and made proposals to XM on new products. XM ignored all these efforts. XM even ignored AGT's proposal to create a Sportscaster with a portable kit as a single product offering – a simple process that would have added enhanced flexibility to the product and would have helped move existing inventory.

49.     Blair Kutrow assured AGT at the 2007 CES that XM would provide the company an opportunity to propose new concepts. However, to date, XM has failed to do so.

50.     XM has failed to provide AGT with the same access to XM technology and chipset pricing and availability as provided to other third-party manufacturers or distributors. On

information and belief, XM has provided Audiovox with far greater access to such information and components, which Audiovox would need to develop and manufacture new products, than it has AGT.

51. In fact, on information and belief, XM provided Audiovox with the concept for a handheld radio satellite receiver/navigation device that closely resembles a concept that AGT had proposed to XM months earlier.

52. Dan Murphy of XM informed AGT that XM has failed to continue its contractual relationship with AGT because the profit margin due AGT under the Agreement is higher than that of AGT's competitors. AGT is guaranteed 29 percent under the Agreement, while, on information and belief, Audiovox is guaranteed only a 20 percent profit margin. On information and belief, Mr. Murphy's explanation was pretextual because Audiovox performs lesser services than AGT. AGT's actual profit margin has been far lower than 29 percent, however, because AGT has contributed significant monies to unplanned and uncontracted-for advertising and promotional costs, among other things.

53. Even more troubling, Blair Kutrow told AGT representatives on October 31, 2006 that she had received a clear directive that XM was moving to a single distributorship model with Audiovox.

54. On information and belief, at the same time that XM was backing away from its contractual commitments to AGT and moving toward a single distributorship model, XM was, and continues to be, engaged in discussions with, and actively pursing, a potential merger with Sirius, its only competitor in the satellite radio market.

55. On information and belief, Sirius recently has taken similar actions against some of its existing manufacturers and distributors in an effort to back out of agreements for long-term manufacturing and distributing relationships in favor of working with an exclusive in-house distributor.

## Count One
### (Breach Of Contract Against XM)

56. Plaintiff repeats and realleges each and every allegation of Paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57. The Master License Agreement is a valid and enforceable agreement between AGT and XM.

58. AGT has in good faith performed its obligations under the Master License Agreement.

59. XM has engaged in bad faith dealing with AGT from the earliest days of the parties' contractual relationship.

60. XM's failure to cooperate with AGT in planning to meet customer demands and meeting projected production quantities constitutes a breach of contract.

61. XM's failure to provide competitive pricing for AGT products constitutes a breach of contract.

62. XM's failure to ensure AGT's guaranteed profit margin constitutes a breach of contract.

63. XM's failure to meet with AGT and to discuss AGT's new product concepts and marketing plans constitutes a breach of contract.

64. XM's failure to support AGT's products or to assist in marketing AGT products constitutes a breach of contract.

22441280

65. XM's failure to provide AGT with access to information and technology and chipset pricing and availability as provided to other third parties constitutes a breach of contract.

66. XM's exclusive distributorship arrangement with Audiovox constitutes a breach of contract.

67. XM's unreasonable withholding of approval of AGT's new products while approving similar products of other third parties constitutes a breach of contract.

68. Absent an award of specific performance, XM will fail, and continue to fail, its contractual duties.

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendant, as follows:

A. Ordering XM to specifically perform its obligations under the Master License Agreement including, but not limited, by:

    1. Ordering XM to provide competitive pricing for AGT products;

    2. Ordering XM to ensure AGT's guaranteed profit margin;

    3. Ordering XM to use commercially reasonable efforts to market AGT's products and to coordinate such efforts with AGT;

    4. Ordering XM to provide AGT no less favorable access to information and technology and chipset pricing and availability than it provides to other third-party manufacturers or distributors;

    5. Ordering XM not to withhold approval unreasonably of AGT's new products; and

22441280

  B. Declaring that any exclusive agreement between XM and Audiovox or any other third-party distributors or manufacturers would constitute a breach of the Master License Agreement; and

  C. Enjoining XM, in the event of a merger with Sirius, from taking any actions that would defeat AGT's rights under the Master License Agreement; and

  D. Awarding plaintiffs such other and further relief as to this Court shall appear just and proper.

New York, NY
May 8, 2007

           DEBEVOISE & PLIMPTON LLP

           /s/
           Molly S. Boast (MB-2350)
           Ann H. Mathews (AM-8653)
           919 Third Avenue
           New York, NY 10022
           (212) 909-6000
           *Attorneys for Plaintiff*