Jeffrey A. Mishkin (JM-8380)
Anthony J. Dreyer (AD-3571)
Peter S. Julian (PJ-3443)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
*Attorneys for Defendant XM Satellite Radio Inc.*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| ADVANCED GLOBAL TECHNOLOGY, LLC, | : | |
| Plaintiff, | : | No. 07 cv 3654 (JSR) (DCF) ECF CASE |
| - against - | : | |
| XM SATELLITE RADIO INC., | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

## Table of Contents

*Page*

Table of Authorities ........................................................................................................... ii

Preliminary Statement .......................................................................................................1

Background ........................................................................................................................2

    A.    The Parties ......................................................................................................2

    B.    The Agreement ...............................................................................................3

    C.    The Complaint ................................................................................................5

Argument ...........................................................................................................................8

I.    AGT'S CLAIM FOR EQUITABLE RELIEF IS NOT RIPE, AND MUST BE DISMISSED UNDER RULE 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION ....................................................................................................................8

II.    AGT HAS FAILED TO ALLEGE FACTS TO SUGGEST THAT ITS REMEDY AT LAW WOULD BE INADEQUATE, AND ITS COMPLAINT MUST BE DISMISSED UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM FOR WHICH EQUITABLE RELIEF MAY BE GRANTED ............................................11

III.    COURTS ARE ESPECIALLY RELUCTANT TO AWARD EQUITABLE RELIEF WHERE, AS HERE, THE UNDERLYING AGREEMENT EMBODIES AN ONGOING RELATIONSHIP BETWEEN THE PARTIES THAT CANNOT BE ENFORCED WITHOUT RECURRENT RECOURSE TO THE COURT ................14

Conclusion .......................................................................................................................16

## Table of Authorities

*Cases*                                                                                                                          *Page*

*AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d 867, 872 (2d Cir. 1993) ......................................................................................................................... 8, 9

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.*, No. 04 Civ. 10014 (PLK), 2006 U.S. Dist. LEXIS 34709, at *28-*29 (S.D.N.Y. May 30, 2006) ........................... 14

*Auerbach v. Board of Educ.*, 136 F.3d 104, 108-09 (2d Cir. 1998) ..................................... 9

*Bethlehem Engineering Export Co. v. Christie*, 105 F.2d 933, 934-35 (2d Cir. 1939) ........................................................................................................................ 14, 15, 16

*Brooklyn Hosp. Ctr. v. Westport Ins. Corp.*, No. 03 Civ. 5190 (BSJ), 2004 U.S. Dist. LEXIS 6931, at *7-*8 & n.3 (S.D.N.Y. Apr. 20, 2004) ........................................ 9

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294-95 (S.D.N.Y. 2003) ............................................................................................................ 9

*Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assoc.*, No. 90 Civ. 5785 (SWK), 1990 U.S. Dist. LEXIS 12299, at *9 (S.D.N.Y. Sept. 14, 1990) ..................... 12

*Dweck v. Oppenheimer & Co.*, 30 A.D.3d 163, 163, 816 N.Y.S.2d 440, 440 (1st Dep't 2006) ................................................................................................................... 12

*General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994) ........................................................................... 11

*Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) .................................... 13

*Hutton v. Klabal*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) ..................................................... 13

*In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993) ............... 9

*Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809-12 (S.D.N.Y. 1986) ................................................................................................................................ 13, 14

*Lucente v. International Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) ....... 11, 12, 13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) .............................................................................................................................. 13

*Peck v. Aponte*, 880 F. Supp. 184, 185-86 (S.D.N.Y. 1995) ............................................... 9

*Rosenfeld v. W.B. Saunders*, 728 F. Supp. 236, 244 (S.D.N.Y.), *aff'd mem.*, 923 F.2d 845 (2d Cir. 1990) ..................................................................................................11

*Sing-Sing Prods., Ltd. v. Farrell*, No. 90 Civ. 0867 (JFK), 1990 U.S. Dist. LEXIS 2248, at *10 (S.D.N.Y. Mar. 2, 1990) .....................................................................14

*T.F. Demilo Corp. v. E.K. Constr. Co.*, 207 A.D.2d 480, 481, 616 N.Y.S.2d 240, 240 (2d Dep't 1994) .....................................................................................................12

*Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) .............................................8

### *Statutes*

9 U.S.C. § 1, *et seq.* ...............................................................................................................5

Fed. R. Civ. P. 12(b)(1) ........................................................................................1, 2, 8, 9, 11

Fed. R. Civ. P. 12(b)(6) ..........................................................................................1, 2, 8, 11, 13

### *Other Authorities*

Oliver Wendell Holmes, Jr., The Common Law 301 (1881) ...........................................12

***Preliminary Statement***

Defendant XM Satellite Radio Inc. ("XM") submits this memorandum of law in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the complaint of plaintiff Advanced Global Technology, LLC ("AGT") in its entirety. The relationship between XM and AGT is governed exclusively by the Master License Agreement between them (the "Agreement"), a copy of which is attached as Exhibit A to the complaint, and AGT's complaint consists of a single claim for breach of that Agreement. The Agreement contemplates the amicable resolution of any dispute between the parties (Compl. Ex. A § 12.1), and requires the parties to submit all disputes arising in connection with the Agreement that are not amicably resolved pursuant to Section 12.1 to binding arbitration. (Compl. Ex. A § 12.2) The Agreement further provides, however, that nothing in Section 12 "will preclude either Party from seeking equitable relief from a court for the other Party's breach of its obligations specified in this Master Agreement." (Compl. Ex. A § 2.2.4)

Because the Agreement requires claims for damages to be submitted to binding arbitration, AGT does not (and could not in this forum) seek damages for XM's alleged breach of the Agreement. Instead, it requests the extraordinary equitable remedy of prospective specific performance, together with declaratory and injunctive relief relating to alleged behavior in which AGT speculates XM might engage in the future.

As demonstrated below, AGT is not entitled to the equitable relief it seeks for at least three discrete reasons. First, to the extent AGT's claim is based on speculation about possible conduct in which XM might engage in the future, the claim is not yet ripe. A claim predicated on uncertain and contingent events that may not occur as antici-

pated, or indeed may not occur at all, is simply not justiciable. For this reason, there presently exists no case or controversy, and the complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Second, even if AGT's claim were not entirely speculative, AGT has not alleged any facts to suggest that money damages – which, under the Agreement, may only be awarded by an arbitrator – would not adequately compensate AGT for the consequences of XM's alleged behavior. Where money damages would suffice to make AGT whole in the event of a future breach of contract, equitable relief – the only relief AGT seeks – is unavailable, and AGT's complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6). Third, courts are especially reluctant to grant equitable relief where, as here, the underlying agreement embodies an ongoing relationship between the parties that cannot be enforced without recurrent recourse to the court to construe the agreement and to determine whether the parties have in fact satisfied their obligations under it. For this independent reason, specific performance is not feasible in this case, providing yet another ground for dismissal pursuant to Rule 12(b)(6).

### *Background*

**A.    The Parties**

According to the complaint, plaintiff AGT designs, develops and distributes a range of innovative consumer electronics. (Compl. ¶ 3)[1] The Agreement describes AGT as a manufacturer and distributor of audio and data systems and components for use

---

[1] Although XM disputes many of the factual allegations contained in the complaint, XM assumes their truth for purposes of this motion to dismiss only.

2

in various markets. (Compl. Ex. A at 1) Defendant XM is in the business of providing a digital audio radio service of more than 150 channels of digital radio content delivered via satellite. (Compl. ¶ 4; Compl. Ex. A at 1) Specially designed satellite and terrestrial receivers incorporating proprietary XM chipsets are required to receive and decode XM's digital satellite signals. (Compl. Ex. A at 1; Compl. Ex. A § 1.33) XM does not manufacture the chipsets itself, but contracts with others, including a company called Flextronics, which AGT alleges is XM's primary receiver manufacturer. (Compl. ¶ 25) The Agreement licenses AGT to design, develop, produce and market products capable of receiving XM's digital audio radio service. (Compl. Ex. A at 1)

**B.   The Agreement**

Although the complaint repeatedly refers to the Agreement as a "long-term" contract (Compl. ¶¶ 9, 18, 39, 55), AGT acknowledges as it must that the Agreement grants AGT a non-exclusive license to design, develop, manufacture, market, distribute and sell products incorporating an XM chipset and capable of receiving XM's digital audio radio service signals for a period of three years, with a one-year renewal. (Compl. ¶ 10; Compl. Ex. A §§ 3.1.1, 10.1) Thus, the parties' obligations to one another under the Agreement run from the Agreement's effective date of October 17, 2005, until October 16, 2008, with a renewal until October 16, 2009.

The purpose of the Agreement is to permit AGT to participate, on a non-exclusive basis, as one of a number of distributors of receivers capable of receiving XM's digital audio radio content. To accomplish this purpose, XM has agreed to provide AGT with access to its technology so that AGT may design products using that technology (Compl. Ex. A § 2.2.1), and AGT has agreed to provide XM with copies of designs and

3

data generated in the course of developing and designing products using the XM chipset so that XM may assess whether there is a business need and/or consumer demand for the proposed product. (Compl. Ex. A §§ 2.1.3, 2.3) In addition, AGT has agreed to submit prototypes and production samples of any product it designs or develops using the XM chipset to XM for testing and approval before beginning mass production of the product. (Compl. Ex. A §§ 2.5.2, 3.2.7)

The Agreement provides that AGT will earn at least a 29% profit margin on all licensed products pursuant to a formula set forth in the Agreement (Compl. Ex. A § 4.8), and that XM will subsidize the manufacture of such products to the extent necessary to ensure that profit margin. (Compl. Ex. A § 4.10) Nonetheless, the parties agreed that if AGT proposes a product to XM for which XM does not believe there is a business need, XM will not be required to subsidize the product in the event AGT elects to proceed with its design, development, manufacture and sale. (Compl. Ex. A § 2.3) The Agreement contemplates that XM and AGT will use commercially reasonable efforts to market the licensed products (Compl. Ex. A § 4.1), and that XM will provide AGT with subsidy payments, as well as access to information about XM's technology, chipset pricing and chipset availability, on terms that are at least as favorable as the terms XM provides to AGT's competitors for products in the same product category and similar price points. (Compl. Ex. A §§ 6.9.2, 6.9.3) Moreover, the Agreement states that XM will provide AGT with promotional support on terms that are at least as favorable as the terms XM provides to AGT's competitors for products in the same product category with the same price points (i.e., the same initial manufacturer's suggested retail price, excluding certain rebates). (Compl. Ex. A § 6.9.6)

4

Finally, as noted above, the Agreement contemplates that the parties will endeavor to resolve amicably any disputes that arise out of the Agreement (Compl. Ex. A § 12.1), and that any dispute that cannot be resolved amicably will be submitted to binding arbitration subject to the Federal Arbitration Act, 9 U.S.C. §1, *et. seq.* (Compl. Ex. A § 12.2) The Agreement provides an exception to the requirement of binding arbitration for equitable relief, providing that nothing in Section 12 of the Agreement "will preclude either Party from seeking equitable relief from a court for the other Party's breach of its obligations specified in this Master Agreement." (Compl. Ex. A § 12.2.4)

C.    **The Complaint**

AGT complains that, despite the parties' initial enthusiasm in early 2006 about the Agreement and a receiver product called the "Sportscaster" that AGT allegedly developed pursuant to the Agreement (Compl. ¶¶ 18-24), production problems and delays caused that enthusiasm to wane during the course of the year. Specifically, AGT alleges that XM and Flextronics, XM's primary receiver manufacturer, experienced difficulties in producing receivers that complied with Federal Communications Commission ("FCC") emissions regulations, and these problems resulted in production delays and recalled product shipments throughout much of 2006. (Compl. ¶¶ 25-32) When, by October 2006, the FCC emissions issue was resolved, XM allegedly advised AGT that it would provide chipsets for only 150,000 units of the Sportscaster for the fourth quarter of 2006, rather than the approximately 750,000 units the parties had contemplated in February 2006 for the entire year. (Compl. ¶¶ 32-33)

AGT also complains that XM has allegedly undercut AGT's ability to sell and market the Sportscaster. (Compl. ¶ 34) For example, AGT alleges that XM's manu-

5

facturer's suggested retail price for the Sportscaster is higher than the retail price of a similar product sold by a competitive satellite radio service provider, Sirius Satellite Radio, Inc. (Compl. ¶ 35) AGT further complains that XM allegedly provided a $20 mail-in rebate promotional program for two competing products in April, May and June 2006, although AGT concedes that XM provided the same $20 mail-in rebate program for the Sportscaster in July, August and September 2006. (Compl. ¶¶ 37-39) AGT also asserts that, in January 2007, XM provided promotional support for an allegedly competing product – the Audiovox Xpress receiver – to Best Buy and Wal-Mart, causing at least Wal-Mart to discontinue sales of the Sportscaster. (Compl. ¶¶ 40-41)

AGT contends that XM intends to discontinue the Sportscaster and replace it with a competing receiver distributed by Audiovox. (Compl. ¶¶ 45-47) Indeed, AGT asserts that XM is moving toward a single distributorship relationship with Audiovox, although AGT makes no allegations as to a possible timetable for the commencement of such an alleged relationship. (Compl. ¶ 53) AGT alleges that it has provided XM with a number of marketing and advertising ideas for the Sportscaster, and has offered to meet with XM to discuss new product ideas, but no meeting has yet been scheduled. (Compl. ¶¶ 48-49) AGT asserts, on information and belief, that XM has not provided AGT with the same access to information about XM technology and chipset pricing and availability as provided to other third-party manufacturers or distributors. (Compl. ¶ 50) Finally, AGT alleges that XM is engaged in discussions concerning a potential merger with Sirius and that, if such a merger were to occur, XM may in the future breach its obligations to AGT under the Agreement. (Compl. ¶ 54)

6

The complaint contains a single claim for relief, alleging that XM has breached the Agreement by: (i) failing to cooperate with AGT in planning to meet customer demands and in meeting production quantities; (ii) failing to provide competitive pricing for AGT products; (iii) failing to ensure AGT's guaranteed profit margin; (iv) failing to meet with AGT to discuss new product concepts and marketing plans; (v) failing to support AGT's products or to assist in marketing AGT's products; (vi) failing to provide AGT with access to information about technology and chipset pricing and availability as provided to other third parties; (vii) considering an exclusive distributorship arrangement with Audiovox; and (viii) failing to approve AGT's new products while approving similar products of other third parties. (Compl. ¶¶ 60-67)

Significantly, because the Agreement requires the parties to submit all claims for damages to binding arbitration, AGT does not seek damages for XM's alleged breach of the Agreement. Rather, it seeks an order requiring specific performance under the Agreement, including a decree directing XM: (i) to provide competitive pricing for AGT products; (ii) to ensure AGT's guaranteed profit margin; (iii) to use commercially reasonable efforts to market AGT's products and to coordinate such efforts with AGT; (iv) to provide AGT no less favorable access to information and technology and chipset pricing and availability than it provides to other third-party manufacturers and distributors; and (v) not to withhold approval unreasonably of AGT's new products. (Compl. at 16) In addition, AGT seeks an order declaring that any exclusive agreement between XM and Audiovox or any other third-party distributors or manufacturers would constitute a breach of the Agreement, and enjoining XM from breaching AGT's rights under the Agreement in the event of a merger between XM and Sirius. (Compl. at 17)

7

*Argument*

As demonstrated below, AGT is not entitled to the equitable relief it seeks for at least three independent reasons. First, because AGT's claims are predicated on uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all, AGT's claim for equitable relief is not ripe, and must be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction. Second, even if the case were ripe for adjudication, AGT has failed to allege any facts to suggest that money damages would be inadequate to compensate AGT for any consequences of XM's alleged breach of contract. Third, because the Agreement embodies an ongoing relationship between the parties that cannot be enforced without recurrent recourse to the court to construe the agreement and to determine whether the parties have in fact satisfied their obligations under it, specific performance to enforce the Agreement is not feasible. For these latter two reasons, the complaint must also be dismissed under Rule 12(b)(6) for failure to state a claim for which equitable relief may be granted.

I.  **AGT'S CLAIM FOR EQUITABLE RELIEF IS NOT RIPE, AND MUST BE DISMISSED UNDER RULE 12(b)(1) FOR LACK OF SUBJECT MATTER JURISDICTION**

It is axiomatic that a federal court "cannot entertain a claim which is based upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) (citations omitted). Federal subject matter jurisdiction requires that a case be ripe for adjudication, reflecting the principle that "courts should decide only 'a real, substantial controversy,' not a mere hypothetical question." *AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d 867, 872 (2d Cir. 1993) (citation omitted). The basic rationale underlying the doctrine of

8

ripeness "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993) (citation omitted). "When the events alleged in a plaintiff's cause of action have not yet occurred, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist for purposes of Article III" of the United States Constitution. *Auerbach v. Board of Educ.*, 136 F.3d 104, 108-09 (2d Cir. 1998); *accord In re Drexel Burnham Lambert Group Inc.*, 995 F.2d at 1146 (subject matter jurisdiction lacking where claim is predicated on "nebulous future events so contingent in nature that there is no certainty they will ever occur").

Ripeness is a jurisdictional prerequisite, and a district court must dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction where the claim is not ripe. *Brooklyn Hosp. Ctr. v. Westport Ins. Corp.*, No. 03 Civ. 5190 (BSJ), 2004 U.S. Dist. LEXIS 6931, at *7-*8 & n.3 (S.D.N.Y. Apr. 20, 2004); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 294-95 (S.D.N.Y. 2003). In determining whether a matter is ripe for decision, courts consider (i) whether the issue is fit for review and (ii) whether the parties would suffer any hardship by withholding review. *See, e.g., AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d at 872; *In re Drexel Burnham Lambert Group Inc.*, 995 F.2d at 1146; *Peck v. Aponte*, 880 F. Supp. 184, 185-86 (S.D.N.Y. 1995). Alternatively, this Court has articulated the standard for ripeness in a declaratory judgment action as whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d at 295 (citations omitted).

AGT predicates its claim against XM on contingent and uncertain future events that may not occur as AGT anticipates, and may not occur at all. For instance, AGT alleges that XM is considering both an exclusive distributorship arrangement with AGT's competitor, Audiovox, and a merger with Sirius Satellite Radio. AGT speculates that, in the event either of these future transactions are consummated, they may – though not necessarily will – result in a breach of XM's obligations to AGT under the Agreement. But regardless of whether XM consummates either transaction during the term of the Agreement, the impact of either transaction on AGT's rights is pure conjecture. AGT has alleged no facts to suggest that either potential transaction has yet ripened into anything other than an abstract possibility, and judicial adjudication as to these possibilities would be entirely premature.

Moreover, although AGT alleges facts regarding its historic experience with the Sportscaster, its request for prospective specific performance assumes that XM will fail to honor its obligations with respect to future products. Yet AGT has not alleged that it has provided XM with design or development plans, technical data, or product prototypes with respect to any prospective products. The complaint asserts no factual basis to suggest that, if AGT were to propose a marketable product idea that serves a perceived consumer demand and to provide XM with the requisite information and prototypes, XM would fail to honor its obligations to test those prototypes efficiently and to approve the manufacture and sale of such products if the prototypes were to satisfy XM's testing. Nor does the complaint allege any basis to suggest that XM would withhold a subsidy payment on any product for which it believes there is a business need. AGT is simply speculating about the future before it occurs, and its claim about possible future breaches

of the Agreement is premature. Until AGT makes a concrete product proposal and supplies XM with the requisite information and materials concerning that proposal, the suggestion that XM may breach the Agreement in the future is nothing but conjecture.

In short, therefore, AGT's request for prospective specific performance, a declaratory judgment, and an injunction against hypothetical future breaches of the Agreement is simply not fit for judicial adjudication. The contingent events on which AGT has based its claim may not occur as AGT thinks they might, if they ever occur at all. And because, as further demonstrated below, AGT has failed to allege any facts to suggest that its remedies at law would be inadequate in the event its speculation becomes reality, there is no hardship from withholding adjudication until future events transpire and the parties and this Court can assess the actual facts. For this reason, AGT's claim is not ripe, and this Court should dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction.

II. **AGT HAS FAILED TO ALLEGE FACTS TO SUGGEST THAT ITS REMEDY AT LAW WOULD BE INADEQUATE, AND ITS COMPLAINT MUST BE DISMISSED UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM FOR WHICH EQUITABLE RELIEF MAY BE GRANTED**

The classic remedy for breach of contract is an action at law for damages. *General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994) (quoting *Rosenfeld v. W.B. Saunders*, 728 F. Supp. 236, 244 (S.D.N.Y.), *aff'd mem.*, 923 F.2d 845 (2d Cir. 1990)). Fundamentally, damages for breach of contract "put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract." *Lucente v. International Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002). Justice Oliver Wendell Holmes observed that contracting

parties always assume the risk of a breach by the other party, and the non-breaching party is generally entitled to damages to compensate him for the breach. As Justice Holmes wrote:

> The only universal consequence of a legally binding promise is that the law makes the promisor pay damages if the promised event does not come to pass. In every case it leaves him free from interference until the time for fulfillment has gone by, and therefore free to break his contract if he chooses.

Oliver Wendell Holmes, Jr., The Common Law 301 (1881) (quoted in *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assoc.*, No. 90 Civ. 5785 (SWK), 1990 U.S. Dist. LEXIS 12299, at *9 (S.D.N.Y. Sept. 14, 1990)).

Because damages constitute the usual remedy for a breach of contract, equitable remedies like specific performance and injunctive relief are deemed extraordinary, and are rarely available. As the Second Circuit has recently observed, "before the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice." *Lucente v. International Bus. Mach. Corp.*, 310 F.3d at 262. If money damages would adequately compensate a plaintiff for the consequences of a defendant's alleged breach of contract, then the plaintiff cannot state a claim for specific performance, *id.*, and a motion to dismiss the complaint should be granted. *See, e.g.*, *Dweck v. Oppenheimer & Co.*, 30 A.D.3d 163, 163, 816 N.Y.S.2d 440, 440 (1st Dep't 2006) ("causes of action for specific performance were properly dismissed [where the plaintiff] would have an adequate remedy at law"); *T.F. Demilo Corp. v. E.K. Constr. Co.*, 207 A.D.2d 480, 481, 616 N.Y.S.2d 240, 240 (2d Dep't 1994) ("Specific performance is not available as a remedy for breach of contract where, as here, there is an adequate rem-

12

edy at law (i.e. money damages)").[2] Likewise, a plaintiff cannot state a claim for injunctive relief where money damages would provide an adequate remedy. *See, e.g., Hutton v. Klabal*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989); *Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 811-12 (S.D.N.Y. 1986).

In the instant matter, AGT has alleged nothing to suggest that its remedy at law would be inadequate or that, if XM were to breach the Agreement in the future, money damages would not put AGT in the same economic position as it would have been in had XM fulfilled its obligations under the Agreement. Nor could it make any such allegations. An arbitrator – to whom the Agreement requires any claim for money damages be made – has the same power to grant relief as a court would have. *See, e.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) ("by agreeing to arbitrate a . . . claim, a party does not forego [its] substantive rights . . .; it only submits to their resolution in an arbitral, rather than a judicial, forum.") (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). There is simply no reason why, if XM were to breach the Agreement, money damages would not adequately compensate AGT for the consequences of that breach. *See Lucente v. International Bus. Mach. Corp.*, 310 F.3d at 262. Because AGT is entitled to seek such money damages for any consequences of XM's alleged conduct (albeit in an arbitral forum and not in federal court), AGT's complaint seeking solely equitable relief should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim for which such equitable relief can be granted.

---

[2] Reliance on New York state cases is appropriate here because the Agreement is governed by New York law. (Compl. Ex. A § 13.10)

III. **COURTS ARE ESPECIALLY RELUCTANT TO AWARD EQUITABLE RELIEF WHERE, AS HERE, THE UNDERLYING AGREEMENT EMBODIES AN ONGOING RELATIONSHIP BETWEEN THE PARTIES THAT CANNOT BE ENFORCED WITHOUT RECURRENT RECOURSE TO THE COURT**

In addition to the adequacy of money damages, courts are loath to order specific performance in situations where the underlying contract embodies an ongoing relationship between the parties. The extraordinary circumstances in which specific performance might be appropriate invariably involve contracts for the one-time purchase of goods that "are unique in kind, quality or personal association where suitable substitutes are unobtainable or unreasonably difficult or inconvenient to procure." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.*, No. 04 Civ. 10014 (PLK), 2006 U.S. Dist. LEXIS 34709, at *28-*29 (S.D.N.Y. May 30, 2006). Where a contract governs the parties' ongoing relationship, however, a grant of specific performance would likely require the court to supervise the parties' relationship over the length of that relationship, a task courts generally (and quite properly) avoid. *See, e.g., Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. at 809-10; *see also Sing-Sing Prods., Ltd. v. Farrell*, No. 90 Civ. 0867 (JFK), 1990 U.S. Dist. LEXIS 2248, at *10 (S.D.N.Y. Mar. 2, 1990) ("Courts are chary of granting equitable relief where the result would be to compel two antagonistic parties to work together, particularly where the success of the relationship requires continuing cooperation and interwoven performance over a period of time.").

The reluctance of courts to grant equitable relief that would require their continued oversight of the business decisions of the parties to the ongoing relationship is compounded when the underlying agreement governing that relationship is itself fraught with ambiguities about the specific nature of the parties' respective obligations. In *Beth-*

*lehem Engineering Export Co. v. Christie*, 105 F.2d 933 (2d Cir. 1939), Judge Learned Hand, writing for a unanimous panel, affirmed the dismissal of a complaint seeking specific performance because the underlying master licensing agreement required the parties to cooperate in trying to sell licenses in countries where the parties thought it "practical" to do so and for prices the parties deemed "reasonable." Judge Hand explained that "it would be impossible to enforce the contract without deciding whenever any dispute arose" both "whether the defendants honestly thought a given country impractical" and "what was the reasonable price to which the defendants should agree." *Id.* at 934. The court held that equitable remedies are not available to contracting parties "if they involve[] repeated recourse to the court in order to do justice to both parties." *Id.* "It is therefore clear beyond question," the appellate court held, "that specific performance would not be feasible." *Id.* at 935.

    The Agreement in the instant case embodies a similar set of nebulous rights between parties to an ongoing business relationship. The Agreement requires, among other things: (i) the use of "commercially reasonable efforts" to produce products "that are of high quality, appropriately priced and fulfill Customers' needs" (Compl. Ex. A § 2.3); (ii) XM's payment of a subsidy only with respect to products for which XM believes "there is a business need" (Compl. Ex. A § 2.3); (iii) the requirement that the parties "work closely" to "expedite or escalate XM's Test as necessary" (Compl. Ex. A § 2.5.3); (iv) the use of "commercially reasonable efforts" to market licensed products to consumers and "to coordinate their marketing efforts" (Compl. Ex. A § 4.1); (v) the "mutual approval" of all promotional materials, which approval shall "not be unreasonably withheld or delayed" (Compl. Ex. A § 4.3); (vi) the provision by AGT of "commercially

reasonable support" for retailers, which support XM "may assist" AGT in providing (Compl. Ex. A § 4.4); (vii) the use of "commercially reasonable efforts" to maintain "competitive" pricing for AGT's products (Compl. Ex. A § 4.7); and (viii) the requirement that the parties "mutually agree upon [production] volumes" where XM "has a reasonable business concern that initial or ongoing quantities are excessive." (Compl. Ex. A § 4.9) Like the license agreement in *Bethlehem Engineering*, the Agreement in the instant action is not enforceable without repeated recourse to the court in order to do justice to both parties who, as the complaint surely suggests, have found it difficult to work together. And, like in *Bethlehem Engineering*, it is therefore clear beyond question that specific performance in this case would not be feasible.

## *Conclusion*

For each of the foregoing reasons, AGT's complaint in this action should be dismissed in its entirety.

Dated: June 29, 2007

Respectfully submitted,

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

Jeffrey A. Mishkin (JM-8380)
Anthony J. Dreyer (AD-3571)
Peter S. Julian (PJ-3443)
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
*Attorneys for Defendant*
  *XM Satellite Radio Inc.*