UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADVANCED GLOBAL TECHNOLOGY, LLC,

       Plaintiff,

    v.          No. 07 cv 3654 (JSR)(DCF)
               ECF CASE

XM SATELLITE RADIO INC.,

       Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## FIRST AMENDED COMPLAINT

  Advanced Global Technology, LLC, by its attorneys Debevoise & Plimpton LLP, for its

first amended complaint against Defendant XM Satellite Radio Inc., alleges as follows:

### Jurisdiction and Venue

1.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because the

action is between citizens of different states and the amount in controversy exceeds $75,000.

2.  Venue in this Court is proper under 28 U.S.C. § 1391(a) and (c) because XM Satellite

Radio Inc. is a corporation that is subject to personal jurisdiction in this District and a

substantial part of the events or omissions giving rise to the claims occurred in this District.

### The Parties

3.  Plaintiff Advanced Global Technology, LLC ("AGT"), is a limited liability corporation

organized under the laws of New York and doing business at 105 Madison Avenue, New York,

New York.  AGT designs, develops and distributes innovative consumer electronics.

4.     Defendant XM Satellite Radio Inc. ("XM"), on information and belief, is a corporation organized under the laws of Delaware with its principal place of business in Washington, DC. XM is in the business of providing a digital audio radio service of over 170 channels of digital radio content delivered via satellite.

## Introduction

5.     This claim arises out of XM's unlawful plan to eliminate AGT's contractual rights to develop and distribute receivers compatible with the XM Service over a four-year or longer term.  The agreement between AGT and XM assured AGT's equal access – on a basis equivalent to that afforded any third party – to XM's most current receiver technology.  The agreement also gave "most favored nation" rights to AGT and its products.

6.     In reliance upon this agreement, AGT invested millions of dollars to design, import, market, and distribute XM receivers.  But since executing the agreement with AGT, XM has continuously and steadfastly backed away from its contractual commitments and ultimately declined to continue the contractual relationship.  XM's actions have put AGT out of the satellite radio business.

7.     In violation of key terms of the agreement between the parties, XM has withdrawn support from, and completely undercut, AGT's ability to produce and market XM receivers and accessory products; has unreasonably withheld approval of new products proposed by AGT while engaging AGT's competitors to produce and distribute similar products; and has afforded AGT's competitors subsidies, promotional support and access to XM's technology

2

developments through the provision of fully manufactured XM receivers for distribution to retailers.

8.      XM has offered AGT no current business opportunities and has demonstrated that it has no intention to conduct business with AGT going forward.  At the same time, XM has entered into a de facto exclusive distribution relationship with the Audiovox Corporation ("Audiovox"), a competing distributor of XM receivers.  XM's key volume models for retail shelf space in 2008 are all Audiovox products.  The exclusive nature of Audiovox's relationship with XM was fully exposed by the comments of Audiovox's president and CEO during that company's October 11, 2007 earnings call.

**The Master License Agreement**

9.      AGT was formed for the sole purpose of doing business with XM.  XM and AGT's principals began discussing the possibility of a partnership as early as June 2003.  At that time, AGT's principals were employed by U.S. Electronics, Inc. ("U.S.E."), a manufacturer of satellite radio receivers for Sirius Satellite Radio Inc. ("Sirius"), XM's sole competitor in the satellite radio market.   Based on XM's assurances of an enduring and bright future for a new business partner, AGT was formed.  AGT soon provided XM with robust product plans that AGT was willing to support financially.

10.     AGT and XM executed a long-term Master License Agreement ("the Agreement"), dated October 17, 2005, a copy of which is attached as Exhibit A to the Complaint.

11.     The Agreement between AGT and XM spells out the relationship between AGT and XM.  The Agreement grants AGT a three-year license, with an automatic one-year renewal, "to

3

design, develop and manufacture Licensed Products worldwide" and "to market, distribute and sell Licensed Products in the Licensed Markets for use in the XM Service Area." Agreement, ¶¶ 3.1.1, 10.1. The Agreement provides for an additional one-year renewal term if AGT sells 750,000 receivers during the first four years the Agreement is in effect. Agreement, ¶ 10.1. The Agreement covers several types of products capable of receiving XM service, including portable ("plug and play") receivers and direct connect receivers for use in both homes and businesses. Agreement, ¶¶ 1.13, 1.16.

12.     The Agreement gives AGT the rights to all XM technology, data and content for the Licensed Products on a "most favored nations" basis. Specifically:

(a)     The Agreement provides that AGT "will have complete access to all present and future technology development by XM and its Affiliates (including XM chipsets)" and that AGT "will be advised by XM of any new development in technology in a reasonable time frame for [AGT] to prepare for integration and development." Agreement, ¶ 2.2.1.

(b)     The Agreement provides that AGT will receive all technical data that XM makes available to third parties, and that AGT "will also receive reasonable consulting services from XM at no cost pertaining to all technical documents and product integration." Agreement, ¶ 2.2.2.

(c)     The Agreement provides that "XM shall make available for all of [AGT's] products complete access to all content on the XM Services" and that AGT, in turn, "will use its commercially reasonable efforts to produce Licensed Products that are of high quality, appropriately priced, and fulfill Customers' needs." Agreement, ¶ 2.3.

4

(d)    The Agreement provides that "[t]he Parties will schedule regular meetings to review [AGT's] progress in designing, developing, manufacturing and distributing Licensed Products." Agreement, ¶ 2.1.3.

(e)    The Agreement provides that so long as AGT's product prototypes pass XM's product tests, with "approval not to be unreasonably withheld," the products will be certified as "Licensed Products" under the Agreement. Agreement, ¶ 2.5.2. Moreover, under the Agreement XM's product tests are "intended to be expeditious and efficient." Agreement, ¶ 1.42.

13.    The Agreement contemplates that AGT and XM will work collaboratively to market AGT's Licensed Products, but gives AGT the rights to market Licensed Products. Specifically:

(a)    The Agreement provides that AGT and XM "will each use commercially reasonable efforts to market" AGT's products and that the parties "will use commercially reasonable efforts to coordinate their marketing efforts." Agreement, ¶ 4.1.

(b)    XM agreed to "provide [AGT] with the results of any market research related to the Licensed Products conducted by XM at no cost to [AGT]" and to meet periodically to discuss AGT's sales and marketing plans. Agreement, ¶¶ 4.1.2, 4.6.

(c)    Under the Agreement, AGT determines product quantities and inventory levels, subject only to a requirement that AGT and XM meet and agree upon volume if XM has a "reasonable business concern" that quantities are excessive. Agreement, ¶ 4.9.

14.    The Agreement also specifically provides that XM will maintain competitive pricing for AGT's products and guarantee AGT a specified profit margin on all Licensed Products:

5

(a)    Although XM establishes the Manufacturer's Suggested Retail Price ("MSRP")

for each of AGT's Licensed Products, it also agreed to "use commercially reasonable

efforts to maintain competitive pricing for all [AGT] products that provide access to the

XM Service." Agreement, ¶ 4.7.

(b)    AGT is guaranteed a profit margin of at least 29 percent on all Licensed

Products, and XM is required to "take such action as is necessary for [AGT] to achieve

such margin, including the payment of increased subsidies." Agreement, ¶ 4.8.

15.    Most importantly, and consistent with AGT's "most favored nations" status, the

Agreement provides that XM cannot discriminate against AGT and its products in favor of those

from a competitive licensed supplier:

(a)    The Agreement requires XM to give AGT complete access to all technology

developed by XM that XM makes available to any third party commercial purchaser of

XM chipsets. Agreement, ¶ 2.2.1.

(b)    XM is required to provide AGT with all technical documentation and data sheets

for all integrated circuits that XM makes available to third parties "as soon as they

become available." Agreement, ¶ 2.2.2.

(c)    XM is prohibited from providing other third-party manufacturers or distributors

with subsidy payments (required to achieve AGT's guaranteed profit margin, among

other things) "that are more favorable than those provided to [AGT] on the same product

category with similar price points." Agreement, ¶ 6.9.2.

(d)    XM is prohibited from providing other third-party distributors or manufacturers

"more favorable treatment than it provides [AGT] with regards to access to technical

6

information about XM's technology 'roadmap' and chipset pricing and availability." Agreement, ¶ 6.9.3.

(e)    XM is required to "provide at least as much aggregate promotional support for [AGT]'s Licensed Products . . . as XM provides to any other third party with regard to the same distribution accounts for the same product category with same price points." Agreement, ¶ 6.9.6.

16.    XM is also prohibited from taking any action or publishing any materials "that have the effect of disparaging [AGT's] . . . products or technology," Agreement, ¶ 4.1.3, and from competing with AGT through an affiliated third-party distributor, Agreement, ¶ 4.12.

17.    The Agreement is governed by the substantive laws of New York.  Agreement, ¶ 13.10.

18.    The Agreement expressly permits AGT to seek equitable relief from a court for breach of XM's obligations.  Agreement, ¶ 12.2.4.

### Initial Relations Between the Parties

19.    In reliance upon the long-term relationship provided for in the Agreement, AGT hired a staff, incurring substantial salary and other obligations, to ensure that it was in a position to fulfill its commitments to XM. AGT also devoted significant time and capital to developing its initial XM receiver, then code named "Gypsy."

20.    At a suggested retail price of $59.99, the product was initially positioned as the lowest-priced receiver in the XM family of receivers for the 2006 product year.  In addition, XM and AGT agreed that the price of the "Gypsy" relative to other XM products would remain constant despite any promotions XM might undertake.

7

21.    AGT intended to market the product with the name Tempo. XM insisted on the name

Sportscaster. AGT objected to this choice because it believed the name could limit the

product's customer appeal, and countered with proposed product names such as Pitch and Score.

Ultimately, however, XM prevailed, and the product was named Sportscaster.

22.    AGT committed to a substantial presentation and presence at the 2006 Consumer

Electronics Show ("CES") in Las Vegas in the first week of January 2006, promoting XM and

the Sportscaster exclusively. AGT spent approximately $750,000 in that effort. XM principals,

including Chairman Gary Parsons, President and CEO Hugh Panero, and Executive Vice

President of Engineering and Technology Stelios Patsiokas, visited the AGT booth at the CES

and congratulated AGT on its display and a job well done.

23.    On or about January 26, 2006, shortly after the 2006 CES, Ed Valenzuela of XM

informed John Bohntinsky of AGT that, based on the enthusiasm expressed for the product at

the CES, "we are confident that our Preferred Distributor network will bring you a significant

amount of business."

24.    In response to this encouragement, and XM's earlier assurances, AGT engaged in

substantial promotional efforts with retailers and spent over $1 million developing the

Sportscaster.

25.    Shortly after the CES, XM asked AGT to provide a forecast of product needs, by

account and by month, for the Sportscaster receiver and its accessory kits. AGT and XM met on

February 16, 2006 in Washington, DC to discuss AGT's forecast and allocation of the product

to retailers. XM's Vice President, General Manger, and Directors of Marketing and

Distribution, who were responsible for maintaining relationships with various retailers, were

8

among those who attended.  At the meeting, AGT and XM agreed upon a sales projection for the year 2006 of 1.5 million receivers and kits based on XM's subscriber goal and a variety of other sales indicators, including historic balance-of-sale, input from XM's Account Managers, conversations with retail accounts and forecasts provided by some of the accounts themselves. This one-year projection substantially exceeded the 750,000 four-year unit sale threshold that would automatically extend the Agreement into a fifth year.

26.    In reliance upon the mutually-agreed-upon projections, AGT placed an initial order for 700,000 Sportscaster units from Flextronics, XM's primary receiver manufacturer, on or before March 3, 2006, in order to achieve an early Spring launch.  However, XM and Flextronics experienced production delays with the Sportscaster.  As a result, AGT was unable to ship the product volume it had planned to provide retailers in March and April of 2006 and, to preserve its relationships with its accounts, had to negotiate downward the number of receivers and kits retailers expected to receive in April 2006.

27.    At no time prior to June 30, 2006, did XM indicate to AGT that it did not continue to endorse and fully support the mutually-agreed-upon projection of 1.5 million Sportscaster units, which lead members of the XM Sales Team had reviewed on multiple occasions.

### XM's Recent Conduct

#### XM Orders Shipment Stoppages of the Sportscaster

28.    In May 2006, AGT learned that XM and Flextronics had failed to produce receivers that complied with Federal Communications Commission ("FCC") emissions regulations.

9

29.    On or about May 26, 2006, XM ordered AGT to stop shipments of the Sportscaster to customers until XM had resolved the emissions issue with the FCC. Because of this, AGT could not implement promotional and sales plans with its retail accounts.

30.    On or about June 30, 2006, XM informed AGT that it did not intend to make available more than 450,000 chipsets for use in Sportscaster receivers in 2006 – less than one-third of the originally anticipated 1.5 million, but still, a substantial volume measured against the 750,000 unit four-year target that triggers a fifth year under the Agreement.

31.    At XM's direction, AGT resumed shipments of the Sportscaster on or about June 21, 2006. On or about July 15, 2006, however, XM again ordered that shipments be halted due to its continued failure to meet FCC emissions requirements. All Sportscasters, as well as car kit and home kit accessories, in AGT's warehouse and in transit to the warehouse had to be returned to the Flextronics factory in Malaysia to be reworked to conform to FCC emissions standards.

32.    The indeterminate span of this second halt in shipments left AGT once again unable to inform retail accounts when Sportscasters would become available, and to plan promotional activities. As a result, Sportscaster sales suffered.

33.    Beginning at least as early as September 2006, XM entered into discussions with its sole competitor in satellite radio, Sirius, about a possible business combination. Around this time, XM executives Blair Kutrow and Dan Murphy informed AGT that XM had decided to adopt the "Sirius model" of exclusive distribution. According to supplemental disclosures contained in Sirius's November 5, 2007 Form 8-K, Sirius expects the merger with XM to result in

"significant cost synergies," including operating cost savings in almost every item on XM's and Sirius's income statements.

34.    Shipments of the Sportscaster did not resume until the second week of October 2006. This time XM advised AGT that it would provide chipsets for only 150,000 units of the Sportscaster for the fourth quarter of 2006 – less than one-fifth of the approximately 750,000 units the parties contemplated as of February 2006.

35.    AGT negotiated with XM to obtain additional chipsets, as promised pursuant to the parties' agreed-upon forecast, over the course of several weeks. AGT required product delivery to its warehouse by December 11, 2006 for sales prior to year-end. Although XM agreed to provide 185,000 chipsets, ultimately, only 178,400 units were delivered to AGT.

    XM Undercuts AGT's Ability to Sell and Market the Sportscaster

36.    Despite the parties' agreement that the Sportscaster would be a low-priced XM receiver with high volume sales, XM has taken a number of steps to undermine the Sportscaster price position.

37.    XM's sole competitor in the satellite radio market is Sirius. XM failed to price the Sportscaster in a manner that would ensure its ability to compete with Sirius's lowest-priced product. Over AGT's objections, XM chose a suggested retail price of $59.99, which exceeded the $49.99 retail price of Sirius's entry level product by approximately 20 percent. Sportscaster sales suffered as a result.

38.    XM also intended to sell the "Bullwinkle," a receiver distributed by Audiovox, at the entry price point at which AGT's Sportscaster would sell. While AGT's allocation of chipsets was declining, on information and belief, during the same period XM allocated chipsets for the

11

"Bullwinkle," thereby providing AGT less favorable access to chipset technology than Audiovox. AGT understood that, as a result of this allocation, it would be unable to obtain the number of chipsets required to meet the projections for the Sportscaster.

39.    XM's promotional activities for other competing products also had a deleterious effect on Sportscaster sales. In early April 2006, AGT learned that XM had implemented a $20 mail-in rebate on the Audiovox Xpress and Delphi Roady2 receivers, both initially priced at $79.99, for the April to June 2006 time frame – the exact time of the launch of AGT's Sportscaster product at a $59.99 retail price. The Sportscaster was not included in the April to June rebate.

40.    The Xpress and Roady2 rebate program adversely affected the launch of the Sportscaster in the second quarter of 2006. Staples, Inc., one of the world's largest office products companies, informed AGT that it would not bring in the product to sell at $59.99 because it already had that price-point covered with the rebated Xpress and Roady2 products.

41.    From July to September 2006, XM offered a $20 mail-in rebate on the Sportscaster for all accounts that use a rebate as part of their selling strategy. Some of the major retailers, such as Wal-Mart, Sam's Club and Target, do not use rebates. XM provided these retailers with a $10 promotional credit through the manufacturer but required AGT to cover half the cost of the credit. AGT spent approximately $345,366 covering unplanned promotional credits to these retailers, resulting in a decrease in AGT's guaranteed profit margin. AGT agreed to pay these costs in reliance upon the long-term nature of its contractual relationship with XM.

42.    Similarly, AGT learned in January 2007 that XM had implemented at Best Buy a $20 instant rebate on the Audiovox Xpress, which, taken with the $20 mail-in rebate already in place

12

on this product, lowered its point-of-sale price to $39.99. No instant rebate was provided for the Sportscaster.

43.     XM was also engaged in promotional activities to support the Audiovox Xpress at Wal-Mart in January 2007. With this support, Wal-Mart sold the Xpress for $58 without rebate. Because Wal-Mart's Sportscaster promotional credit was no longer in force in January 2007, Wal-Mart could no longer acquire new Sportscasters to sell at the reduced price. Wal-Mart advised AGT that it did not need two products at $59 and that Wal-Mart therefore was dropping the Sportscaster. Wal-Mart had been AGT's biggest customer for the Sportscaster. AGT has not shipped to Wal-Mart since the beginning of January 2007.

## XM Abandons the Sportscaster

44.     During the fourth quarter of 2006, AGT attempted on numerous occasions to obtain an understanding from XM of its plan for the Sportscaster in 2007. On December 13, 2006, AGT received an email from Lane Bruns at XM, in which Bruns indicated that the 2007 "rolling forecast" called for 32,000 Sportscaster units, all of which were to be manufactured in January, and that XM was "excited to move forward in 2007/2008" with AGT.

45.     While at the 2007 CES in early January 2007, John Bohntinsky, Mark Alford, Ben Lowinger and Philip Petracca visited the XM booth and again requested a meeting. Confronted in person, XM's Blair Kutrow and Lane Bruns agreed, and the group met that day.

46.     During that  meeting, AGT was told that the Sportscaster continued to figure in XM's plans in the year 2007. Kutrow informed AGT, however, that XM wanted only 35,000 Sportscaster units for the entire 2007 year and that XM needed all 35,000 units by the end of

13

January 2007. XM promised to schedule a follow-up meeting in February at AGT's offices in New York. That meeting never took place.

47.    John Bohntinsky of AGT spoke with Dan Turak of XM about Wal-Mart. Turak advised Bohntinsky that XM planned to replace the Sportscaster with a new Audiovox product that would be available in retail markets in May 2007. Turak expressed surprise that AGT had not been aware that XM planned to drop the Sportscaster.

48.    Shortly after the conversation between John Bohntinsky and Dan Turak, AGT representatives began hearing from retail accounts that XM had advised them that the new Audiovox model would replace the Sportscaster. An AGT sales representative was informed by a Wal-Mart sales representative that Wal-Mart had known of the Audiovox replacement of the Sportscaster as early as November 2006, not long after XM and Sirius began their merger discussions.

49.    On January 24, 2007, XM's Dan Murphy sent a note to the XM sales team advising them that the Sportscaster was being discontinued.

### XM Repudiates Its Relationship With AGT

50.    XM demonstrated its decision to replace AGT with other distributors through multiple tactics, all of which violate XM's duties under the Agreement to cooperate in promoting AGT's products, to respond reasonably to AGT's product proposals, and to confer equal treatment on AGT. AGT provided XM with a number of marketing and advertising proposals for the Sportscaster, most of which were not even acknowledged by XM. For instance, AGT proposed an advertising campaign using sportscasters of national baseball teams to promote the

Sportscaster product. XM also failed to provide additional product opportunities to AGT. AGT attempted on numerous occasions to schedule meetings with XM to work on new products for 2007 and made proposals to XM on new products. XM ignored all these efforts. XM even ignored AGT's proposal to create a Sportscaster with a portable battery kit as a single product offering – a simple process that would have added enhanced flexibility to the product and would have helped move existing inventory.

51.    Blair Kutrow assured AGT at the 2007 CES that XM would provide the company an opportunity to propose new concepts. However, to date, XM has failed to take reasonable steps to do so.

52.    XM has failed to provide AGT with the same access to XM technology and chipset pricing and availability as provided to other third-party manufacturers or distributors in violation of AGT's "most favored nations" rights under the Agreement. On information and belief, XM has provided Audiovox with far greater access to such information and components, which Audiovox would  necessarily require to develop and distribute new products, than it has AGT.

53.    In fact, on information and belief, XM provided Audiovox with the concept for a handheld radio satellite receiver/navigation device that closely resembles a concept that AGT had proposed to XM months earlier.

54.    Dan Murphy of XM informed AGT that XM has failed to continue its contractual relationship with AGT because the profit margin due AGT under the Agreement is higher than that of AGT's competitors, even though XM agreed to the subsidy it promised AGT as a means of inducing AGT to make substantial investments as a new distributor of XM receivers. AGT is

15

guaranteed 29 percent under the Agreement, while, on information and belief, Audiovox is guaranteed only a 20 percent profit margin. On information and belief, Mr. Murphy's explanation was pretextual because Audiovox performs lesser services than AGT. AGT's actual profit margin has been far lower than 29 percent, however, because AGT has contributed significant monies to unplanned and uncontracted-for advertising and promotional costs, among other things.

55.     Recent events have demonstrated unequivocally that XM has an exclusive distribution relationship with Audiovox for large volume products on the retail shelf – precisely the products AGT has and would have distributed for XM had XM fulfilled its contractual obligations.

56.     On September 17, 2007, AGT representatives attended a meeting at XM's headquarters in Washington, DC. During this meeting, Mark Roenigk, XM's Senior Vice President of Supply Chain Operations, and others made clear that XM anticipates no receiver business for AGT in the remainder of 2007 or in 2008 and 2009—thus exhausting the term of the Agreement.

57.     On information and belief, since mid-2007 XM's new product offerings at retail have been limited to Audiovox receivers. Moreover, XM's new retail product line for 2008 does not include any AGT products and, at the price points for which AGT's products are intended, is devoted exclusively to products distributed by Audiovox.

58.     Audiovox's president and CEO, Patrick Lavelle, boasted of his company's exclusive distribution relationship with XM during Audiovox's earnings call for the second quarter of its 2008 fiscal year, held on October 11, 2007. During this call, as reported in a transcript, Mr.

Lavelle declared, "We supply the direct connect products on an exclusive basis with XM, and we supply the Plug-n-Plays, you know, that are sold at retail."

59.    XM is dramatically reducing its retail product lines and favoring distributors with lower subsidy requirements just as its proposed merger with Sirius is imminent, an act wholly consistent with the operating cost synergies Sirius has touted as a benefit of the merger. XM and Sirius have stated that, pending regulatory approval, they expect the transaction to be completed by the end of 2007, and Sirius has scheduled its shareholder meeting to approve the merger for November 13, 2007.

60.    XM has phased out all AGT products from its retail product line up for the 2008 retail year, which has already begun. The new receivers now being sold in major retail stores at AGT's intended price points are distributed exclusively by Audiovox. On information and belief, XM subsidizes and promotes the new Audiovox receivers.

61.    AGT's product line was cancelled at major retailers, such as Wal-Mart and Target, and at consumer electronics specialists such as Best Buy and Circuit City. XM told AGT it would close out the Sportscaster through sales on the web, where the XM store offers obsolete products. XM does not engage in promotional activities for AGT's products comparable to those in which it engages for Audiovox products. Without the promotion XM provides for Audiovox receivers sold in retail stores, the AGT receivers XM offers in its online store are likely to elicit little interest from consumers, and sales of such products are almost certain to be de minimis.

62.     On information and belief, Sirius recently has taken similar actions against some of its existing manufacturers and distributors in an effort to back out of agreements for long-term manufacturing and distributing relationships in favor of working with an exclusive distributor.

63.     XM has no plans to incorporate any AGT products in its retail line up for the 2009 retail year, whether it merges with Sirius or remains an independent firm.

64.     AGT learned of XM's plans for fourth and fifth generation chipsets, which are to be incorporated into XM receivers, on September 17, 2007.  By the time AGT learned of the new technology, it was too late to incorporate the technology into the 2008 product cycle.  Technical documentation and data sheets for these chipsets still have not been provided to AGT.  On information and belief, other distributors were given access to this technology months before it was made available to AGT, by way of finished products provided by XM or otherwise.

65.     XM's continuing repudiation of its relationship with AGT has put AGT out of the satellite radio business and thwarts the purpose for which AGT was founded—to provide and distribute receivers solely for the XM brand.  Indeed, XM's failure to honor its contractual relationship with AGT denies AGT its core revenue stream.  AGT's business with XM accounted for approximately 100% of AGT's gross revenue for the fiscal years 2005 – 2006.  The loss of virtually all of this revenue, and the absence of any reasonable prospect that it will be replaced by sales of receivers for XM, creates a life-threatening financial outlook for AGT, as payroll and overhead costs associated with its XM receiver business continue to accrue unabated.

66.     As a result of XM's failure to support and promote AGT's XM receivers, AGT's relationships with consumers, retailers, and vendors have deteriorated.  AGT also now faces

lawsuits arising out of XM's failure to carry out its commitments to AGT. The harm to AGT's reputation and standing with retailers and vendors cannot be adequately redressed through monetary damages.

67.     XM has discriminated against AGT and in favor of other distributors by failing to provide AGT complete and timely access to XM's technology developments and no less favorable subsidy payments and promotional support. The harm flowing from XM's discriminatory conduct against AGT cannot readily be quantified or redressed through damages because it is not possible to try to reconstruct a retail environment in which AGT was distributing XM receivers on a level playing field.

68.     The financial harm caused by XM, combined with the broader and unquantifiable harm to AGT's business reputation and relationships, has placed AGT in jeopardy of going out of business entirely, absent intervention by this Court.

## Count One
### (Breach Of Contract Against XM)

69.     Plaintiff repeats and realleges each and every allegation of Paragraphs 1 through 68 of the Complaint as if fully set forth herein.

70.     The Master License Agreement is a valid and enforceable agreement between AGT and XM.

71.     AGT has in good faith performed its obligations under the Master License Agreement.

72.     XM has engaged in bad faith dealing with AGT from the earliest days of the parties' contractual relationship.

19

73.    XM's failure to cooperate with AGT in planning to meet customer demands and meeting projected production quantities constitutes a breach of contract.

74.    XM's failure to provide competitive pricing for AGT products constitutes a breach of contract.

75.    XM's failure to ensure AGT's guaranteed profit margin constitutes a breach of contract.

76.    XM's failure to meet with AGT and to discuss AGT's new product concepts and marketing plans constitutes a breach of contract.

77.    XM's failure to support AGT's products or to assist in marketing AGT products constitutes a breach of contract.

78.    XM's failure to provide AGT with access to information and technology and chipset pricing and availability as provided to other third parties constitutes a breach of contract.

79.    XM's exclusive distributorship arrangement with Audiovox constitutes a breach of contract.

80.    XM's unreasonable withholding of approval of AGT's new products while approving similar products of other third parties constitutes a breach of contract.

81.    AGT has no adequate remedy at law.  Absent an award of specific performance, XM will fail, and continue to fail, its contractual duties.

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendant, as follows:

A.     Ordering XM to specifically perform its obligations under the Master License Agreement including, but not limited, by:

1.     Ordering XM to provide competitive pricing for AGT products;

2.     Ordering XM to ensure AGT's guaranteed profit margin;

3.     Ordering XM to use commercially reasonable efforts to market AGT's products and to coordinate such efforts with AGT;

4.     Ordering XM to provide AGT no less favorable access to information and technology and chipset pricing and availability than it provides to other third-party manufacturers or distributors;

5.     Ordering XM to provide AGT no less favorable subsidy payments and promotional support than it provides to other third-party manufacturers or distributors;

6.     Ordering XM not to withhold approval unreasonably of AGT's new products; and

B.     Declaring that the exclusive agreement between XM and Audiovox or any other third-party distributors or manufacturers constitutes a breach of the Master License Agreement; and

C.     Enjoining XM, in the event of a merger with Sirius, from taking any actions that would defeat AGT's rights under the Master License Agreement; and

22602558

D.    Awarding plaintiffs such other and further relief as to this Court shall appear just and proper.

New York, NY
November 12, 2007

DEBEVOISE & PLIMPTON LLP

  /s/ Molly S. Boast
Molly S. Boast  (MB-2350)
Robert H. Chandler (RC-9666)
919 Third Avenue
New York, NY  10022
(212) 909-6000
*Attorneys for Plaintiff*

22

**EXHIBIT A**

*Execution Version*

# MASTER LICENSE AGREEMENT

This Master License Agreement (this "Master Agreement"), dated as of October 17, 2005, (the "Effective Date"), is between XM Satellite Radio Inc., a Delaware corporation, having its principal office at 1500 Eckington Place NE, Washington, DC 20002 ("XM"), and Advanced Global Technologies, LLC, a Florida limited liability company, having an office at 1111 Brickell Ave., Miami, FL 33131 ("Company"). Both XM and Company may be referred to in this Master Agreement individually as a "Party" and collectively as the "Parties."

Background

A.    XM is in the business of providing a DARS (as defined below) of over 150 channels of digital radio content delivered via satellite.

B.    Specially designed satellite and terrestrial receivers incorporating proprietary chipsets are required to decode XM's digital satellite signals.

C.    Company is a manufacturer and distributor of audio and data systems and components for use in various markets.

D.    XM desires that Company design, develop, produce and market products compatible with the XM Service and is willing to grant a license to Company to do so.

E.    Company seeks to design, develop, produce and market such products and desires a license to do so.

Agreement

In consideration of the mutual promises set forth below, and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties agree as follows:

1.    **Definitions.**

For the purposes of this Master Agreement, the following terms will have the following meanings:

1.1    **"Activation" or "To Activate"** (and all of its correlative forms) refers to the point in time at which XM activates any XM Receiver or Connect-and-Play Antenna to receive XM's SDARS for a new or existing XM subscriber. For purposes of any "Activation" calculation, each XM Receiver or Connect-and-Play Antenna shall only be counted as having been "Activated" one time (i.e., no deactivation / reactivation or transfer shall be counted as an "Activation").

1.2    **"Advanced Features"** means features other than Standard Features, such as storage with hierarchical format, file downloading, video compression / decompression, voice recognition / text-to-speech, or real-time traffic data.

1.3    **"Affiliate"** means any corporation or other business organization that, directly or indirectly, controls, is controlled by, or is under common ownership or control with a Party. "Control" means ownership of at least 50% of the voting shares or other equity interests of a business organization or the ability to direct the management policies of a business organization through equity ownership or contract.

1.4    **"Company"** is defined in the preamble.

1.5    **"Company Information"** means Company's Intellectual Property (excluding Development Information) that Company owns or will own, or is licensed or will be licensed to Company, during the Term.

1.6    **"Company Marks"** means the Marks owned by or licensed to Company listed in Appendix 7 as such Appendix may be amended by the Company, from time to time, to add other marks owned by or licensed to Company.

1.7    **"Company Patent Rights"** means the patents and patent applications anywhere in the world, and all continuations, continuations-in-part, divisions, reissues, reexaminations, substitutions, additions and extensions, and all supplementary protection certificates (excluding Development Patent Rights) that Company owns or will own, or is licensed or will be licensed to Company, during the Term.

1.8    **"Customers"** means Company's distributors, retailers and direct consumer or business customers.

1.9    **"DARS"** means a digital audio radio service delivered via satellite system, terrestrial system or a combination of satellite and terrestrial systems.

1.10    **"Development Information"** means Intellectual Property relating to the design and development by Company of XM Receivers, which relate solely to the digital audio visual imaging or digital broadcast system of XM or its Affiliates, excluding (i) the XM Information, (ii) the Company Information, and (iii) any Intellectual Property possessed or obtained by Company prior to the Effective Date.

1.11    **"Development Patent Rights"** means the patents and patent applications anywhere in the world, and all continuations, continuations-in-part, divisions, reissues, reexaminations, substitutions, additions and extensions thereof, and all supplementary protection certificates, relating to the design and development by Company of XM Receivers, which relate solely to the digital audio visual imaging or digital broadcast system of XM or its Affiliates and excluding (i) XM Patent Rights, (iii) the Company Patent Rights, and (iii) any patents, patent applications or rights possessed or obtained by Company prior to the Effective Date.

1.12    **"Dual Ensemble"** means an XM Receiver capable of receiving all of the XM audio and data channels at any one time (i.e., both ensembles of the XM audio and data channels), and which therefore may receive, display and output more than one of the XM audio and data channels simultaneously.

1.13    **"Home, Business and Portable Market"** means the market for products that are capable of receiving the XM Service in the XM Service Area.

1.14    **"Initial Term"** is defined in Section 10.1.

1.15    **"Intellectual Property"** means any patents and patent applications, copyrights, mask works, trademarks, service marks, trade dress, industrial designs (and any registrations or applications therefor), inventions (whether or not patentable), trade secrets, know how and any other information or knowledge that is confidential, proprietary or not generally known to the relevant public, including data, designs, specifications, material lists, drawings, algorithms, formulas, patterns, compilations, programs, samples, devices, protocols, methods, techniques, processes, procedures and results of experimentation and testing.

1.16    **"Licensed Markets"** means the Home, Business and Portable Market and any additional markets identified in the Schedules with respect to particular XM Receivers.

1.17    **"Licensed Product"** means any XM Receiver that receives type approval under Section 2.5.1.

1.18    **"Marks"** means any name, logo, trademark, service mark, trade dress or other identifying mark of either Party.

1.19    **"MDF"** means Marketing Development Funds.

1.20    **"MSRP"** means the Manufacturer's Suggested Retail Price.

1.21    **"NDA"** means the Mutual Non-Disclosure Agreement or other confidentiality agreement, however titled, between the Parties in effect as of the Effective Date.

1.22    **"Prototype Product"** means a prototype model XM Receiver that is used by a manufacturer of Licensed Products in its marketing and sales activities prior to commencement of mass production.

*Execution Version*

1.23    "**Renewal Term**" is defined in Section 10.1.

1.24    "**Schedule**" means any Licensed Product or Licensed Market Schedule executed by the Parties that incorporates this Master Agreement and adds one or more Licensed Products and/or Licensed Markets. The Schedules shall be designated in accordance with the outline set forth in Appendix 1.

1.25    "**Single Ensemble**" means an XM Receiver capable of receiving only one-half of the XM audio and data channels at any one time, and which must change between the two ensembles of XM audio and data channels as appropriate to receive, display and output the selected channel.

1.26    "**Standard Features**" means the following features, which are common to all XM Receivers and XM-Ready Receivers (when used in conjunction with a Connect-and-Play Antenna): reception, conversion, amplification, and output of XM's DARS signals and the selection and presentation of data about XM's DARS signals.

1.27    "**Subsidy Payments**" shall refer to the overall financial value of XM subsidy payments, taking into consideration the subsidy payment amount, payment terms, timing of payment, production quantities and product MSRP.

1.28    "**Technical Specifications**" means the technical specifications referenced in Appendix 3.

1.29    "**Term**" means the Initial Term and any Renewal Term.

1.30    "**Testing Fee**" means XM's testing fee in effect at the time a Prototype Product is submitted for testing. The Testing Fees as of the Effective Date are set forth in Appendix 4. XM may make reasonable changes to its Testing Fees upon notice to Company.

1.31    "**Total Loss**" with respect to any XM satellite, means that the XM satellite is lost or destroyed, the original signal strength has been reduced by over 50%, or that it is no longer possible to maintain the XM satellite in a controlled position in orbit.

1.32    "**XM**" is defined in the preamble.

1.33    "**XM Chipset**" means a set of integrated circuits or a single integrated circuit including an RF IC that performs the channel decoding, source decoding, and conditional access processing on XM's DARS signal, using chips, circuits, and operating systems designated by XM from time to time.

1.34    "**XM Format**" means the TDM and MCM bit stream structures used in the XM System, subject to refinements by XM or its Affiliates.

1.35    "**XM Information**" means XM's Intellectual Property relating to the XM Format, the XM System, the XM Chipset, the XM Receiver technology, the XM Patent Rights, and the XM functionality of any XM-Ready Receiver that XM owns or will own, or is licensed or will be licensed to XM, during the Term. "XM-Information" does not include any Intellectual Property that is developed independently by Company without reference to the XM Information or the XM Patent Rights.

1.36    "**XM Marks**" means the Marks owned by or licensed to XM and listed in Appendix 2.

1.37    "**XM Patent Rights**" means the patents and patent applications anywhere in the world, and all continuations, continuations-in-part, divisions, reissues, reexaminations, substitutions, additions and extensions, all supplementary protection certificates, relating to the XM Format, the XM System, the XM Chipset, the XM Receiver technology, the XM Patent Rights, and the XM functionality of any XM-Ready Receiver that XM owns or will own, or is licensed or will be licensed to XM, during the Term.

1.38    **"XM Receiver"** means a product incorporating an XM Chipset and capable of reception, conversion, amplification, and output of XM's DARS signals and, in certain products, that may also select and present data about XM's DARS signals, whether consisting of a single or multiple components.

1.39    **"XM Service"** means the DARS and any ancillary services provided by XM that operates in the S-band.

1.40    **"XM Service Area"** means the geographic area in which reception of the signal from the XM System may be achieved using a Licensed Product and XM has been authorized by applicable governmental authorities to provide the XM Service.

1.41    **"XM System"** means a digital audio, visual imaging and data broadcasting system using time division multiplex ("TDM") downlink and PSK (phase shift key) modulation from satellites and multicarrier modulation ("MCM") from terrestrial repeaters to provide the XM Service.

1.42    **"XM's Test"** means XM's standard type approval test of Prototype Products commonly applicable to all manufacturers that produce XM Receivers, which is intended to be expeditious and efficient.

2.    **Development and Production of Licensed Products.**

2.1    **Development of Licensed Products.**

2.1.1    *Chipsets and Test Equipment.* For any Licensed Product, Company will purchase XM Chipsets from any licensed XM Chipset manufacturer. Company will purchase radio test equipment from any test equipment manufacturer licensed by XM. XM will be responsible for negotiating global pricing for XM Chipsets and other unique XM Receiver parts. Company will be responsible for negotiating all terms of any XM Chipsets, other unique XM Receiver parts or radio test equipment. Company shall have access to parts with XM's worldwide pricing (where applicable). If and to the extent Company and its subcontractors use parts obtained at prices negotiated by XM for Licensed Products for use with the XM Service, then they will not use such parts for products compatible with the services of other DARS providers.

2.1.2    *Subcontracts.* Company may subcontract the performance of all or part of the design, development, manufacture or distribution of the Licensed Products, subject to any additional restrictions set forth in the Schedules. Company shall be fully responsible for any breach of this Master Agreement or any Schedule by a subcontractor.

2.1.3    *Designs and Data.* Company will, at XM's request, deliver to XM copies of designs and data generated in the course of developing and designing Licensed Products, including estimates of the Licensed Product prices, in accordance with the confidentiality provisions of Section 6 of this Master Agreement. The Parties will schedule regular meetings to review Company's progress in designing, developing, manufacturing and distributing Licensed Products. One of the subjects of such meetings may be, for example, the total quantity and description (including model names or other product identification) of all such Licensed Products.

2.1.4    *Cost Reduction.* XM and Company will use commercially reasonable efforts to reduce the costs incurred by or on behalf of Company in manufacturing the Licensed Products and to implement such cost reductions, including but not limited to migrating to newer generations of the XM Chipset within a reasonable time after they become available.

2.2    **Transfer of XM Information and Technical Assistance.**

2.2.1    *Access to Technology.* Company will have complete access to all present and future technology development by XM and its Affiliates (including XM Chipsets) that XM or its Affiliates makes

available to any third party commercial purchaser of XM Chipsets, and Company will be advised by XM of any new development of technology in a reasonable time frame for Company to prepare for integration and development.

    2.2.2   **Technical Assistance.**  Company will receive all technical documentation and data sheets for all integrated circuits and related technologies that XM makes available to third parties as soon as they become available.   Company will also receive reasonable consulting services from XM at no cost pertaining to all technical documents and product integration.  All technical assistance will be conducted at such times and places as XM may designate.  Notwithstanding the foregoing, XM reserves the right to charge Company for excess technical assistance or extra-ordinary engineering services performed directly for Company at XM's then-current rates or applicable NRE; provided however, that XM shall notify if a charge will apply and provide an estimate of such charge prior to commencing any excess technical assistance (it being agreed that reasonable ordinary course engineering consulting services shall be provided by XM without charge).  Current rates are outlined in Appendix 4.

**2.3     Production of Licensed Products.**  Company will have the right to design, develop, manufacture and sell Licensed Products for the Licensed Markets.  XM shall make available for all of Company's products complete access to all content on the XM Service. Company will use its commercially reasonable efforts to produce Licensed Products that are of high quality, appropriately priced, and fulfill Customers' needs.  Any manufacturing company introduced by Company may at Company's option be exclusive to Company.  XM will work closely with Company to insure that the manufacturing facilities meet XM's quality and cost requirements.  Company may subcontract with prior written approval of XM, such approval not to be unreasonably withheld or delayed.  This Master Agreement only grants Company the right to produce Licensed Products for the Licensed Markets and specifically does not grant Company the right to produce Licensed Products for any other market.  If Company proposes a product to XM and XM does not believe there is a business need for the product, nothing in this Agreement shall require XM to subsidize such product in the event that Company proceeds to design, develop, manufacture, market and sell such product.

**2.4     Consumer Demand; Sales Forecasts.**  Company will use commercially reasonable efforts to manufacture and distribute a sufficient quantity of each Licensed Product developed or manufactured by or for the Company to meet Customer Demand (as defined below).  Company shall use commercially reasonable efforts to ship products on a timely basis to meet Customer Demand.  In the event Customer Demand is greater than expected, the parties will mutually agree on a process to ensure that products are in the market timely, such agreement to encompass among other things the bearing of the additional costs such as air freight, if necessary.  No later than the first week of each calendar month during the Term, Company shall deliver to XM a non-binding, updated, rolling twelve (12) month forecast of consumer demand for each Licensed Product ("Company Forecast").  Company and XM shall promptly review and discuss the Company Forecast, make any necessary adjustments, and mutually agree on a final binding forecast of consumer demand for each Licensed Product ("Customer Demand").

**2.5     Approval of Licensed Products.**

    2.5.1   **Type Approval Requirement.**  Company may introduce, promote and demonstrate Prototype Products to potential customers in advance of completion of XM's Test; provided however, that Company must disclose that such Prototype Products have not been approved by XM, and XM shall not be required to support public relations efforts regarding such Prototype Products until they have passed XM's Test.  Company may not ship to any customer any XM product that has not passed XM's Test.

    2.5.2   **Type Approval Process.**  Prior to commencing mass production of any Licensed Products, Company will submit to XM for its inspection: (i) three Prototype Products of each basic model that Company proposes to manufacture, so that XM may confirm that such Prototype Product performs in accordance with the XM Format and the Technical Specifications; and (ii) the preliminary design specifications for such Prototype Products, including all circuit diagrams, blueprints (or equivalents), component specifications (if XM requests) and overall specifications of such Prototype Product as it relates to the XM System.  If such Prototype Product successfully passes XM's Test, such approval not to be

*Execution Version*

unreasonably withheld, it will be certified as a "Licensed Product" under this Master Agreement. After a Prototype Product has been certified as a Licensed Product, only those changes may be made to the Licensed Product that do not materially affect the look, appearance or placement of XM Marks on such Licensed Product or materially affect its function or quality, unless the Licensed Product is resubmitted to XM for testing and XM confirms that this modified Licensed Product continues to qualify as a Licensed Product.

   *2.5.3    Requests for Testing.*  All requests for testing will be accompanied by payment in full of, or a purchase order for XM's Testing Fee, three (3) Prototype Products (as described in Section 2.5.1) and all test data and schematics pertaining to the Prototype Products. XM will endeavor in good faith to test, or have its authorized agent test, all prototype receivers submitted for testing within thirty (30) days from the date XM or such authorized agent has received such prototype and all test data and schematics pertaining to such prototype.  XM shall not intentionally delay testing.  Delays in testing will not entitle Company to cancel a testing order or to claim damages.  XM will work closely with Company to expedite or escalate XM's Test as necessary.

**2.6    Shipping Reports.**  Not less than weekly, Company shall electronically report to XM the radio ID numbers, recipient name and recipient address for each Licensed Product shipped by Company to its Customers. XM shall provide to Company its standard reporting format for these shipping reports.  Company will use commercially reasonable efforts to implement the ability to report such information on a daily basis.

**2.7    Month-End Reports.**  Within ten (10) business days after the end of each month, Company shall electronically report to XM the radio ID numbers, recipient name and recipient address for each Licensed Product shipped by Company to its Customers during that month, using XM's standard reporting format.

**3.    Intellectual Property.**

   **3.1    Technology Licenses to Company.**

      *3.1.1    License to Manufacture, Market, Distribute and Sell.*  XM hereby grants to Company a non-exclusive, non-transferable, indivisible license during the Term (i) to design, develop and manufacture Licensed Products worldwide, and (ii) to market, distribute and sell Licensed Products in the Licensed Markets for use in the XM Service Area.  Company shall have no right to manufacture, market, distribute or sell Licensed Products for any other market unless and until the market is added by execution of an appropriate Schedule.

      *3.1.2    Intellectual Property License.*  XM hereby grants to Company a non-exclusive, non-transferable, indivisible license during the Term to use and practice the XM Information and the XM Patent Rights solely for the purpose of exercising the license granted to Company in Section 3.1.1.

   **3.2    License of the Marks.**

      *3.2.1    License to use the XM Marks.*  XM hereby grants to Company a non-exclusive, non-transferable, indivisible license during the Term to use the XM Marks on the Licensed Products and in connection with the manufacture, marketing, distribution, and sale of the Licensed Products in the Licensed Markets for use in the XM Service Area.  Company may not use the XM Marks for any products marketed, distributed or sold for initial consumer use outside the XM Service Area.  Company may use the XM Marks worldwide to exhibit, make presentations, introduce, demonstrate, and market Licensed Products manufactured by Company for the purpose of technical and commercial promotion.  Company may use the XM Marks in advertising, promotional materials, sell sheets, exhibits, give-away products and other similar activities whose purpose is to increase sales of Licensed Products.  All use by Company of the XM Marks shall comply with XM's written guidelines provided to Company.

*Execution Version*

**3.2.2   *License to use the Company Marks.*** Company hereby grants to XM a non-exclusive, non-transferable, indivisible license during the Term to use the Company Marks on the Licensed Products and in connection with the manufacture, marketing, distribution, and sale of the Licensed Products in the Licensed Markets for use in the XM Service Area. XM may not use the Company Marks on any products marketed, distributed or sold for initial consumer use outside the XM Service Area. XM may use the Company Marks worldwide to exhibit, make presentations, introduce, demonstrate, and market Licensed Products manufactured by XM (if applicable) for the purpose of technical and commercial promotion. All use by XM of the Company Marks shall comply with Company's written guidelines provided to XM.

**3.2.3   *Proper Use.*** Company will in a reasonably permanent manner affix the XM Marks to all Licensed Products. Each Party will use the other Party's Marks in all advertising and promotional materials concerning the Licensed Products (a) in such a manner as to allow a person with normal vision to recognize the Marks, (b) in accordance with such other Party's written guidelines provided by such other Party. Additionally, each Party will cause notice of the other Party's ownership of the other Party's Marks to be used in any advertising or promotional materials for Licensed Products in such a manner and at least as frequently as the Party uses any equivalent notice with respect to any other logo or mark of similarly licensed technology in similar products or similar advertising. The following notices (or such other notices as either Party may reasonably require) is an example of an appropriate notice:

*XM and the XM logos are trademarks of XM Satellite Radio Inc.*

**3.2.4   *Benefit of Use.*** Each Party's use of the other Party's Marks will inure exclusively to the benefit of the other Party, and neither Party will at any time acquire any rights in the other Party's Marks or any name, trademark, service mark or similar trade dress by virtue of any use it may make of any of the other Party's Marks.

**3.2.5   *Good Will.*** All of the good will now or in the future to be associated with each Party's Marks belongs exclusively to that Party and all good will associated with either Party's Marks pursuant to the other Party's use will inure exclusively to that Party.

**3.2.6   *Use of Similar Marks.*** Neither Party will adopt or use any name, trademark or service mark confusingly similar to any of the other Party's Marks. Promptly after discovery, each Party will notify the other Party of any potentially infringing use of the other Party's Marks or any name, trademark or service mark confusingly similar to any of the other Party's Marks by any third party.

**3.2.7   *Protection of the XM Marks.*** To ensure the protection of the XM Marks and associated good will, (i) Company will submit for XM's approval, free of charge and in addition to Prototype Products required under Section 2.5.1 for XM's Test, a production sample of each model of Licensed Product to be manufactured by Company, (ii) Company shall implement and use reasonable quality control procedures to assure that its Licensed Products meet the quality standards approved by XM, and (iii) XM shall have the right from time to time during the Term (not to exceed once per three (3) months) to request in writing that Company provide XM with a reasonable number of production samples of the Licensed Products (not to exceed three (3) units per request) exclusively for the purpose of allowing XM to verify that such quality control procedures are implemented and used by Company in the manufacture of such Licensed Products.

**3.3   Royalties.**

**3.3.1   *XM and Third Party Technology Royalties.*** The XM and third party technology royalties (if any) applicable with respect to the Licensed Products manufactured for a particular Licensed Market will be set forth in the applicable Schedule. Notwithstanding the foregoing, XM reserves the right to impose a royalty on Licensed Products upon one hundred eighty (180) days written notice to Company.

**3.3.2   *DART Royalties.*** Company acknowledges that for any Licensed Product capable of producing a digital recording from the XM Service, it will be responsible for filing with the U.S. Copyright

Office and paying the digital audio recording technology royalty or any other applicable royalty, as provided in the Audio Home Recording Act and related regulations, as may be amended from time to time ("DART Royalty").

**3.4    Sublicensing.** Company will have no right to sublicense the rights granted in this Section 3 to any third party, in whole or in part, without XM's prior written approval, such approval not to be unreasonably withheld or delayed.

**3.5    Product Names.** The name of each Licensed Product shall be selected by Company, subject to XM's prior approval which shall not be unreasonably withheld or delayed.    Unless otherwise agreed, the consecutive letters "XM" shall not appear anywhere in the name of any Licensed Product.    Company agrees not to use the name of any Licensed Product or any associated trademark or logo (a) with any products compatible with services of any other DARS provider during the Term or thereafter, or (b) with any other product from the Effective Date through the date that is thirty-six (36) months after the product is discontinued.

**3.6    Ownership.**

**3.6.1    *Existing Intellectual Property.*** Each Party will continue to own all right, title and interest in all Intellectual Property owned by such Party prior to the Effective Date.

**3.6.2    *Independently Developed New Intellectual Property.*** New Intellectual Property developed by one Party without assistance from the other Party or use of the other Party's Intellectual Property shall be the property of the Party that developed such Intellectual Property.

**3.6.3    *Jointly Developed New Intellectual Property.*** New Intellectual Property jointly developed by the Parties shall be the property of both Parties; provided that no such new Intellectual Property shall be licensed or otherwise disclosed to a third party prior to the six (6) month anniversary of the launch of the first Licensed Product incorporating such Intellectual Property. Any such license of new Intellectual Property jointly developed by the Parties to a third party will be granted on the basis of reasonable compensation and pursuant to other reasonable terms and conditions; provided, however, that any royalties, revenue or other consideration received as compensation from such third party will be shared equally by XM and Company.  Subject only to the limitations in Section 3.5, however, Company shall own all right, title and interest in and to any Product Names.

**3.6.4    *Development Rights.*** Company hereby grants to XM and its Affiliates, with the right to sublicense to third parties, a worldwide, non-exclusive, non-transferable, indivisible, royalty-free, paid-up (except as set forth below) license under Development Information and Development Patent Rights to design, develop, manufacture or sell, or have designed, developed, manufactured or sold, products or services utilizing such Development Information and Development Patent Rights, which products or services relate solely to the XM System; provided that such Development Information and Development Patent Rights shall not be licensed or otherwise disclosed to a third party prior to the six (6) month anniversary of the launch of the first Licensed Product incorporating such Development Information or Development Patent Rights. Any such sublicense to a third party will be granted on the basis of reasonable compensation and pursuant to other reasonable terms and conditions; provided, however, that any royalties, revenue or other consideration received as compensation from such third party will be shared equally by XM and Company.  Development Information and Development Patent Rights will not be licensed or otherwise disclosed to a third party unless agreed in writing by both parties.  Company agrees not to grant a license under Development Information or Development Patent Rights to any other DARS provider.

**4.    Marketing and Subsidies.**

**4.1    *Marketing of Licensed Products.*** Company and XM will each use commercially reasonable efforts to market the Licensed Products to consumers in the applicable Licensed Markets throughout the XM Service Area. Company and XM will use commercially reasonable efforts to coordinate their marketing efforts.

*Execution Version*

**4.1.1    Minimum MDF.**  For Licensed Products with a Subsidy Payment, Company and XM agree that a minimum of 3% above the 29% margin will be utilized towards MDF.

**4.1.2    Marketing Support.**  XM will provide Company with the results of any market research related to the Licensed Products conducted by XM at no cost to Company.

**4.1.3    No Disparagement.**  Company and its Affiliates shall never take any action or publish any materials that have the effect of disparaging XM's products, service, content or technology.  XM and its Affiliates shall never take any action or publish any materials that have the effect of disparaging Company's or its Affiliates' products or technology.

**4.1.4    MDF Final Reconciliation.**  Promptly after the earlier to occur of (i) the discontinuation of a subsidized Licensed Product or (ii) any expiration or termination of this Master Agreement ("Final Calculation Date"), Company shall determine the cumulative total sales price for all units of each subsidized Licensed Product sold by Company to its Customers.  To the extent that Company has not spent 3% of this amount as MDF for each subsidized Licensed Product, Company shall spend the balance of this amount in its entirety during the three (3) months following the Final Calculation Date to promote the affected Licensed Products.  XM may offer a promotional support with retailers (such as MDF, advertising funds and coop contributions) for Licensed Products manufactured and marketed by Company.

**4.1.5    MDF Reports.**  Within sixty (60) days after the end of each calendar quarter, Company will deliver to XM a report detailing Company's expenditures of the MDF for each subsidized Licensed Product during such calendar quarter.  Upon request, Company will provide reasonable documentation of the MDF expenditures (e.g., receipts or invoices).

**4.2    Packaging.**  Company will design the packaging and end-user materials for the Licensed Products, subject to XM's approval, not to be unreasonably withheld or delayed.  XM will provide reasonable assistance to Company with these efforts.

**4.3    Promotional Materials.**

**4.3.1    End-User Materials.**  Company will include a description of XM and how to subscribe to XM's programming services in the materials provided to the end-user consumers (such as Users Manual, Set-up Instructions or Troubleshooting Guides) with the packaging of any Licensed Product.  All such materials shall require mutual approval by the Parties, not to be unreasonably withheld or delayed.

**4.3.2    In-Box Promotional Materials.**  Upon XM's request, subject to Company's approval (not to be unreasonably withheld or delayed), Company will include XM Service promotional material (such as advertising flyers or introductory special offers) with the packaging of any Licensed Product.  Company shall charge XM, and XM shall pay Company, a reasonable amount for inclusion of such materials.

**4.3.3    General Public Promotional Materials.**  Company will furnish XM, free of cost, for prior comment and written approval (such approval not to be unreasonably withheld or delayed), any advertising or promotional materials (such as commercial advertisements, media promotions or store sale flyer spots) that include reference to XM or any Licensed Product.

**4.4    Retail Support.**  Company will provide, at its expense, commercially reasonable support, in light of volume of sales among other factors, for retailers requesting training or assistance in the display, demonstration and operation of the Licensed Products.  Such support will consist of tools and programs of the type typically used by consumer electronics manufacturers to promote similar products and services, and will, at a minimum, include periodic sales force training seminars and the provision of demonstration units for use by Company's sales force.  XM, at its cost, may assist Company in providing retail support.

XM/Company Confidential

*Execution Version*

**4.5    Direct Sales.** In all sales by Company and its Affiliates direct to consumers, except with respect to Company and its Affiliates employee, supplier, customer loyalty and other similar special purchase programs not available to the general public, Company and its Affiliates will follow Company's minimum advertised price policy and any other requirements that Company makes generally applicable to retailers of Company's consumer electronics products, except with respect to close-outs and specials.

**4.6    Periodic Marketing Reviews.** Company will meet with designated XM personnel, at XM's request, on a mutually agreeable schedule (with a mutual goal of at least once per calendar month) to review Company's sales and marketing plans for the proceeding period. Topics for review include, but are not limited to, all promotional materials and any planned changes; sales and production accomplishments from prior periods; promotional budgets; new product plans and proposed modifications to product or collateral materials; XM technology roadmap and planned engineering change notices.

**4.7    MSRP.** XM shall establish and provide Company with advance notice of the MSRP for each Licensed Product and any changes in the MSRPs. XM shall use commercially reasonable efforts to maintain competitive pricing for all Company products that provide access to the XM Service. The details applicable to each Licensed Product (e.g., subsidy (if any) and retailer margin opportunity) proposed by Company must be set forth in a Schedule to this Agreement prior to any distribution of such product by Company.

**4.8    Required Margin.** Company shall earn at least a 29% profit margin on all Licensed Products. The 29% profit margin shall be the product of 29% and the greater of (X) Company's landed cost (before receipt of any subsidy) for a Licensed Product and (Y) Company's wholesale price to retailers for a Licensed Product. XM shall take such action as is necessary for Company to achieve such margin, including the payment of increased subsidies. The 29% profit margin is in addition to the following other amounts which XM shall include in the subsidy payments or otherwise advance or reimburse: (i) any MDF expenditures, (ii) the DART Royalty for products with over the air recording capability (i.e., products that are digital audio recording devices under the Audio Home Recording Act), (iii) any third party royalties imposed on XM's technology and (iv) any XM royalties charged with respect to Licensed Products.

**4.9    Production Quantities.** Company will inform XM of the projected production quantities prior to placing initial orders for each product. Company will determine initial and ongoing production quantities and inventory levels required to meet the needs of the market, to promote XM business, and product sales. If XM has a reasonable business concern that initial or ongoing quantities are excessive, then the parties will meet, and must mutually agree upon volume, ensuring that each customer is supplied with sufficient product, both initially and on an ongoing basis.

**4.10    Subsidies.**

**4.10.1    *Subsidy Payments.*** XM will provide Subsidy Payments (where applicable) on Company products. Subsidy Payment level (if any) will be evaluated and set by XM and Company in order to achieve Company's required margin set forth in Section 4.8 and other factors on a product-by-product basis. The Subsidy Payments (if any) with respect to individual products will be set forth in a separate Schedule.

**4.10.2    *Changes in Subsidy Payments and Price Protection.*** In the event that a Subsidy Payment level is changed, XM will notify Company with reasonable time. XM will keep all cost reductions on XM Chipsets and parts acquired at prices negotiated by XM and utilized in subsidized products as long as XM does not cause the MSRP price to change. If XM causes the MSRP of a subsidized Company product to change, XM will notify Company at the earliest possible time and price protect the inventory. In the event that Company changes the MSRP for strategic reasons then Company will be responsible for price protecting the inventory. All existing inventory, inventory on order (at time of subsidy level change), all committed orders, and inventory in transit will be covered by the original Subsidy Payment or higher Subsidy Payment if the original Subsidy Payment is increased.

*Execution Version*

**4.10.3  *Payment Terms.*** Provided that XM receives a monthly report on products shipped from a facility in a timely manner, Subsidy Payments (when applicable) for a particular Company product shall be payable within thirty (30) days after the end of the month in which the product is shipped to Company from the factory. Company and XM agree that all Subsidy Payments (if any) and any amounts due from Company to XM (if any) may be netted to arrive at a single payment to be made to Company or XM, as applicable.

**4.11     Consideration of Exclusivity.** XM cannot at this time provide exclusivity to Company for unique distribution channels (telecommunications, VoIP, RV, Cable, Financial, etc.) that may be proposed from time to time, but will consider exclusivity with Company for specific distribution channels if proposed by Company and the opportunity is mutually beneficial to each party and does not conflict with other XM agreements or relationships.

**4.12     Limited Non-Compete.** XM and its Affiliates shall not, directly or indirectly, compete with Company for sales to or in third party retailers other than through unaffiliated third party distributors such as Company. For the avoidance of doubt, this Section shall not prevent or restrict XM from licensing third party retailers to design, develop, manufacture (or have designed, developed or manufactured), market and sell products under brands owned or licensed by such retailers.

**4.13     Purchase by XM.** (a) Company shall make reasonable quantities of Licensed Product units available to XM for distribution by XM through the following direct markets: college campuses, conventions and events (provided that any Licensed Products sold at such conventions or events are sold in conjunction with an XM subscription), XM's "Friends and Family" program, XM-branded retail programs (e.g., XM-branded mall kiosks) and direct-response programs. These Licensed Product units will be made available to XM at Company's most favorable net price available to any third party for the Licensed Product during the thirty (30) day period prior to the placement of XM's order. (b) Additionally, if the Licensed Product is produced at a third party factory, in the event that the Licensed Product is on allocation or XM requires ten thousand (10,000) or more Licensed Product units for a special promotion (e.g., rebate or buy-one, get-one free offer), XM and Company shall negotiate in good faith to determine on a case-by-case basis XM's purchase price and Company's margin for such Licensed Product units.

**5.     Confidentiality; No Reverse Engineering.**

**5.1     Confidential Treatment.** Neither Party will disclose the contents of this Master Agreement or the Schedules without the prior written consent of the other Party, except to the extent required by applicable national or local laws and regulations, or in connection with bona fide financing activities. All confidential information exchanged under this Master Agreement or any Schedule will be subject to the NDA, provided that the term of the NDA shall be automatically extended for the duration of the Term for purposes of this Master Agreement.

**5.2     Additional Confidentiality Restriction.** Under no circumstances will Company authorize the use of any XM Information or XM Patent Rights by any Company or its Affiliates employees, agents or contractors on projects for any other DARS provider.

**5.3     No Reverse Engineering.** Company and its Affiliates shall not reverse-engineer, decompile, deconstruct or otherwise seek to determine the engineering of the XM Chipset or any other technology licensed under this Master Agreement or any Schedule.

**6.     Representations and Warranties; MFN Provisions.**

**6.1     Authority.** Each Party represents and warrants that it has the necessary corporate authority, and has taken the necessary steps, to enter into and fulfill its obligations under this Master Agreement.

**6.2     Funding.** Company represents and warrants that it is adequately capitalized for its business purposes, and that Company (excluding its Affiliates) will work with XM.

*Execution Version*

**6.3    Compliance with Laws.** Each party represents and warrants that it will comply with all applicable local, state and federal laws, regulations and court orders in performing its obligations or exercising its rights under this Agreement.

**6.4    XM Rights.** XM represents that (i) it owns and throughout the Term will continue to own all right, title and interest or have a license to all XM Information, XM Patents Rights and XM Marks, (ii) it has the right to grant the rights granted under this Master Agreement, (iii) the granting of such rights does not require the consent of any third party, and (iv) there is and throughout the Term will be no agreement between XM and any third party that is inconsistent with the provisions of this Master Agreement or any Schedule.

**6.5    Company Rights.** Company represents that (i) it owns and throughout the Term will continue to own all right, title and interest or have a license to all Company Information, Company Patent Rights and Company Marks, (ii) it has the right to grant the rights granted under this Master Agreement, (iii) the granting of such rights does not require the consent of any third party, and (iv) there is and throughout the Term will be no agreement between Company and any third party that is inconsistent with the provisions of this Master Agreement or any Schedule.

**6.6    No Knowledge of Infringement.**

*6.6.1    XM.* As of the Effective Date, XM represents and warrants that it is unaware of any third party patent or other intellectual property right that would be infringed or otherwise violated by the use or practice of the XM Information, the XM Patent Rights, or the XM Marks, as contemplated by this Master Agreement or any Schedule. Except as provided in the preceding sentence, XM does not represent that the XM Receivers or the use of the XM Patent Rights, the XM Information, or the XM Marks does not infringe any patent or other intellectual property right of any third party.

*6.6.2    Company.* As of the Effective Date, Company represents and warrants that it is unaware of any third party intellectual property right that would be infringed or otherwise violated by the use of the Company Marks, as contemplated by this Master Agreement or any Schedule, and that no third party has asserted any claim to the contrary. Except as provided in the preceding sentence, Company does not represent that the use of the Company Marks does not infringe any intellectual property right of any third party.

**6.7    Nonreliance.** Company will independently test, analyze, and evaluate technical information provided by XM and Licensed Products before manufacturing and marketing them.

**6.8    Limitations.**

*6.8.1    Disclaimer.* NEITHER XM NOR COMPANY MAKES ANY REPRESENTATIONS OR WARRANTIES OTHER THAN THOSE CONTAINED IN THIS ARTICLE 6. EACH PARTY SPECIFICALLY DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, TITLE OR RESPECTING THE RESULTS TO BE OBTAINED FROM USE OF OR COMMERCIAL UTILITY OF THE XM INFORMATION, XM PATENT RIGHTS, XM SYSTEM, DEVELOPMENT INFORMATION, DEVELOPMENT PATENT RIGHTS, COMPANY MARKS OR PRODUCT NAMES.

*6.8.2    Exclusion of Damages.* NEITHER PARTY WILL BE LIABLE FOR ANY PUNITIVE, EXEMPLARY, SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR LOST PROFITS (EXCLUDING LOST PROFITS REFLECTED IN WRITTEN BINDING, NON-CANCELABLE ORDERS BY COMPANY'S CUSTOMERS, WHICH SHALL BE RECOVERABLE, IF APPLICABLE, OR AMOUNTS DUE FROM XM TO AGT FOR LICENSED PRODUCTS PRODUCED) DAMAGES OF ANY KIND, WHETHER BASED IN CONTRACT, TORT OR OTHERWISE, THAT MAY ARISE IN

CONNECTION WITH THIS MASTER AGREEMENT OR ANY SCHEDULE, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**6.9     MFN Provisions.**

      **6.9.1     *Company—No More Favorable Subsidy Payment.*** Subject to Company's recovery of the net profit margin per product specified above, at no time will XM or its Affiliates be required to provide Company a Subsidy Payment that is more favorable than XM or its Affiliates provide other parties on the same product category and similar price points.

      **6.9.2     *Company—No Less Favorable Subsidy Payment.*** XM or its Affiliates shall not provide other third party manufacturers or distributors such as Company, Subsidy Payments that are more favorable than those provided to Company on the same product category with similar price points, unless such action is required for product close out or balancing inventory. XM and its Affiliates will consider similar action for Company.

      **6.9.3     *Company—No Less Favorable Access.*** XM or its Affiliates shall not provide other third party manufacturers or distributors such as Company, more favorable treatment than it provides with regards to access to technical information about XM's technology "roadmap" and chipset pricing and availability, as well as parts with XM's worldwide pricing.

      **6.9.4     *XM—No Less Favorable Presentation and Placement.*** Company and its Affiliates shall not provide more favorable treatment for other DARS providers or Company or its Affiliates' products that are compatible with the service provided by other DARS providers with regards to product and technology presentation and placement by Company and its Affiliates with its distributors and retailers.

      **6.9.5     *XM—Trade Show Space.*** Company will provide, at a reasonable cost payable by XM, the Licensed Products reasonable space at trade shows and events in light of the actual or projected volume and types of Licensed Products then distributed by Company.

      **6.9.6     *Company—Promotional Support.*** XM and its Affiliates shall provide at least as much aggregate promotional support for its Licensed Products (to the extent that XM controls distributors/retailers' use of promotional funds) as XM provides to any other third party with regard to the same distribution accounts for the same product category with same price points (i.e., same initial MSRP, excluding rebates for other-tier products and closeouts).

**7.     Company Limited Consumer Warranty.**

      **7.1     Minimum Warranty.** Company shall extend its standard (but in no event less than one (1) year) manufacturer's limited warranty to purchasers of Licensed Products with commercially reasonable provisions for returns, customer support, and repair or replacement service; provided however that particularly sensitive components or consumables may be warranted for a mutually agreed-upon, shorter period of time (e.g., headphones or batteries). Company will submit its proposed manufacturer's limited warranty to XM for prior approval, such approval not to be unreasonably withheld or delayed.

      **7.2     Company Responsibility.** Company shall be responsible for all issues and costs relating to the distribution, sale or other disposition of the Licensed Products, including taxes, product returns, repairs and replacements (in or out of Company's warranty).

      **7.3     No XM Customer Warranty.** XM makes no representations or warranties of any kind, express or implied, nor assumes any responsibilities whatsoever to Company's Customers with respect to the Licensed Products. Company is not authorized to make any such representation or warranty of any kind on behalf of XM to Company's Customers.

*Execution Version*

8.    **Indemnification.**

8.1    **Company Indemnification.**  Company will defend, indemnify and hold harmless XM, its Affiliates, and their respective officers, employees, and other representatives ("XM Indemnitees") from and against any and all suits, actions, claims, judgments, debts, obligations or rights of action ("Claims") of any nature or description asserted by any third party arising from product liability laws, tort, contract or common law arising out of (i) Licensed Products manufactured by or for Company, (ii) Company's failure to file with the U.S. Copyright Office or pay any DART Royalty, (iii) caused by use of the Company Marks by XM in accordance with this Agreement and any Schedules, or (iv) Company's use of the XM Information or XM Patent Rights other than in accordance with this Master Agreement and any Schedules, together with all reasonable costs, including attorneys' fees, incurred by the XM Indemnitees with respect to such Claims.  This indemnity provision will impose no obligation upon Company to the extent that the risk indemnified against arises from the acts or omissions of XM.

8.2    **XM Indemnification.**

8.2.1    XM will defend, indemnify and hold harmless Company, its Affiliates, and their respective officers, employees, and other representatives ("Company Indemnitees") from and against any and all Claims arising out of alleged infringement of a third party's intellectual property rights, including patent rights, caused by any aspect or function of the XM Chipset, the XM Format, the XM Marks or any other element or feature of the Licensed Product that was required under the Technical Specifications and resulting from the manufacture, use or sale of the Licensed Products in accordance with this Master Agreement.  This indemnity provision will impose no obligation upon XM to the extent that the risk indemnified against arises from the acts or omissions of Company, including but not limited to Company's failure to file with the U.S. Copyright Office or pay any DART Royalty.

8.2.2    In the event that a Claim of infringement is successful, or in XM's judgment is likely to be successful, in addition to its indemnification obligation under Section 8.2.1, XM will either (a) procure for Company the right to continue using the infringing intellectual property, or (b) modify the design of the XM Chipset or XM Receiver, as applicable, so that it no longer infringes, provided that such modification can be done without substantially impairing its functionality or performance.

8.3    **Indemnification Procedure.**  Any Company Indemnitee or XM Indemnitee claiming indemnification under this Section 8 ("Indemnified Party") will promptly notify the other Party ("Indemnifying Party") in writing of any Claim, and will provide the Indemnifying Party (at the Indemnifying Party's expense) with the authority, information and assistance necessary to defend or settle the Claim; provided, however, that any Indemnified Party will have the right to participate in such defense and to approve in advance any proposed settlement requiring the Indemnified Party to pay money damages or admit any wrongdoing.

9.    **Audit Rights.**  During the Term and for a period of one year after the Term, , XM (and its authorized representatives) shall have the right at its expense, not more than once in every twelve (12) months, during normal business hours and upon reasonable written notice, to inspect, audit, and copy any books and records of Company, at Company's offices, that relate to the performance of Company's obligations under this Master Agreement or that relate to the determination of any royalty or Subsidy Payment.  Without limiting the generality of the foregoing sentence, XM shall have the right to audit Company cost prices (including actual invoices with confidential information redacted) used to establish the amount of the Subsidy Payment (understanding that Company may hold all information confidential that is not required for price verification).  If any such audit indicates, within thirty (30) days after completion of the audit, a discrepancy between amounts previously paid and the amounts determined by such audit to be due and payable at such time, or a discrepancy regarding any information reported to XM under this Master Agreement, Company shall have ten (10) days after the date of receipt of notice of the discrepancy from XM ("Objection Period") to correct the discrepancy or object to the audit results.  If Company does not object to the audit results within the Objection Period, then the audit results will become final and binding upon the Parties.  If Company does object to the audit results within the Objection Period, Company shall, within thirty (30) days after

XM/Company Confidential

*Execution Version*

objecting, provide documentation to XM in support of Company's position. Any disputes shall be resolved in accordance with Section 12.

## 10. Term and Termination.

**10.1    Master Agreement Term.** This Master Agreement will be effective for a period of three (3) years from the Effective Date ("Initial Term") and shall automatically renew for one (1) additional year. Thereafter this Master Agreement shall renew for another one (1) additional year Company has sold a total of seven hundred fifty thousand (750,000) Licensed Products during the first four years this Agreement is in effect (each, a "Renewal Term").

**10.2    Schedule Terms.** Unless otherwise provided in a particular Schedule, all Schedules shall be coterminous with this Master Agreement, and shall automatically renew if the Parties mutually agree to a Renewal Term.

**10.3    Termination for Cause.** If a Party substantially fails to comply with any of its material obligations under this Master Agreement or any Schedule, and does not remedy the failure of performance within sixty (60) days after it has been notified in writing (other than in the case of the failure to comply with a Party's obligations under Section 3 or 5, in which case the cure period shall be fifteen (15) days), the other Party may terminate this Master Agreement or the affected Schedule at the end of such period, without prejudice to any damages or additional remedies that may be available at law or in equity. Any such termination will not affect any payments that have previously come due, or the furnishing of statements contemplated under this Master Agreement or any Schedule.

**10.4    Insolvency.** Either Party may terminate this Master Agreement upon written notification to the other Party if the other Party becomes the subject of (i) a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation or composition for the benefit of creditors; or (ii) an involuntary petition in bankruptcy or any involuntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, and such petition or proceeding is not dismissed within sixty (60) days of filing.

**10.5    Revocation or Nullity Action.** If Company or its Affiliates files any action against, or challenges the validity of any of the XM Patent Rights, or the XM Information, including but not limited to any revocation or nullity action, XM may immediately terminate this Master Agreement. If XM or its Affiliates files any action against, or challenges the validity of any Company Patent Rights, or the Company Information, including but not limited to any revocation or nullity action, Company may immediately terminate this Master Agreement.

**10.6    Assignment.** Either Party may immediately terminate this Master Agreement if the other Party attempts to assign it in violation of Section 13.1.

**10.7    Force Majeure.** Either Party may terminate this Master Agreement for Force Majeure in accordance with Section 13.3.

## 11.    Effect of Expiration or Termination.

**11.1    Effect on Schedules.** Upon any expiration or termination of this Master Agreement, all Schedules shall automatically terminate and be of no further force or effect.

**11.2    Termination of XM Licenses to Company.** Following any expiration or termination of this Master Agreement, all licenses granted to Company under this Master Agreement or any Schedule will terminate and Company will (i) stop using the XM Marks, and will not use or register any mark confusingly similar to the XM Marks, and (ii) stop using any of the XM Information or XM Patent Rights; provided that Company may continue to exercise its rights under this Master Agreement and any Schedules to the extent reasonably necessary to wind down

its operations and to sell its inventory of Licensed Products (on hand, in transit or on firm order as of the date of expiration or termination) with a reasonable time allowance.

**11.3     Termination of Company Licenses to XM.**  Following any expiration or termination of this Master Agreement, all licenses granted to XM under this Master Agreement or any Schedule will terminate and XM will (i) stop using the Company Marks, and will not use or register any mark confusingly similar to the Company Marks; provided that XM may continue to exercise its rights under this Master Agreement and any Schedules to the extent reasonably necessary to fulfill any binding commitments existing as of the date of expiration or termination, or to otherwise liquidate XM's inventory of Licensed Products on hand as of the date of expiration or termination.

**11.4     Liability.**  Following any expiration or termination of this Master Agreement, neither Party will have any further rights or obligations under this Master Agreement or any Schedule except that: (i) such expiration or termination will not relieve either Party of any liability to the other party arising prior to such expiration or termination; and (ii) such expiration or termination will not affect the continued operation or enforcement of any provision of this Master Agreement which survives the expiration or earlier termination of this Master Agreement pursuant to Section 13.14.

**11.5     Effect of Termination of Schedules.**  Termination of any Schedule will have the same effects set forth in Sections 11.2 – 11.4 with respect to the Licensed Products or Licensed Markets authorized by the affected Schedule.

**12.     Settlement of Disputes.**

**12.1     Amicable Resolution.**  The Parties will endeavor to resolve amicably any dispute arising out of this Master Agreement within thirty (30) days of receipt of notice of such dispute.  If the Parties are unable to resolve such dispute within such thirty (30) day period, then the Parties may refer the dispute to their respective senior management teams.  If the Parties' senior management teams are unable to agree upon a mutually acceptable resolution within an additional thirty (30) day period, then the dispute will be resolved in accordance with the provisions of Section 12.2.

**12.2     Formal Arbitration.**

*12.2.1     Arbitration Entity.*  All disputes arising in connection with this Master Agreement which are not resolved pursuant to Section 12.1 may be submitted by either Party to binding arbitration administered by JAMS/Endispute (or such other alternative dispute resolution service provider as may be mutually agreed upon by the parties, the "Arbitration Entity") in accordance with such entity's expedited arbitration rules.  The Parties intend Arbitration under Section 12.2 to be binding and subject to the Federal Arbitration Act, 9 U.S.C.A. § 1 et. seq.

*12.2.2     Location.*  The arbitration proceedings will take place in a location mutually agreed upon by the Parties and will be conducted in English.  In the event that the Parties cannot agree upon a location within thirty (30) days of the initiation of the arbitration process, the arbitration shall be brought in the city in which the party that did not initiate the arbitration is located and the arbitrators shall decide, as the first issue, the location of the arbitration.

*12.2.3     Arbitrators.*  The Parties will jointly determine the number of arbitrators and the method for selection of the arbitrator(s).  If, within thirty (30) days of the initiation of the arbitration process, the Parties are unable to agree on the number of arbitrators, the method for selection of the arbitrator(s) or the appointment of the arbitrator(s), the Parties will seek assistance in such regard from the Arbitration Entity.  The arbitrator(s) shall render a written decision within thirty (30) days after submission of all materials and evidence by the Parties, and shall not be empowered to award any damages listed in Section 6.5.2.

- 16 -

**12.2.4  *Equitable Relief.*** Nothing in this Section 12 will preclude either Party from seeking equitable relief from a court for the other Party's breach of its obligations specified in this Master Agreement.

**12.2.5  *Continuing Performance.*** Pending resolution of a dispute under this Section 12, each Party will, unless the other Party otherwise directs, fulfill all of its obligations under this Master Agreement and the Schedules.

## 13.    General Provisions.

**13.1    Assignment.** Neither Party will assign this Master Agreement without the other Party's prior consent, which will not be unreasonably withheld or delayed; provided that either Party may freely assign this Master Agreement to any of its Affiliates (or in the case of Company, any entity in which Andrew Lowinger and/or Ronald Lowinger control 50% or more of the outstanding equity interests). Notwithstanding the foregoing, under no circumstances may Company assign this agreement to another DARS provider. No Schedule may be assigned by either Party unless the Master Agreement and all Schedules are assigned together in their entirety and such assignment is otherwise permitted by this Section 13.1.

**13.2    Required Permits and Licenses.** Company will obtain and pay for any permits and the like relating to the sale of the Licensed Products; provided that XM will cooperate as necessary in such efforts. The Parties will comply with all applicable export compliance laws, including obtaining any export licenses required under the laws or regulations of the United States or any other applicable jurisdiction for the export of technical information or Licensed Products. The Parties will cooperate as necessary to obtain any such export licenses.

**13.3    Force Majeure.** Any delay or failure of either Party to perform its obligations under this Master Agreement or any Schedule shall be excused if, and to the extent that it is caused by an event or occurrence beyond the reasonable control of the Party and without its fault or negligence, such as, by way of example and not by way of limitation, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, terrorism, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor, equipment or transportation, or court injunction or order, or a Total Loss; provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected Party within five (5) days after the affected Party becomes aware of such event. If the delay lasts more than thirty (30) days or the affected Party does not provide adequate assurance that the delay will cease within thirty (30) days, the Party not claiming Force Majeure may terminate this Master Agreement or any affected Schedule by written notice to the other Party.

**13.4    Relationship of Parties.** The relationship of the Parties under this Master Agreement and any Schedules is that of independent contractors and not partners, franchisees, legal agents, or employees of the other Party for any purpose.

**13.5    No Third Party Beneficiaries.** The provisions of this Master Agreement and any Schedules are solely for the benefit of the Parties and no third party may seek to enforce or benefit from these provisions.

**13.6    Updates of Appendices.** XM will update Appendix 2 (XM Marks) and Appendix 5 (XM Patents) at least once every twelve (12) months during the Term. Company will update Appendix 7 (Company Marks) at least once every twelve (12) months during the Term.

XM/Company Confidential

**13.7    Notices.**    All communications under this Master Agreement will be given in English by (i) overnight courier or (ii) e-mail or facsimile, with a copy by U.S. mail. All communications shall be sent to XM at:

Attn: Rocco Tricarico
XM Satellite Radio Inc.
1500 Eckington Place, NE
Washington, D.C. 20002
(202) 380-4078
(202) 380-4310 (Fax)
e-mail: rocco@xmradio.com

With a copy to:
Attn: General Counsel
XM Satellite Radio Inc.
1500 Eckington Place, NE
Washington, D.C. 20002
(202) 380-4066
(202) 380-4534 (Fax)
e-mail: Joe.Titlebaum@xmradio.com

and to Company at:

Attn:_____
_____
_____
( ___ ) ____ - _____
( ___ ) ____ - _____
e-mail: _____

With a copy to:
Attn:    _____
_____
_____
( ___ ) ____ - _____
( ___ ) ____ - _____
e-mail: _____

or such other addresses as either Party may have previously specified in the manner specified above.  Any communication delivered by e-mail will constitute a "written" communication for the purposes of this Master Agreement.

**13.8    Amendment.**    Except with respect to updates required by Section 13.2, this Master Agreement may be modified only by the Parties' duly authorized representatives in a writing stating that the modification is an "Amendment to the Master License Agreement."  Additional Licensed Products or Licensed Markets may be added to the scope of this Master Agreement by execution of an applicable Schedule.

**13.9    Non-Waiver.**    No waiver of any rights under this Master Agreement or any Schedule will be enforceable unless the waiver is in writing and signed by the Party against whom the waiver is asserted.  No waiver of or failure to assert any right on any particular occasion shall be construed as a waiver of any other right or as a waiver of the same right on any other occasion.

**13.10    Governing Law.**    This Master Agreement and all Schedules shall be governed by the laws of New York, excluding its conflicts of law principles.  The Parties expressly agree that the United Nations Convention on Contracts for the International Sale of Goods and the United Nations Convention on the Limitation Period in the International Sale of Goods shall not apply to this Master Agreement, any Schedule, or any transactions contemplated by this Master Agreement or any Schedule.

**13.11    Severability.**    Should any part of this Master Agreement be held unenforceable by a final and unappealable order of a court of competent jurisdiction in any jurisdiction, then the part of the Master Agreement held unenforceable will be severed from this Master Agreement and the validity of the remaining parts will not be affected.

*Execution Version*

**13.12   Entire Agreement.** This Master Agreement, together with the attached Appendices and any Schedules, embodies the Parties' entire understanding related to its subject matter and supersedes any prior or contemporaneous agreements or understandings between the Parties related to its subject matter.

**13.13   Captions.** The captions contained in this Master Agreement and any Schedules are inserted for convenience of reference only and will not affect the interpretation of the provisions captioned.

**13.14   Counterparts.** This Master Agreement and any Schedules may be executed in two (2) signed counterparts, each of which will constitute an original, but which together shall constitute one and the same document.

**13.15   Press Releases.** Neither Party will issue a press release related to the subject matter of this Master Agreement or any Schedule without the other Party's prior written consent, which will not be unreasonably withheld or delayed.

**13.16   Survival.** Section 4.2, all of Section 8, and Sections 10.2, 13.3, 13.4, 13.5, 13.6 and 13.10 will survive any expiration or termination of this Master Agreement indefinitely. Section 5 will survive any expiration or termination of this Master Agreement for three (3) years. Section 9 will survive the expiration or earlier termination for one (1) year.

The Parties, intending to be legally bound, have caused this Master Agreement to be signed by their respective authorized representatives as of the Effective Date.

| XM Satellite Radio Inc. | Advanced Global Technologies, LLC |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _____ Peter Graf |
| Title: _____ | Title: _____ C.F.O. |

#7477
Rev. 4/05

11/02/05

*Execution Version*

**APPENDIX 1**
**Licensed Products And**
**Licensed Markets Schedules**

Schedules to this Master Agreement shall be designated in accordance with the following outline, as applicable,

notwithstanding any resulting "gaps" in the designation of the Schedules:

| | |
|---|---|
| Schedule 1A | OEM Market Schedule |
| Schedule 1B | Aftermarket Market Schedule |
| Schedule 1C | XM-Ready Receiver Product Schedule |
| Schedule 1D__ [1, 2,...] | Product Schedule |
| Schedule 1E__ [1, 2,...] | Product Schedule (XM-Designed) |

Schedules not described above shall be designated sequentially commencing with Schedule 1F.

*Execution Version*

**APPENDIX 2**
**XM Marks**

1.    XM Satellite Mark - Registration No.: 2,556,817



2.    "XM" Mark without design - Registration No.: 2,547,677

11357691.4.BUSINESS

*Execution Version*

**APPENDIX 3**
**Technical Specifications**

Provided in the XM Innovation Center document e-room at:

https://eroom.xmradio.com/eRoom/xmproject/XMEdgeDevelopmentKit



*Execution Version*

### APPENDIX 4
### Type Approval Testing

Effective December 1, 2002, costs associated with Type Approval testing performed by XM Satellite Radio will be charged to the manufacturer seeking radio approval. This new policy applies to both Type Approval I (Functionality) and Type Approval II (Performance). Each individual receiver or piece of XM capable equipment utilizing the XM chipset that will be manufactured for retail, distributors, or OEM must go through the Type Approval process. The fees to be charged for service are as follows:

**Type Approval Part I Fees:**
- Type Approval (Head Unit/Controller Functionality) Part I testing will be charged on a per day basis.
- Charge per day (8 hours): $1,000.00 USD • Each different receiver/software version will count as a separate test.
- Typical TA I testing (Full) takes 1-2 days. XM will advise if testing takes longer than 2 days
- Company must submit two samples for type approval part I.
- Company should perform each of the relevant type approval tests on their own prior to submission to XM for formal type approval. Provide results of these tests prior to submitting units for official XM Type Approval tests.
- Company must submit a user manual for each XM Receiver.
- Company must submit software firmware version with the two samples.
- Company must submit radio identification number one week ahead of type approval testing in Florida.

**Type Approval Part II Fees:**
- Type Approval Part II (Head Unit Receiver/Hardware Performance) testing will be a flat rate equivalent to three days of testing per request.
- Flat fee charge per request: $3,000.00 USD
- Any full re-test requested will be considered a new charge at the same rate.
- Changes in hardware (component changes or PCB layout changes) will require full re-testing.
- Re-testing of specific sub-sections of Part II will be charged at $1,000.00 USD per day.

**Ancillary devices:**
Any devices duplicating the functionality of the main controller/head unit (such as remote controls) will be reviewed during the Type Approval process at no additional charge. Requestor/Company will provide written certification that any such devices conform to the Minimum Feature Functionality Requirements Document XM-BUS-0-0003-RD.

**Technical Notes:**
See Type Approval Procedures in the eRoom for further guidance (XM-TEC-3-0042 Type Approval I, rev 1.30; XM-TEC-3-0043 Type Approval II, rev 1.4). All Type Approval requests require prior test data taken at the requestor's facilities. Type Approval testing must be scheduled 30 days in advance.

**Type Approval Purchase Order Submittal:**
XM must receive a Purchase Order (PO) before any Type Approval or Technical Support testing will commence.

**Technical Assistance Fees:**
$1,200.00 USD / day (8 hours)

11357691.4.BUSINESS

*Execution Version*

## APPENDIX 5
### XM Patents

| Total Number of U.S. Patents Issued: | 33 |
|---|---|

| XM No. | Title | U.S. Patent Number | Foreign Patent Number | Date Issued |
|---|---|---|---|---|
| PA-1 | SATELLITE DIGITAL AUDIO RADIO SERVICE TUNER ARCHITECTURE FOR RECEPTION OF SATELLITE AND TERRESTRIAL SIGNALS | 6,510,317 B1 | | 1/21/2003 |
| PA-2 | LOW COST INTEROPERABLE SATELLITE DIGITAL AUDIO RADIO SERVICE (DARS) RECEIVER ARCHITECTURE | 6,832,169 | | 11/23/2004 |
| PA-5 | DIGITAL RADIO PREPAID MUSIC RECORDING SYSTEM | 6,563,805B1 | | 5/13/2003 |
| PA-6 | RECEIVER ARCHITECTURE FOR DARS FULL BAND SIGNAL RECEPTION HAVING AN ANALOG CONVERSION TO BASEBAND STAGE | 6,735,416B1 | | 5/11/2004 |
| PA-8 | LOW COST INTEROPERABLE SATELLITE DIGITAL AUDIO RADIO SERVICE (DARS) RECEIVER ADAPTED TO RECEIVE SIGNALS IN ACCORDANCE WITH ADVANTAGEOUS FREQUENCY PLAN | 6,724,827B1 | | 4/20/2004 |
| PA-9 | METHOD AND APPARATUS FOR DISPATCH COMMUNICATIONS IN A BROADCAST RADIO SYSTEM | 6,397,076 | | 5/28/2002 |
| PA-12 | FOLDED HELIX ANTENNA DESIGN | 6,229,499 | | 5/8/2001 |
| PA-13 | DUAL COUPLED VEHICLE GLASS MOUNT ANTENNA SYSTEM | 6,232,926 B1 | | 5/15/2001 |
| PA-16 | System For Providing Signals From An Auxiliary Audio Source To A Radio Receiver Using A Wireless Link | 6,493,546 | | 12/10/2002 |
| PA-16B (CIP) | System For Providing Signals From An Auxiliary Audio Source To A Radio Receiver Using A Wireless Link | 6,810,233 | | 10/26/2004 |



*Execution Version*

| XM No. | Title | U.S. Patent Number | Foreign Patent Number | Date Issued |
|--------|-------|--------------------|-----------------------|-------------|
| PA-17 | System for Providing Audio Signals from an Auxiliary Audio Source to a Radio Receiver via a DC Power Line | 6,272,328 | | 8/7/2001 |
| PA-18 | Vehicle Antenna Assembly for Receiving Satellite Broadcast Signals | 6,295,033 | | 9/25/2001 |
| PA-18B | Vehicle Antenna Assembly for Receiving Satellite Broadcast Signals | 6,421,020 | | 7/16/2002 |
| PA-19(also see PA-20) | Method and Apparatus for Continuous Cross-Channel Interleaving Based on Serial No. 09/318,938 | 6,154,452 | | 11/28/2000 |
| PA-20 (also see PA-19) | Method and Apparatus for Continuous Cross-Channel Interleaving; A Continuation of Serial no. 09/318,938 Based on Serial No. 09/318,938 | 6,614,767 | | 9/2/2003 |
| PA-21 | Digital Audio Radio Service Satellite Receiver Having Switchable Operating Modes for Stationary or Mobile Use | 6,549,774 | | 4/15/2003 |
| PA-22 | Method and Apparatus for Concatenated Convolutional Encoding and Interleaving | 6,229,824 | | 5/8/2001 |
| PA-24 | Electronically Steerable Antenna Array Using User-Specified Location Data for Maximum Signal Reception Based on Elevation Angle | 6,640,085B1 | | 10/28/2003 |
| PA-25 | Method and Apparatus for Composite Data Stream Storage and Playback | 6,564,003 | | 5/13/2003 |
| PA-26 | Method and Apparatus for Selectively Operating Satellites in Tundra Orbits to Reduce Receiver Buffering Requirements for Time Diversity Signals | 6,442,385 | | 8/27/2002 |
| PA-27 | Method and System for Providing Geographic Specific Services in a Satellite Communications Network | 6,347,216 | | 2/12/2002 |
| PA-29 | Method and Apparatus for Controlling User Access and Decryption of Locally Stored Content at Receivers in a Digital Broadcast System | 6,834,156 | | 12/21/2004 |

*Execution Version*

| XM No. | Title | U.S. Patent Number | Foreign Patent Number | Date Issued |
|---|---|---|---|---|
| PA-30A | GLASS-MOUNTABLE ANTENNA SYSTEM WITH DC AND RF COUPLING (Based on PA-30) | 6,538,609 B2 | | 3/25/2003 |
| PA-32 | Method and Apparatus for Prompting a Reverse Channel Response from a Receiver in a Digital Broadcast System | 6,686,880 | | 2/3/2004 |
| PA-41 | METHOD AND APPARATUS FOR DIGITAL AUDIO PLAYBACK USING LOCAL STORED CONTENT | 6,785,656 B2 | | 8/31/2004 |
| PA-43 | COMBINATION LINEARLY POLARIZED AND QUADRIFILAR ANTENNA | 6,483,471 | | 11/19/2002 |
| PA-44 | SYSTEM AND METHOD OF JOINTLY OPTIMIZING THE TRANSMIT ANTENNA PATTERNS OF TWO GEOSTATIONARY SATELLITES IN A SATELLITE BROADCASTING SYSTEM | 6,470,058 | | 10/22/2002 |
| PA-46 | METHOD AND APPARATUS FOR CUSTOMIZED SELECTION OF AUDIO CHANNELS | 6,553,077 | | 4/22/2003 |
| PA-47 | DROOPING HELIX ANTENNA | 6,535,179B1 | | 3/18/2003 |
| PA-53 | APPARATUS AND METHOD FOR TRANSFERRING DC POWER AND RF ENERGY THROUGH A DIELECTRIC FOR ANTENNA RECEPTION (Combines patent applications 60/241,361 &60/241,362 into single non-provisional application) | 6,686,882 | | 2/3/2004 |
| 54 | COMBINATION LINEARLY POLARIZED AND QUADRIFILAR ANTENNA SHARING A COMMON GROUND | 6,621,458B1 | | 9/16/2003 |
| PA-55 | THROUGH GLASS RF COUPLER SYSTEM | 6,661,386B1 | | 12/9/2003 |
| PA-59 | COMBINATION SATELLITE AND TERRESTRIAL ANTENNA | 6,806,838 | | 10/19/2004 |

*Execution Version*

## APPENDIX 6
### Licensed XM Chipset Manufacturers

STMicroelectronics Srl.
20041 Agrate Brianza
Via C. Olivetti 2, Italy

- 27 -

**APPENDIX 7**
**Company Marks**