Jeffrey A. Mishkin (JM-8380)
Anthony J. Dreyer (AD-3571)
Peter S. Julian (PJ-3443)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
*Attorneys for Defendant XM Satellite Radio Inc.*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADVANCED GLOBAL TECHNOLOGY,
LLC,                                                    :

                      Plaintiff,        :        No. 07 cv 3654 (JSR) (DCF)
                                     ECF CASE

       - against -                :

XM SATELLITE RADIO INC.,            :

                     Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

**Table of Contents**

*Page*

Table of Authorities ........................................................................................................... ii

Preliminary Statement ........................................................................................................1

Background ...........................................................................................................................2

Argument ..............................................................................................................................7

I.      AGT'S Remedy at Law is Adequate. ...............................................................7

II.     AGT's Speculation About Future Possible Breaches Remains Unripe. ...........................12

III.    This Court Cannot Issue an Order Requiring Specific Performance Without Taking on the Burden of Continuous Supervision and Repeated Intervention in the Parties' Business Decisions to Do Justice to Both Parties..................................13

Conclusion ..........................................................................................................................17

## Table of Authorities

*Cases*                                                                                      *Page*

*Advanced Global Tech., LLC v. XM Satellite Radio, Inc.*, No. 07 Civ. 3654 (JSR),
   2007 WL 3196208, at *2-*3 (S.D.N.Y. Oct. 29, 2007) ............................................ passim

*AMSAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d 867, 872 (2d Cir.
   1993) .....................................................................................................................12

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.*, No. 04 Civ. 10014 (PKL),
   2006 U.S. Dist. LEXIS 34709, at *28-*29 (S.D.N.Y. May 30, 2006) ............................14

*Auerbach v. Board of Educ.*, 136 F.3d 104, 108-09 (2d Cir. 1998) ..............................12

*Bethlehem Engineering Export Co. v. Christie*, 105 F.2d 933, 934-35 (2d Cir.
   1939) .............................................................................................................14, 15, 16

*Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) ...........................................12

*Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y.
   2006) .....................................................................................................................10

*Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*, No. 90 Civ. 5785
   (SWK), 1990 U.S. Dist. LEXIS 12299, at *9 (S.D.N.Y. Sept. 14, 1990) ........................8

*Dweck v. Oppenheimer & Co.*, 30 A.D.3d 163, 163, 816 N.Y.S.2d 440, 440 (1st
   Dep't 2006) ...............................................................................................................8

*General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F.
   Supp. 1070, 1075 (S.D.N.Y. 1994) ...........................................................................7

*Gulbenkian v. Gulbenkian*, 147 F.2d 173, 175 (2d Cir. 1945) ....................................15

*Hutton v. Klabal*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) ..............................................8

*In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993) ........12

*Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809-12 (S.D.N.Y.
   1986) ..................................................................................................................8, 14

*Lucente v. International Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) .........7, 8

*Sing-Sing Prods., Ltd. v. Farrell*, No. 90 Civ. 0867 (JFK), 1990 U.S. Dist. LEXIS
   2248, at *10 (S.D.N.Y. Mar. 2, 1990) .......................................................................14

*TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007) .........14, 15, 16

*T.F. Demilo Corp. v. E.K. Constr. Co.*, 207 A.D.2d 480, 481, 616 N.Y.S.2d 240,
   240 (2d Dep't 1994) ............................................................................................8

*Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) ......................................12

## *Statutes*

9 U.S.C. § 1, *et seq.* ......................................................................................................3

Fed. R. Civ. P. 12(b)(1) .............................................................................................1, 13

Fed. R. Civ. P. 12(b)(6) .............................................................................................1, 17

## *Other Authorities*

Oliver Wendell Holmes, Jr., The Common Law 301 (1881) ........................................8

Restatement (Second) of Contracts § 362 cmt. a (2007) ............................................15

### *Preliminary Statement*

Defendant XM Satellite Radio Inc. ("XM") submits this memorandum of law in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the first amended complaint ("FAC") of plaintiff Advanced Global Technology, LLC ("AGT"). It is now abundantly clear that AGT is dissatisfied with the bargain it struck in the Master License Agreement (the "Agreement") when it agreed to limit any damages claims to lost profits (FAC Ex. A § 6.8.2) and to submit any damages claims to binding arbitration. (FAC Ex. A § 12.2) Presumably because it can show no such damages, AGT has assiduously tried to avoid arbitration by filing, and continuing to pursue, this lawsuit for equitable relief. But, as this Court observed when it dismissed AGT's initial complaint, "equity will not countenance AGT's transparent attempt to evade this agreement through the device of the instant action." *Advanced Global Tech., LLC v. XM Satellite Radio, Inc.*, No. 07 Civ. 3654 (JSR), 2007 WL 3196208, at *2 (S.D.N.Y. Oct. 29, 2007).

Like its initial complaint, AGT's amended complaint alleges a single claim for breach of the Master License Agreement between the parties (the "Agreement") and seeks the extraordinary equitable remedies of prospective specific performance, a declaratory judgment, and an injunction. In its amended complaint, AGT makes several additional factual assertions that it hopes will allow the amended pleading to withstand a motion to dismiss. But even if true, none of the new factual allegations – not the allegation that Audiovox is currently the only distributor of certain models of XM receivers at some price points, nor the assertion that the proposed merger between XM and Sirius is closer to possible consummation than it was six months ago, nor the allegation that AGT was informed about certain XM technology too late to incorporate that technology into its 2008 designs – supports AGT's claim for equitable relief. Like its

1

initial complaint, AGT's amended complaint should be dismissed because, *inter alia*, it fails to allege any factual basis for a finding that AGT has an inadequate remedy at law and because it seeks equitable relief relating to allegations that are not yet ripe for adjudication.  In addition, as XM established in connection with its motion to dismiss the initial complaint, the amended complaint should be dismissed because AGT is not entitled to equitable relief where, as here, the underlying agreement embodies an ongoing relationship between the parties that cannot be enforced without recurrent recourse to the court to construe the agreement and to determine whether the parties have in fact satisfied their obligations under it.

### *Background*

The background to AGT's complaint is, by now, familiar to the Court.  AGT designs, manufactures and distributes audio and data systems and components for use in various markets.  (FAC Ex. A at 1)  XM provides a digital audio radio service of more than 170 channels of digital radio content delivered via satellite.  (FAC ¶ 4; FAC Ex. A at 1)  The parties' relationship is governed by the terms of the Agreement, which grants AGT a non-exclusive license for a period of three years, with a one-year renewal, to design, develop, manufacture, market, distribute and sell products incorporating an XM chipset and capable of receiving XM's digital audio radio service signals.  (FAC ¶ 10; FAC Ex. A at 1 & §§ 3.1.1, 10.1)  Thus, as the Court is aware, the parties' obligations to one another under the Agreement run from the Agreement's effective date of October 17, 2005, until October 16, 2008, with a renewal until October 16, 2009.

The Agreement permits AGT to present XM with product designs and data generated in the course of developing and designing products using the XM chipset so that XM may assess whether there is a business need and/or consumer demand for the proposed product (FAC Ex. A §§ 2.1.3, 2.3), and to submit prototypes and production samples of any product it designs

2

or develops using the XM chipset to XM for testing and approval before beginning mass production of the product.  (FAC Ex. A §§ 2.5.2, 3.2.7)  With respect to those products proposed by AGT for which XM believes there is a business need and which pass XM's product testing, the Agreement further provides that XM will subsidize their manufacture to the extent necessary to ensure that AGT earns at least a 29% profit margin pursuant to a formula set forth in the Agreement.  (FAC Ex. A §§ 2.3, 4.8, 4.10)  The Agreement contemplates that XM and AGT will use commercially reasonable efforts to market the licensed products (FAC Ex. A § 4.1), and that XM will provide AGT with subsidy payments, as well as access to information about XM's technology, chipset pricing and chipset availability, on terms that are at least as favorable as the terms XM provides to AGT's competitors for products in the same product category and similar price points.  (FAC Ex. A §§ 6.9.2, 6.9.3)  Moreover, the Agreement states that XM will provide AGT with promotional support on terms that are at least as favorable as the terms XM provides to AGT's competitors for products in the same product category with the same price points (i.e., the same initial manufacturer's suggested retail price, excluding certain rebates).  (FAC Ex. A § 6.9.6)  Finally, as the Court is aware, the Agreement contemplates that the parties will endeavor to resolve amicably any disputes that arise out of the Agreement (FAC Ex. A § 12.1), and that any dispute that cannot be resolved amicably will be submitted to binding arbitration subject to the Federal Arbitration Act, 9 U.S.C. §1, *et seq*.  (FAC Ex. A § 12.2)  Although the Agreement does not "preclude either Party from seeking equitable relief from a court for the other Party's breach of its obligations specified in this Master Agreement" (FAC Ex. A § 12.2.4), such relief may only be granted where principles of equity would otherwise authorize it.

In its initial complaint, AGT described at length the parties' past relationship regarding the development and sale of a receiver product called the "Sportscaster" that AGT alleg-

edly developed pursuant to the Agreement.[1]  AGT complained that XM had undercut AGT's ability to sell and market the Sportscaster by, for example, setting XM's manufacturer's suggested retail price for the Sportscaster above the retail price of a similar product sold by an independent satellite radio service provider, Sirius Satellite Radio, Inc, and providing allegedly unequal promotional support for the Sportscaster.  AGT contended that XM intended to discontinue the Sportscaster and replace it with a competing receiver distributed by Audiovox, and that XM was moving toward a single distributorship relationship with Audiovox, although AGT made no allegations in its initial complaint as to a possible timetable for the commencement of such an alleged relationship.  AGT contended that XM had not provided AGT with the same access to information about XM technology and chipset pricing and availability as it provided to other third-party manufacturers or distributors.  Finally, AGT asserted in its initial complaint that XM was engaged in discussions concerning a potential merger with Sirius Satellite Radio, Inc., and that, if such a merger were to occur, XM may in the future breach its obligations to AGT under the Agreement.

The initial complaint alleged that XM had breached the Agreement by:  (i) failing to cooperate with AGT in planning to meet customer demands and in meeting production quantities; (ii) failing to provide competitive pricing for AGT products; (iii) failing to ensure AGT's guaranteed profit margin; (iv) failing to meet with AGT to discuss new product concepts and marketing plans; (v) failing to support AGT's products or to assist in marketing AGT's products; (vi) failing to provide AGT with access to information about technology and chipset pricing and availability as provided to other third parties; (vii) considering an exclusive distributorship ar-

---

[1]    Although, as it did previously, XM disputes AGT's factual allegations relating to the XM's alleged breach, XM assumes the truth of those allegations for purposes of this motion to dismiss only.

rangement with Audiovox; and (viii) failing to approve AGT's new products while approving

similar products of other third parties.  AGT did not seek damages for XM's alleged breach of

the Agreement; rather, it sought an order requiring specific performance under the Agreement,

including a decree directing XM:  (i) to provide competitive pricing for AGT products; (ii) to

ensure AGT's guaranteed profit margin; (iii) to use commercially reasonable efforts to market

AGT's products and to coordinate such efforts with AGT; (iv) to provide AGT no less favorable

access to information and technology and chipset pricing and availability than it provides to

other third-party manufacturers and distributors; and (v) not to withhold approval unreasonably

of AGT's new products.  In addition, AGT sought an order declaring that any exclusive agree-

ment between XM and Audiovox or any other third-party distributors or manufacturers would

constitute a breach of the Agreement, and enjoining XM from breaching AGT's rights under the

Agreement in the event of a merger between XM and Sirius.

This Court dismissed AGT's initial complaint on the grounds that (i) as to past

breaches of the Agreement, AGT has an adequate remedy at law – damages – which are the tra-

ditional remedy for breaches of contract, and (ii) as to the allegations that XM may possibly

breach the Agreement in the future, such claims were nothing more than unripe speculation.

2007 WL 3196208, at *2-*3.  In a conference held with the Court on October 31, 2007, the Court

permitted AGT to file an amended complaint if it could allege facts occurring after August 3,

2007, to establish that a ripe case or controversy existed for adjudication.

The amended complaint AGT served on November 12, 2007, contains the identi-

cal breach of contract claim and seeks the same equitable relief.[2]  It does not, however, cure the

---

[2]    In its prayer for relief, AGT asserts an additional request for specific performance, asking the
Court to order XM to provide AGT no less favorable subsidy payments and promotional
support than it provides to other third-party manufacturers and distributors.  (FAC at 21)

fatal flaws in the original complaint. In its amended complaint, AGT repeats the detailed recita-

tion of alleged past breaches of the Agreement relating to the Sportscaster for which this Court

has already held that AGT has an adequate remedy at law. AGT likewise continues to speculate

about the future possibility that, if AGT were to submit product design or development plans or

prototypes to XM, XM would fail to honor its obligation to consider such plans or prototypes.

Of course, AGT does not – because it cannot – allege that it has supplied XM with design or de-

velopment plans, technical data, or product prototypes with respect to any prospective products,

and so AGT's conjecture about what XM might do if AGT actually were to make a concrete

proposal is nothing more than sheer speculation.

       In a vain effort to assert a ripe case or controversy, AGT makes several additional

factual allegations to suggest that XM would not comply with its obligations under the Agree-

ment even if AGT were to supply XM with product designs or a prototype, including: (i) that

XM allegedly "has entered into a de facto exclusive distribution relationship" with Audiovox for

XM's "key volume models" "at price points for which AGT's products are intended" (FAC ¶¶ 8,

57); (ii) that XM and Sirius have stated that, pending regulatory approval, they expect the merger

between them to be completed by the end of 2007, and that Sirius had scheduled its shareholder

meeting to approve the merger for November 13, 2007 (FAC ¶ 59); (iii) that Sirius has disclosed

in its November 5, 2007 Form 8-K that it expects the proposed merger with XM to result in "sig-

nificant cost synergies," including operating cost savings in almost every item on XM's and Sir-

ius's income statement (FAC ¶ 33); (iv) that XM is dramatically reducing its retail product lines

and favoring distributors with lower subsidy requirements just as the proposed merger with Sir-

ius is imminent, "an act wholly consistent with the operating cost synergies Sirius has touted as a

benefit of the merger" (FAC ¶ 59); (v) that AGT learned of XM's plans for fourth and fifth gen-

eration chipsets, which are to be incorporated into receivers, on September 17, 2007, "too late to incorporate the technology into the 2008 product cycle" (FAC ¶ 64); and (vi) that, at a September 17, 2007 meeting between AGT and XM, XM "made clear that XM anticipates no receiver business for AGT in the remainder of 2007 or in 2008 and 2009." (FAC ¶ 56)

These additional allegations – which do nothing more than assert that Audiovox is currently the only distributor of *certain* models of XM receivers at *some* price points, that the proposed merger between XM and Sirius is closer to possible consummation than it was when the initial complaint was filed, and that AGT learned of certain XM technology too late to incorporate that technology into its 2008 designs – are insufficient to save AGT's amended complaint. Even assuming *arguendo* that each of these additional allegations were true, they do not establish that AGT's remedy at law is inadequate, that AGT's claims about possible future breaches of the Agreement are ripe for adjudication, or that an order of specific performance could feasibly be crafted that would give the parties notice of what was required for compliance. Accordingly, AGT's amended complaint should be dismissed with prejudice.

## *Argument*

### I.    AGT's Remedy at Law is Adequate.

This Court correctly observed when it dismissed AGT's initial complaint that the traditional remedy for breach of contract is an action at law for damages. 2007 WL 3196208, at *2 (citing *General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994)). Fundamentally, damages for breach of contract "put the plaintiff in the same economic position he would have been in had the defendant fulfilled the contract." *Lucente v. International Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002). Contracting parties always assume the risk of a breach by the other party, and the non-breaching party is gener-

ally entitled to damages to compensate him for the breach.  As Justice Oliver Wendell Holmes wrote:

> The only universal consequence of a legally binding promise is that the law makes the promisor pay damages if the promised event does not come to pass.  In every case it leaves him free from interference until the time for fulfillment has gone by, and therefore free to break his contract if he chooses.

Oliver Wendell Holmes, Jr., The Common Law 301 (1881) (quoted in *Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*, No. 90 Civ. 5785 (SWK), 1990 U.S. Dist. LEXIS 12299, at *9 (S.D.N.Y. Sept. 14, 1990)).

Because damages constitute the usual remedy for a breach of contract, equitable remedies like specific performance and injunctive relief are deemed extraordinary, and are rarely available.  "[B]efore the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice."  *Lucente v. International Bus. Mach. Corp.*, 310 F.3d at 262.  Where, as here, AGT has an adequate remedy at law for alleged breaches of the Agreement, it cannot state a claim for specific performance or an injunction, and XM's motion to dismiss should therefore be granted.  *See*, *e.g.*, *Dweck v. Oppenheimer & Co.*, 30 A.D.3d 163, 163, 816 N.Y.S.2d 440, 440 (1st Dep't 2006) ("causes of action for specific performance . . . were properly dismissed [where the plaintiff] would have an adequate remedy at law"); *T.F. Demilo Corp. v. E.K. Constr. Co.*, 207 A.D.2d 480, 481, 616 N.Y.S.2d 240, 240 (2d Dep't 1994) ("Specific performance is not available as a remedy for breach of contract where, as here, there is an adequate remedy at law (i.e. money damages)"); *Hutton v. Klabal*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) (claim for injunction dismissed where remedy at law deemed adequate); *Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 811-12 (S.D.N.Y. 1986) (same).

AGT makes a feeble, if not disingenuous, effort in its amended complaint to bolster its argument that it will go out of business if equitable relief is not granted.  In its initial complaint, AGT asserted that it "designs, develops and distributes a range of innovative consumer electronics."  (Compl. ¶ 4)  In its amended complaint, AGT has altered that allegation to assert only that it "designs, develops and distributes innovative consumer electronics."  (FAC ¶ 4)  It couples that change with new allegations (which certainly could have been, but were not, made in its initial complaint) that it "was formed for the sole purpose of doing business with XM" (FAC ¶ 9), that "AGT's business with XM accounted for approximately 100% of AGT's gross revenue for the fiscal years 2005-2006" (FAC ¶ 65),[3] that the "loss of virtually all of this revenue, and the absence of any reasonable prospect that it will be replaced by sales of receivers for XM, creates a life-threatening financial outlook for AGT, as payroll and overhead costs associated with its XM receiver business continue to accrue unabated" (FAC ¶ 65), and that the "financial harm caused by XM, combined with the broader and unquantifiable harm to AGT's business reputation and relationships, has placed AGT in jeopardy of going out of business entirely, absent intervention by this Court."  (FAC ¶ 68)  Even if these new and altered allegations were true – and they are inconsistent with the recitals of the Agreement and the information publicly provided on AGT's website[4] – they do not address the undisputable facts that (i) the Agreement is

---

[3]    Interestingly, AGT does not reveal the percentage of its 2007 gross revenues attributable to its business with XM.

[4]    The Agreement, which is attached to the amended complaint and which marks the official beginning of AGT's relationship with XM, recites that AGT already was "a manufacturer and distributor of audio and data systems and components for use in various markets."  (FAC Ex. A at 1)  Moreover, on its website, AGT boasts that its HD Radio products – which are unrelated to its relationship with XM – demonstrate AGT's commitment "to excellence with a relentless drive to bring you the best products for your lifestyle."  www.advancedgt.com/visteon.  "For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the

*(cont'd)*

*not* a long-term agreement, but expires in October 2009, after which XM has no obligation to continue the relationship, and (ii) the Agreement does not guarantee AGT any particular level of sales or revenues, but only that XM will support viable, working receiver products that AGT designs, develops, and presents to XM for approval and for which the parties determine, during the course of the Agreement's term, that there is a business need and/or consumer demand. As this Court has already held, this case does not fall within the unusual set of cases where an indefinite, long-term licensing agreement can give rise to equitable relief. 2007 WL 3196208, at *2.[5]

       In addition to its "going out of business" allegations, AGT makes new allegations about the allegedly unquantifiable nature of the financial harm it has allegedly suffered. (FAC ¶ 67) This Court has already addressed this argument as well, holding that where, as here, damages, if any, would be limited to lost profits, AGT's remedy at law can be readily calculated. 2007 WL 3196208, at *3.

       AGT's assertion that XM has entered into "a de facto exclusive distribution arrangement" with Audiovox for XM's "key volume models" "at price points for which AGT's products are intended" (FAC ¶¶ 8, 57) does not support the notion that AGT's remedy at law is inadequate. Indeed, this assertion does not even allege a breach of the Agreement, let alone a breach for which AGT's remedy at law would be inadequate. Even assuming, for purposes of this motion, that Audiovox were currently the sole – or, in AGT's phrase, the "exclusive" – dis-

---

*(cont'd from previous page)*

    website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (citation omitted).

[5]   AGT also adds allegations in its amended complaint to the effect that the Agreement may be extended for a further year, until October 2010, if AGT has sold 750,000 receivers during the first four years of the Agreement's term. (FAC ¶¶ 11, 25, 30) Even if this provision were triggered, the Agreement still would not constitute the unusual kind of indefinite, long-term license agreement for which equitable relief might be available to redress a breach.

tributor of certain models of XM receivers at certain particular price points, AGT does not allege that that situation is the result of any unlawful contractual relationship; it simply labels that circumstance "de facto."  AGT does not allege – because it cannot – that Audiovox is not entitled to make product proposals to XM and to distribute those receiver products XM approves.  Nor does AGT allege that it has made a concrete proposal to XM for a receiver product in the same (unspecified) price point categories in which Audiovox is allegedly selling XM models.[6]  And AGT does not allege – because it cannot – that, even if AGT were to make a concrete product proposal, XM is obligated to find a business need or consumer demand for an AGT product in the same product and price category as products already distributed by Audiovox or any other third party.  Absent these allegations, the bare assertion that Audiovox happens to be the only company currently distributing certain receiver models at certain price points fails to state a claim for breach of the Agreement.  But, most important for purposes of this motion, even if AGT had alleged all of the foregoing, and even if such allegations, if true, amounted to a breach of the Agreement, AGT's remedy at law would be adequate to redress the alleged breach.  Extraordinary equitable relief is therefore unavailable.

Finally, AGT complains about another alleged past breach (which, if true, would be remediable at law) when it asserts that the access XM provided AGT to certain new chipset technology came too late to incorporate that technology into its 2008 product designs.  (FAC ¶ 64)  Even if that conclusory assertion were true (and the amended complaint sets forth no facts to support it), and even if XM's provision of technological information on September 17, 2007 ar-

---

[6]    Indeed, AGT appears to believe that XM is obligated under the Agreement to make product proposals to AGT and to offer AGT specific "business opportunities" for AGT's approval. (FAC ¶ 8)  But AGT has the contractual obligations backwards.  The Agreement requires AGT to present product proposals and prototypes to XM for XM's approval.

guably constituted a breach of the Agreement, it is not clear what equitable relief AGT would

ask this Court to order to redress this alleged grievance.  It is too late for this Court to order XM

to provide AGT with the technological information before September 17, 2007.

In conclusion, AGT has an adequate remedy at law, and its continued attempt to

evade that remedy by pursuing this claim for equitable relief should not be countenanced.

## II.    AGT's Speculation About Future Possible Breaches Remains Unripe.

AGT continues to speculate about future breaches of the Agreement, and that

speculation simply is not yet ripe for adjudication.  As this Court previously held, injunctive re-

lief "will not be granted against something merely feared as liable to occur at some indefinite

time in the future."  2007 WL 3196208, at *3 (quoting *Connecticut v. Massachusetts*, 282 U.S.

660, 674 (1931)); *accord Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) (courts

"cannot entertain a claim which is based upon 'contingent future events that may not occur as

anticipated, or indeed may not occur at all.'"); *Auerbach v. Board of Educ.*, 136 F.3d 104, 108-

09 (2d Cir. 1998) ("When the events alleged in a plaintiff's cause of action have not yet occurred,

a federal court is precluded from exercising subject matter jurisdiction because a real case or

controversy does not exist for purposes of Article III" of the United States Constitution.); *AM-*

*SAT Cable Ltd. v. Cablevision of Conn. Ltd. P'ship*, 6 F.3d 867, 872 (2d Cir. 1993) ("courts

should decide only 'a real, substantial controversy,' not a mere hypothetical question."); *In re*

*Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d Cir. 1993) (subject matter juris-

diction lacking where claim is predicated on "nebulous future events so contingent in nature that

there is no certainty they will ever occur").

AGT's new allegations that the proposed merger between XM and Sirius is closer

than it was when AGT filed its initial complaint, and that Sirius expects that, if the transaction is

12

consummated, it will result in "operating cost synergies" (FAC ¶¶ 33, 59), does not allege a violation of the Agreement.  AGT simply speculates that XM might breach the Agreement after the possible consummation of the proposed merger.  Such conjecture is no riper now than it was when this Court dismissed AGT's initial complaint, and it should be dismissed here as well.

Likewise, as noted above, AGT's allegation that Audiovox is the sole distributor of certain models of XM receivers at some price points does not allege a violation of the Agreement.  AGT speculates that, because Audiovox is currently distributing certain models of receivers, XM might breach the Agreement by unreasonably withholding approval or subsidization if AGT were to propose a similar product and to supply XM with product prototypes for testing and evaluation.  But AGT does not allege that it has made any such proposal to XM or has supplied XM with any such prototypes for testing and evaluation, and how XM would respond to such a proposal if and when it is ever made is mere conjecture.  It is, as it was at the time the initial complaint was dismissed, premature to address whether XM's possible response to an as-yet-unmade product proposal might warrant equitable relief.

For this additional reason, AGT's amended complaint should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  Fed. R. Civ. P. 12(b)(1).

## III.    This Court Cannot Issue an Order Requiring Specific Performance Without Taking on the Burden of Continuous Supervision and Repeated Intervention in the Parties' Business Decisions to Do Justice to Both Parties.

Lastly, as XM showed in its motion to dismiss the initial complaint, courts are loath to order specific performance in situations where the underlying contract embodies an ongoing relationship between the parties.  The extraordinary circumstances in which specific performance might be appropriate invariably involve contracts for the one-time purchase of goods that "are unique in kind, quality or personal association where suitable substitutes are unobtain-

13

able or unreasonably difficult or inconvenient to procure." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.*, No. 04 Civ. 10014 (PKL), 2006 U.S. Dist. LEXIS 34709, at *28-*29 (S.D.N.Y. May 30, 2006). Where a contract governs the parties' ongoing relationship, however, a grant of specific performance would likely require the court to supervise the parties' relationship over the length of that relationship, a task courts generally (and quite properly) avoid. *See*, *e.g.*, *Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. at 809-10; *see also TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007) ("specific performance is rarely an appropriate remedy where such a grant would mandate ongoing supervision by the court"); *Sing-Sing Prods., Ltd. v. Farrell*, No. 90 Civ. 0867 (JFK), 1990 U.S. Dist. LEXIS 2248, at *10 (S.D.N.Y. Mar. 2, 1990) ("Courts are chary of granting equitable relief where the result would be to compel two antagonistic parties to work together, particularly where the success of the relationship requires continuing cooperation and interwoven performance over a period of time.").

The reluctance of courts to grant equitable relief that would require their continued oversight of the business decisions of the parties to the ongoing relationship is compounded when the underlying agreement governing that relationship is itself fraught with ambiguities about the specific nature of the parties' respective obligations. In *Bethlehem Engineering Export Co. v. Christie*, 105 F.2d 933 (2d Cir. 1939), Judge Learned Hand, writing for a unanimous panel, affirmed the dismissal of a complaint seeking specific performance because the underlying master licensing agreement required the parties to cooperate in trying to sell licenses in countries where the parties thought it "practical" to do so and for prices the parties deemed "reasonable." Judge Hand explained that "it would be impossible to enforce the contract without deciding whenever any dispute arose" both "whether the defendants honestly thought a given country impractical" and "what was the reasonable price to which the defendants should agree." *Id.* at 934.

14

The court held that equitable remedies are not available to contracting parties "if they involve[] repeated recourse to the court in order to do justice to both parties." *Id.* "It is therefore clear beyond question," the appellate court held, "that specific performance would not be feasible." *Id.* at 935.

It is well established that a contract may be certain enough to constitute a valid contract for purposes of a damages action and yet be too indefinite to be specifically enforced. *Gulbenkian v. Gulbenkian*, 147 F.2d 173, 175 (2d Cir. 1945); Restatement (Second) of Contracts § 362 cmt. a (2007) (contract terms may be "certain enough to provide the basis for the calculation of damages but not certain enough to permit the court to frame an order of specific performance . . . and to determine whether the resulting performance is in accord with what has been ordered"). Furthermore, because of the availability of the contempt power for disobedience, it is equally "well settled that for the granting of specific performance the contract must be sufficiently certain in its terms to permit the decree to state with some exactness what the defendant must do." *Gulbenkian v. Gulbenkian*, 147 F.2d at 175; *accord TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d at 637 (requiring licensee to "make 'all reasonable efforts' to manufacture and market" licensed product too imprecise to order specific performance; "an order for specific performance is appropriate only when the terms of the contract are sufficiently specific to allow the precise drafting of such an order").

Like the agreements at issue in *Bethlehem Engineering* and *TSA Distributing*, the Agreement in the instant case embodies a similar set of nebulous rights between parties to an ongoing business relationship. The Agreement requires, among other things: (i) the use of "commercially reasonable efforts" to produce products "that are of high quality, appropriately priced and fulfill Customers' needs" (Compl. Ex. A § 2.3); (ii) XM's payment of a subsidy only with

15

respect to products for which XM believes "there is a business need" (Compl. Ex. A § 2.3); (iii) that the parties "work closely" to "expedite or escalate XM's Test as necessary" (Compl. Ex. A § 2.5.3); (iv) the use of "commercially reasonable efforts" to market licensed products to consumers and "to coordinate their marketing efforts" (Compl. Ex. A § 4.1); (v) the "mutual approval" of all promotional materials, which approval shall "not be unreasonably withheld or delayed" (Compl. Ex. A § 4.3); (vi) the provision by AGT of "commercially reasonable support" for retailers, which support XM "may assist" AGT in providing (Compl. Ex. A § 4.4); (vii) the use of "commercially reasonable efforts" to maintain "competitive" pricing for AGT's products (Compl. Ex. A § 4.7); and (viii) that the parties "mutually agree upon [production] volumes" where XM "has a reasonable business concern that initial or ongoing quantities are excessive."  (Compl. Ex. A § 4.9)  Like the terms of the agreements in *Bethlehem Engineering* and *TAS Distributing*, the terms of the Agreement are too indefinite to allow a precise drafting of an order of specific performance that would set forth exactly what XM must do without recurring recourse to the Court to do justice to both parties who, as AGT's two complaints surely suggest, have found it difficult to work together.  And, like in *Bethlehem Engineering* and *TAS Distributing*, it is therefore clear beyond question that specific performance in this case would not be feasible.

Even AGT's request for a declaratory judgment that the alleged "de facto" exclusive arrangement with Audiovox constitutes a breach of the Agreement cannot feasibly be granted.  Audiovox's alleged de facto exclusive role as the only distributor of certain models of receivers at particular price points does not violate the Agreement; it would only be any future unreasonable withholding of approval by XM of AGT product designs or prototypes as a consequence of such a relationship that would arguably constitute a breach.  Thus, there would surely be no basis for a declaration prohibiting Audiovox from being the sole distributor of product

models at price points for which AGT has not designed a product, or for which AGT has not supplied a commercially viable prototype, or for which AGT's competing product has failed in the marketplace despite the parties' commercially reasonable efforts to produce and market it. The declaration sought by AGT would thus require a multitude of qualifications and exceptions. It could not be crafted in a way that would put the parties on notice of the specific conduct that would constitute compliance and, in all events, would inevitably require repeated intervention by the Court in the parties' business decisions.

Because the equitable relief AGT seeks is simply not feasible or appropriate, the case should be dismissed for failure to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6).

## *Conclusion*

For each of the foregoing reasons, AGT's amended complaint should be dismissed with prejudice.

Dated: November 30, 2007                    Respectfully submitted,


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP


/s/  Jeffrey A. Mishkin_____
Jeffrey A. Mishkin (JM-8380)
Anthony J. Dreyer (AD-3571)
Peter S. Julian (PJ-3443)
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
*Attorneys for Defendant*
    *XM Satellite Radio Inc.*