FILED ELECTRONICALLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

ADVANCED GLOBAL TECHNOLOGY, LLC,          :
                                          :
                              Plaintiff,  :
              v.                          :
                                          :   No. 07cv3654 (JSR) (DCF)
XM SATELLITE RADIO INC.,                  :   ECF CASE
                                          :
                              Defendant.  :
                                          :
                                          :
-------------------------------------------------------------------- X


**PLAINTIFF ADVANCED GLOBAL TECHNOLOGY, LLC'S MEMORANDUM
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

Molly S. Boast
      (msboast@debevoise.com)
Robert H. Chandler
      (rhchandler@debevoise.com)
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, NY 10022
(212) 909-6000
*Attorneys for Plaintiff
Advanced Global Technology, LLC*

22623440

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ............................................................................................................2

I.      THE AGREEMENT ...............................................................................................3

II.     AGT'S INITIAL COMPLAINT AND THE MOTION TO DISMISS IT .......................................4

III.    AGT'S AMENDED COMPLAINT ................................................................................6

ARGUMENT ...............................................................................................................8

I.      AGT'S CLAIM FOR RELIEF IS RIPE FOR ADJUDICATION AND SHOULD NOT BE
        DISMISSED UNDER RULE 12(b)(1). ........................................................................9

II.     AGT ALLEGES FACTS SUFFICIENT TO DEMONSTRATE THAT AN AWARD OF
        SPECIFIC PERFORMANCE IS APPROPRIATE IN THIS CASE .........................................11

III.    NOTHING IN THE AGREEMENT BETWEEN THE PARTIES OR THEIR COURSE OF
        PERFORMANCE WOULD MAKE EITHER SPECIFIC PERFORMANCE OR A
        DECLARATORY JUDGMENT IMPRACTICAL. ..............................................................17

CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967) .........................................9

*Advanced Global Technology, LLC v. XM Satellite Radio, Inc.*,
2007 WL 3196208, at *2-*3 (S.D.N.Y. Oct. 29, 2007) .............................................5, 10

*Am. Motor Club, Inc. v. Corcoran*, 644 F. Supp. 862, 866 (S.D.N.Y. 1986)....................15

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 04 Civ. 10014,
2006 U.S. Dist. LEXIS 34709, at *26 (S.D.N.Y. May 31, 2006) ................................14

*Atsi Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ........................8

*Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996)................................................................8

*Bethlehem Eng'g Export Co. v. Christie*, 105 F.2d 933, 934 (2d Cir. 1939)....................18

*Crimson Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903, 910
(S.D.N.Y. 1986) ................................................................................................10

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295
(S.D.N.Y. 2003) ....................................................................................................9

*Goodman Mfg. Co. L.P. v. Raytheon Co.*, 98 Civ. 2774, 1999 U.S. Dist. LEXIS
13418, at *32 (S.D.N.Y. 1999) ............................................................................16, 19

*Gulbenkian v. Gulbenkian*, 147 F.2d 173, 174-75 (2d Cir. 1945) .....................................19

*Hutton v. Klabal Gallery, Inc.*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) ..............................14

*La Mirada Prods. Co. v. Wassall PLC*, 823 F. Supp. 138, 141 (S.D.N.Y. 1993) .............13

*Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809 (S.D.N.Y. 1986)...........14

*Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002)...............................14

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*,
749 F.2d 124, 125-26 (2d Cir. 1984).................................................................15

22623440

*SATCOM Int'l Group PLC v. ORBCOMM Int'l Partners, L.P.*, 98 CIV. 9095, 2000 U.S. Dist. LEXIS 7739, at *46-*61 (S.D.N.Y. 2000) ...........................................18

*SATCOM Int'l Group PLC v. ORBCOMM Int'l Partners, L.P.*, 49 F. Supp. 2d 331 (S.D.N.Y. 1999) ...................................................................................................12

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ...................................................................8

*Shred-It USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 234 (S.D.N.Y. 2002) ...................................................................................................16

*TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007) .................19

*Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) .........................................13

*Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087, 1090-91, 1105-06 (S.D.N.Y. 1989) .........................................................................11, 15, 17, 19

*USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989) .............15

*Williams v. Breslin*, 274 F. Supp. 2d 421, 425 (S.D.N.Y. 2003) ........................................8

## STATE CASES

*Dweck v. Oppenheimer & Co.*, 30 A.D.3d 163, 163, 816 N.Y.S. 2d 440, 440 (1st Dep't 2006) ............................................................................................................14

*Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 415 (2001) .............................16

*Van Wagner Adver. Corp. v. S & M  Enters.*, 67 N.Y.2d 186, 193 (1986) ........................12

22623440

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
ADVANCED GLOBAL TECHNOLOGY, LLC,　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　Plaintiff,　　　:
　　　　　　　　v.　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:　No. 07cv3654 (JSR) (DCF)
XM SATELLITE RADIO INC.,　　　　　　　　　:　ECF CASE
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　Defendant.　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
-------------------------------------------------------------------- X

**PLAINTIFF ADVANCED GLOBAL TECHNOLOGY, LLC'S MEMORANDUM
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Advanced Global Technology, LLC ("Plaintiff" or "AGT"), by its undersigned counsel, respectfully submits this memorandum in opposition to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint.

**PRELIMINARY STATEMENT**

In its Order of August 3, 2007, this Court dismissed AGT's initial complaint against XM Satellite Radio Inc. ("Defendant" or "XM") without prejudice, holding that AGT could re-file should certain of its concerns ripen into a dispute warranting equitable relief. Since that Order, a number of events have demonstrated that XM is violating its Master License Agreement with AGT (the "Agreement") by entering into an exclusive relationship with one of AGT's competitors. These intervening events, alleged in detail

1

in AGT's First Amended Complaint (the "Amended Complaint"), demonstrate that AGT's claim is now ripe.

In addition, the Amended Complaint alleges facts sufficient to demonstrate that money damages are not an adequate remedy in this case and that equitable relief, including specific performance, is warranted. Given the Agreement's express provisions anticipating the need for equitable relief, and the well-founded allegations that XM's ongoing conduct threatens to destroy AGT's business, this Court has ample discretion to award equitable relief. Furthermore, neither the terms of the Agreement nor the parties' interactions with one another suggest that equitable relief would be more difficult to implement in this case than in any other setting in which a business relationship has led to a disagreement. Thus, AGT's claim is ripe for review, and equitable relief is warranted and appropriate.

## BACKGROUND

AGT, a company that designs, develops, and distributes innovative consumer electronics, was formed for the sole purpose of doing business with XM. (Am. Compl. ¶¶ 3, 9). In October 2005, after their principals had spent approximately two years discussing a potential partnership, AGT and XM entered into the Agreement, which gave AGT the right to develop and distribute receivers compatible with XM's satellite radio service over at least a four-year term. (Am. Compl. ¶¶ 5, 9-10).

2

## I.    THE AGREEMENT

The Agreement sets forth many specific rights and obligations to fill out the details of the parties' partnership.  For instance, it gives AGT the rights to all XM technology, data, and content for Licensed Products on a "most favored nations" basis.  (Am. Compl. ¶ 12).  Specifically, the Agreement provides that AGT "will have complete access to all present and future technology development by XM and its Affiliates (including XM Chipsets) that XM or its Affiliates makes available to any third party commercial purchaser of XM Chipsets" (Am. Compl. ¶ 12(a) & Ex. A ¶ 2.2.1) and that XM "shall not provide other third party manufacturers or distributors . . . more favorable treatment than it provides with regards to access to technical information about XM's technology 'roadmap' and chipset pricing and availability" (Am. Compl. ¶ 15(d) & Ex. A ¶ 6.9.3).[1]

The Agreement also spells out the collaborative nature of the parties' arrangement.  It provides that the parties will schedule regular meetings to review AGT's progress and efforts in designing, distributing, and marketing products (Am. Compl. Ex. A ¶ 2.1.3), and provides that the parties "will each use commercially reasonable efforts to

---

[1]    As it did in briefing its motion to dismiss the initial complaint, XM mischaracterizes Section 6.9.3 of the Agreement.  (See Def. Mem. at 3.)  This section, which requires that XM provide AGT with access to information about XM's technology, chipset pricing and chipset availability on terms at least as favorable as XM provides to other third party distributors and manufacturers, is *not* limited to products in the same product category with similar price points, but applies across the board to all products.  (See Am. Compl. Ex. A ¶ 6.9.3).  XM's repeated misinterpretation of this provision is an example of the crabbed reading it gives to a contract that, taken as a whole, is not nearly as limited as XM pretends.

3

market" AGT's products and "to coordinate their marketing efforts" (Am. Compl. Ex. A ¶ 4.1). The Agreement provides that so long as AGT's product prototypes pass XM's product tests, with "approval not to be unreasonably withheld, the products will be certified as 'Licensed Products'" under the Agreement. (Am. Compl. ¶ 12(e) & Ex. A ¶ 2.5.2). There can be no question that the Agreement contemplates an ongoing, multi-product relationship.

In addition, the Agreement provides for resolution of disputes arising under the Agreement. In particular, the Agreement provides for arbitration of disputes (Am. Compl. Ex. A ¶¶ 12.1, 12.2.1-12.2.3) but explicitly states that nothing in the Agreement "will preclude either Party from seeking equitable relief from a court for the other Party's breach of its obligations specified in this Master Agreement." (Am. Compl. ¶ 17 & Ex. A ¶ 12.2.4). This provision is sweeping in its breadth; it is not, for example, limited to breaches such as unauthorized use of XM's chipsets.

## II.    AGT'S INITIAL COMPLAINT AND THE MOTION TO DISMISS IT

AGT's initial complaint alleged that, in backing away from its contractual commitments under the Agreement during the first year of a four-year agreement, XM breached the Agreement in several ways. In particular, the complaint noted that (*i*) XM dramatically and unilaterally reduced the year 2006 sales projection for AGT's Sportscaster units (*see* Am. Compl. ¶¶ 25, 30, 34); (*ii*) XM undermined the competitive price position of the Sportscaster product, thereby further decreasing sales (*see* Am. Compl. ¶¶ 36-43); (*iii*) XM abandoned the Sportscaster and repeatedly refused to meet with AGT representatives to discuss its actions (*see* Am. Compl. ¶¶ 44-49); and (*iv*) XM

4

failed to approve AGT's new product concepts even as it endorsed virtually identical concepts put forth by other distributors (*see* Am. Compl. ¶¶ 51, 53). XM's actions resulted in significantly fewer sales of AGT's Sportscaster product than the parties originally contemplated and essentially put AGT out of the satellite radio business. (*See* Am. Compl. ¶ 6). The initial complaint sought specific performance to enforce XM's ongoing, collaborative obligations, along with other declaratory and injunctive relief.

XM moved to dismiss the initial complaint, and this Court granted that motion on August 3, 2007. In its October 29, 2007 Memorandum Order, this Court elaborated upon its reasons for the dismissal. The Memorandum Order stated that damages were an adequate remedy at law for XM's alleged past breaches, and that allegations that XM might breach the Agreement in the future were "unripe speculation." *Advanced Global Technology, LLC v. XM Satellite Radio, Inc.*, 2007 WL 3196208, at *2-*3 (S.D.N.Y. Oct. 29, 2007). Specifically, the Memorandum Order declared that "the declaratory relief AGT seeks—a court declaration 'that any exclusive agreement between XM and Audiovox … would constitute a breach of the Master License Agreement' –involves contingent issues not ripe for adjudication and seeks an interpretation of the contract that would seem obvious…. It is therefore premature to address whether these events, were they to actually occur, warrant relief." *Id.* at *3.

As discussed at a telephonic conference held on October 31, 2007, this Court allowed AGT to file an amended complaint, so long as AGT could allege new facts that would show that the controversy was ripe for adjudication.

5

**III.    AGT'S AMENDED COMPLAINT**

On November 12, 2007, AGT filed the Amended Complaint, which supplements the initial complaint with additional allegations that demonstrate that AGT's claims are ripe and equitable relief appropriate.

The new developments set forth in the Amended Complaint show that XM's exclusive relationship with Audiovox is anything but "conjecture."  (*See* Def. Mem. at 6). Rather, these allegations reveal that such a relationship has become, to AGT's detriment, a reality.  As detailed in the Amended Complaint, Audiovox's CEO bragged about his company's exclusive distribution relationship with XM during Audiovox's October 11, 2007 earnings call.  (Am. Compl. ¶ 58).  XM's own recent actions also demonstrate its abandonment of AGT in favor of Audiovox.  XM's new product line for 2008 does not include any AGT products, and the price points at which AGT and XM intended to sell AGT's products are now devoted exclusively to Audiovox products.  (Am. Compl. ¶ 57). In fact, during a meeting on September 17, 2007, XM representatives made clear that XM foresees no retail receiver business for AGT throughout the rest of 2007 or in 2008 and 2009.  (Am. Compl. ¶ 56).  XM claims that these allegations merely show "that Audiovox is currently the only distributor of *certain* models of XM receivers at *some* price points."  (Def. Mem. at 7).  XM is mistaken; these allegations sufficiently state that XM has made Audiovox its exclusive distributor (as Audiovox itself seems

6

unequivocally to believe) at the very price points AGT would have occupied at retail.[2]
XM's actions demonstrate its intention effectively to terminate its relationship with AGT
years before the Agreement is set to expire.

The new allegations also demonstrate that XM has failed to provide AGT with
technology for Licensed Products on a "most favored nations" basis, as the Agreement
requires. As the Amended Complaint alleges, AGT did not even learn of certain new
chipset technology until September 2007. (Am. Compl. ¶ 64). The significance of this
incident is not simply that AGT learned of the technology too late to incorporate it into its
2008 designs, as Defendant would have it. (Def. Mem. at 7). Rather, it is that, as AGT
alleges, "other distributors were given access to this technology months before it was
made available to AGT," in contravention of the equal access and "most favored nations"
provisions of the Agreement. (Am. Compl. ¶¶ 64, 78). An XM product line-up for 2007,
2008, and 2009 that excludes AGT altogether, as alleged, would seem to make this
conclusion inescapable and certainly provides an ample basis for reasonable inference.

The Amended Complaint requests specific performance, along with other
declaratory and injunctive relief. This request for relief is intended to ensure XM's
compliance with its most critical affirmative and ongoing obligations under the
Agreement: (*i*) providing competitive pricing for AGT's products; (*ii*) ensuring AGT's

---

[2] Completely contrary to XM's assertions, AGT has alleged that it provided XM with
    new product proposals and requested meetings with XM to discuss these proposals,
    to no avail. (Am. Compl. ¶¶ 50-51, 76, 80). In addition, the Sportscaster was
    intended for—and was sold at—the price points now occupied exclusively by
    Audiovox products.

7

guaranteed profit margin; (*iii*) using commercially reasonable efforts to market AGT's products and coordinating those efforts with AGT; (*iv*) providing AGT with no less favorable access to information and technology and chipset pricing and availability than XM provides to other third-party manufacturers or distributors; (*v*) providing AGT with no less favorable subsidy payments and promotional support than XM provides to other third-party manufacturers or distributors; and (*vi*) not unreasonably withholding approval of AGT's new products.

## ARGUMENT

A court considering a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) "must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir. 1996) (citation omitted); *see also Williams v. Breslin,* 274 F. Supp. 2d 421, 425 (S.D.N.Y. 2003). A complaint may be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) only if the plaintiff fails to allege facts sufficient "to raise a right to relief above the speculative level." *Atsi Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). In reviewing the sufficiency of a complaint at this pleading stage, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). Especially in light of these mandates,

XM's motion to dismiss should be denied; the Amended Complaint plainly alleges a claim for relief that is ripe for this Court's review and suitable for equitable relief.

**I.    AGT'S CLAIM FOR RELIEF IS RIPE FOR ADJUDICATION AND SHOULD NOT BE DISMISSED UNDER RULE 12(b)(1).**

The ripeness doctrine is meant to keep courts out of parties' "abstract disagreements." *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 148-49 (1967). In this case, AGT's claim is anything but abstract. Because AGT's claim rests on particular, concrete allegations of XM's behavior, and because judicial inaction could result in the destruction of AGT's business, this controversy is ripe for adjudication.

In a declaratory judgment action such as this one, the test for ripeness is whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 261 F. Supp. 2d 293, 295 (S.D.N.Y. 2003) (internal quotation and citation omitted); *see also Abbott Labs.*, 387 U.S. at 149 (In order to determine a controversy's ripeness for review, a court must examine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.").

The allegations of the Amended Complaint attest to the immediacy and the reality of the controversy between AGT and XM. As asserted in the Amended Complaint, an exclusive distribution relationship between XM and Audiovox constitutes a breach of the

9

Agreement.[3]  (Am. Compl. ¶ 79).  The Amended Complaint sets forth several specific

factual allegations making clear that such an arrangement is not merely hypothetical; it

has already come to pass.  Audiovox's own CEO told the entire investment community

about the exclusive nature of his company's relationship with XM.  (Am. Compl. ¶ 58).

Moreover, XM's recently disclosed new retail product line for 2008 and anticipated 2009

product line demonstrate that the price points at which AGT's products formerly

competed are now solely the domain of Audiovox, and that AGT is notably absent from

these product plans.  (Am. Compl. ¶ 57).  The allegations of exclusivity and

discrimination against AGT in favor of other distributors, then, are not based on

speculation, conjecture, or contingencies, but on specific events that are now taking

place.

        XM tries to rely on a distinction between "de facto" exclusivity and exclusivity in

some other form, as though that distinction has legal significance on this motion.  But it

does not.  Exclusivity is exclusivity; it necessarily results in discriminatory access to

technology and promotional support, and it is sufficiently alleged in the Amended

Complaint.  *See, e.g.*, *Crimson Semiconductor, Inc. v. Electronum*, 629 F. Supp. 903, 910

(S.D.N.Y. 1986) (holding, where plaintiff alleged a de facto agency relationship, that

"[c]haracterization of the relationship between the two parties is a factual issue that the

---

[3] This Court appears to concur; it described the proposed declaration "that any exclusive
    agreement between XM and Audiovox … would constitute a breach of the Master
    License Agreement" as an "obvious" interpretation of the contract.  *Advanced
    Global Technology*, 2007 WL 3196208, at *3.

10

court is unable to resolve at this stage of the litigation" and denying a motion to dismiss).

Attempting to draw such a distinction is especially inappropriate on a motion to dismiss,

when the court must make all inferences in favor of the plaintiff.

The Amended Complaint also sets forth with immediacy the potential

consequence if this Court does not consider AGT's claim: AGT could well go out of

business.  (Am. Compl. ¶ 68).   XM's breach of the Agreement has denied AGT its core

revenue stream, and AGT's financial outlook is now dire.  (Am. Compl. ¶ 65).  Thus, the

possible hardship facing AGT is both considerable and imminent, and AGT's declaratory

relief claim is ripe.

## II.    AGT ALLEGES FACTS SUFFICIENT TO DEMONSTRATE THAT AN AWARD OF SPECIFIC PERFORMANCE IS APPROPRIATE IN THIS CASE.

AGT has adequately demonstrated for pleading purposes that specific

performance is an appropriate remedy for this action. Contrary to XM's argument, a case

need not concern a licensing agreement of indefinite length to qualify for equitable relief.

In addition, the Agreement itself explicitly contemplates the possibility of equitable

relief, and the allegations of the Amended Complaint are sufficient to demonstrate the

appropriateness of specific performance.

XM argues that the set length of the Agreement precludes a grant of equitable

relief (Def. Mem. at 9-10).  However, the breach of a contract of definite term, if

sufficiently vital to the viability of a company, can merit equitable relief; courts are not

foreclosed from granting such relief simply because the breached contract runs for a set

length.  *See, e.g.*, *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087,

11

1090-91 (S.D.N.Y. 1989) (awarding specific performance to enforce a contract covering the period from 1986 to 1991).  Moreover, the fact that a contract runs for a specified term does not necessarily mean that the parties' relationship will not continue beyond the contract term.  Contracts similar to the Agreement, which envisions an ongoing working relationship between a company and a distributor dependent on that company, are often renewed for multiple terms.  The Agreement itself contemplated an extension if the relationship proved successful; it provided for an additional one-year renewal if AGT sold 750,000 receivers during the first four years the Agreement was in place, a goal it might easily have met had XM not undermined AGT's position within months of AGT's initial product launch.  (*See* Am. Compl. ¶ 11 & Ex. A ¶ 10.1).

Equitable relief is particularly appropriate in this case, because the Agreement specifically recognizes the need for such relief.  (*See* Am. Compl. ¶ 18 & Ex. A ¶ 12.2.4 ("Nothing in this [section regarding arbitration] will preclude either Party from seeking equitable relief for the other Party's breach of its obligations specified in this Master Agreement.")).  The parties envisioned claims that could not be resolved or remedied through an arbitrator's award of money damages, and AGT's claim presents precisely such a situation.  *Cf. SATCOM Int'l Group PLC v. ORBCOMM Int'l Partners, L.P.*, 49 F. Supp. 2d 331 (S.D.N.Y. 1999) (ruling on merits of request for equitable relief when parties specifically carved out equitable remedies from an arbitration provision otherwise governing disputes arising under licensing agreement).

For money damages to provide an adequate remedy, one must be able to project losses owing to a breach of contract.  *See Van Wagner Adver. Corp. v. S & M Enters.*, 67

12

N.Y.2d 186, 193 (1986) ("What matters, in measuring money damages, is the volume, refinement, and reliability of the available information about substitutes for the subject matter of the breached contract.") (citation omitted).  Here, specific performance is necessary because "the assessment of monetary damages is impractical or too speculative." *La Mirada Prods. Co. v. Wassall PLC*, 823 F. Supp. 138, 141 (S.D.N.Y. 1993) (citations omitted).  XM began to breach the Agreement less than one year into its four-year term, and AGT produced and marketed only one XM-approved product during that time.  (*See, e.g.*, Compl. ¶¶ 10, 11, 31-35, 44-49).  It would be extraordinarily difficult to determine the volume of Sportscaster receivers AGT would have sold had XM supported the product appropriately, much less the volume of AGT's product sales and resulting profits had XM exercised reasonable approval of AGT's further product designs.  *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (recognizing that it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship . . . that would produce an indeterminate amount of business in years to come").

A damages calculation would be all the more difficult in this case, because XM's alleged conduct altered the competitive landscape.  The Amended Complaint alleges that XM discriminated against AGT by failing to give it the same access to XM's technology and the same subsidies and promotional support that XM gave to other distributors.  (Am. Compl. ¶¶ 39, 64, 67).  XM's treatment of AGT put AGT at a competitive disadvantage to the distributors who received full access to XM's technology and XM's full promotional support.  It would be exceedingly difficult to try to quantify the harm AGT

13

suffered as a result of this disparate treatment; as alleged in the Amended Complaint, it is impossible "to try to reconstruct a retail environment in which AGT was distributing XM receivers on a level playing field."  (Am. Compl. ¶ 67).

XM relies upon cases in which, unlike this case, the calculation of money damages was straightforward and noncontroversial.  *See, e.g., Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (no difficulty calculating stock options allegedly due plaintiff); *Hutton v. Klabal Gallery, Inc.*, 726 F. Supp. 67, 73 (S.D.N.Y. 1989) (no difficulty calculating the $156,000 allegedly due plaintiff for defendant's failure to obtain and resell certain artwork); *Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809 (S.D.N.Y. 1986) ("The principal injury plaintiff will suffer if defendant terminates the contract – loss of defendant's contract payments for printing services – may be calculated to the last cent."); *Dweck v. Oppenheimer & Co.*, 30 A.D.3d 163, 163, 816 N.Y.S. 2d 440, 440 (1st Dep't 2006) (no difficulty calculating "lost income derived essentially from a fixed interest rate").  Even assuming that AGT's claims lent themselves to such precision, however, "the existence of a remedy at law does not preclude the granting of specific performance," so long as the plaintiff "demonstrate[s] that remedies at law are incomplete and inadequate to accomplish substantial justice." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 04 Civ. 10014, 2006 U.S. Dist. LEXIS 34709, at *26 (S.D.N.Y. May 31, 2006) (citations omitted).  Here, remedies at law would not accomplish substantial justice; they would not restore AGT's relationships with retailers or its position vis-à-vis its competitors in the market.  Moreover, absent an

award of specific performance, AGT will be in jeopardy of going out of business entirely. (*See* Am. Compl. ¶ 68).

Equitable relief is appropriate for cases in which a breach threatens the "destruction or catastrophic impairment of an ongoing business." *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y. 1989) (citations omitted); *see also Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N.Y., Inc.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (loss of distributorship cannot be fully compensated by subsequent monetary damages).  Specific performance is especially appropriate in this case, where, as alleged, AGT's sole satellite radio receiver distribution relationship is with XM (and XM is merging with the only other operator of a satellite radio business), XM's conduct has essentially put AGT out of the satellite radio business (Am. Compl. ¶ 6), XM has damaged AGT's reputation with its retail customers (Am. Compl. ¶¶ 26, 29, 32, 43, 48, 66), and XM has allowed AGT's competitors to occupy the field in violation of AGT's equal access and "most favored nation" rights.  *See Travellers*, 722 F. Supp. at 1105 (awarding specific performance where plaintiff did roughly 90-95% of its business with the defendant and had no prospects for a substitute relationship); *Am. Motor Club, Inc. v. Corcoran*, 644 F. Supp. 862, 866 (S.D.N.Y. 1986) ("[P]otential damage to [plaintiff] of up to 30% and possibly even 70% of its normal sales is sufficient to constitute irreparable harm" befitting equitable relief.).

Any recent efforts AGT may have made to enter a new product line in an attempt to improve its business prospects do not change the fact that XM's breach of the Agreement has denied AGT its core revenue stream and threatened AGT's ongoing

15

viability.  (Am. Compl. ¶ 65).  As alleged, AGT derived approximately 100% of its gross

revenue for fiscal years 2005 and 2006 from its XM receiver business.  (Am. Compl. ¶

65).  As a result of XM's repudiation of its relationship with AGT, AGT has lost almost

all of this revenue, and there is no reasonable prospect that its XM receiver business will

pick up in the future.  (*See* Am. Compl. ¶¶ 56-57, 65).  Equity should not punish AGT for

trying to find new revenue streams in the face of such hardship.

     At a minimum, discovery is warranted to determine whether money damages

would adequately provide compensation to AGT.  The fact-specific nature of a court's

determination whether specific performance is warranted in a particular case renders

dismissal rarely appropriate at an early procedural stage of the litigation.  *See Shred-It*

*USA, Inc. v. Mobile Data Shred, Inc.*, 202 F. Supp. 2d 228, 234 (S.D.N.Y. 2002)

(question of whether equitable relief is appropriate cannot often be decided on a motion

to dismiss); *Goodman Mfg. Co. L.P. v. Raytheon Co.*, 98 Civ. 2774, 1999 U.S. Dist.

LEXIS 13418, at *32 (S.D.N.Y. 1999) ("Balancing the hardships and equities of both

parties, which is necessary to resolve [a claim for equitable relief], would be singularly

inappropriate at this stage of the proceedings."); *see also Sokoloff v. Harriman Estates*

*Dev. Corp.*, 96 N.Y.2d 409, 415 (2001) ("Whether money damages would adequately

compensate plaintiffs for loss of these allegedly unique [goods] is a matter to be resolved

at a later stage, not on a motion to dismiss the complaint.").  In the face of AGT's

specific allegations, and in the absence of any factual record to the contrary, the Court

should decline to determine dispositively that specific performance is not justified in this

case.  *See Goodman Mfg. Co. L.P.*, 1999 U.S. Dist. LEXIS 13418, at *32.

16

**III.**    **NOTHING IN THE AGREEMENT BETWEEN THE PARTIES OR THEIR COURSE OF PERFORMANCE WOULD MAKE EITHER SPECIFIC PERFORMANCE OR A DECLARATORY JUDGMENT IMPRACTICAL.**

XM incorrectly suggests that specific performance is inappropriate in this case merely because the parties have encountered past difficulties in their relationship. *See, e.g., Travellers*, 722 F. Supp. at 1105 (holding that a long history of disputes does not prevent specific performance where parties were able to do some amount of business together despite their differences). Most litigation involves parties experiencing conflicts of one sort or another, and in this case the difficulties are not at all insurmountable. Indeed, even though XM began to fall short of its commitments under the Agreement just a few months into the contract term, the parties were able to cooperate sufficiently to launch and promote the Sportscaster.

XM is similarly misguided in arguing that the Agreement is so "fraught with ambiguities" as to be ineligible, as a matter of law, for the equitable relief for which the parties specifically provided. To the contrary, the Agreement imposes straightforward obligations on XM. For example, the Agreement requires XM to: (*i*) provide AGT "complete access to all [of its] present and future technology . . . (including XM chipsets)" and advise AGT "of any new development of technology in a reasonable time frame for [AGT] to prepare for integration and development" (Am. Compl. Ex. A ¶ 2.2.1); (*ii*) provide AGT all technical data that XM makes available to third parties (Am. Compl. Ex. A ¶ 2.2.2), (*iii*) provide AGT "the results of any market research related to the Licensed Products" and meet periodically with AGT (with a goal of at least once per month) for a marketing review (Am. Compl. Ex. A ¶¶ 4.1.2, 4.6); (*iv*) guarantee AGT

17

a profit margin of at least 29% on all Licensed Products (Am. Compl. Ex. A ¶ 4.8); and

(*v*) refrain from providing other third-party distributors or manufacturers "more favorable

treatment . . . with regards to access to technical information about XM's technology

'roadmap' and chipset pricing and availability" (Am. Compl. Ex. A ¶ 6.9.3). Given

specific terms such as these, the Court could readily frame an order clearly stating what

XM must do to comply.

Conveniently, XM ignores these express and certain contractual obligations, and

instead culls a handful of allegedly "nebulous" terms from the twenty-page Agreement.

These purportedly incomprehensible terms include such commonly used and understood

contractual language as "commercially reasonable efforts," "business need," "work

closely," "coordinate," and "unreasonably." Despite XM's protestations to the contrary,

courts often interpret and enforce contractual terms such as these. *See, e.g., SATCOM*

*Int'l Group PLC v. ORBCOMM Int'l Partners, L.P.*, 98 CIV. 9095, 2000 U.S. Dist.

LEXIS 7739, at *46-*61 (S.D.N.Y. June 6, 2000) (interpreting contract provision

requiring party to use "all commercially reasonable efforts" in marketing and promoting

the licensed system and in applying for permits to construct and operate satellite system

gateways in various countries).

The cases XM cites are inapt to the Agreement. The contract in *Bethlehem*

*Engineering Export Co. v. Christie*, the primary authority on which XM relies, contained

*no* material terms that were clear and independently enforceable. *Bethlehem Eng'g*

*Export Co. v. Christie*, 105 F.2d 933, 934 (2d Cir. 1939). The contract in *Gulbenkian v.*

*Gulbenkian* was neither a licensing agreement nor a commercial contract, but an

18

agreement that a corporation "shall be reorganized … in such manner as may be determined" jointly by parties' counsel. *Gulbenkian v. Gulbenkian*, 147 F.2d 173, 174-75 (2d Cir. 1945). The court denied specific performance not because the contract contained allegedly ambiguous language but because "too many major matters regarding the corporation's capitalization and the manner of effecting its reorganization" were expressly left to the future discretion of the parties. *Id.* at 175. In *TAS Distributing Co. v. Cummins Engine Co.*, specific performance was denied in part because the agreement in question ran for an indefinite term—ironically, the very feature XM claims is a prerequisite for equitable relief here. *See TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007).

At a minimum, AGT should be allowed to present evidence that the meanings of the contractual terms were, and are, well understood by the parties. *Cf. Travellers*, 722 F. Supp. at 1105-06 (ordering defendants to specifically perform after assessing evidence of the parties' past performance to determine meaning of contractual terms). In addition to imbuing the contractual terms with more definite meanings to the extent needed, an evidentiary record would "provide[] more than adequate direction to enable [the parties] to operate . . . in the future without continual judicial involvement," thereby alleviating one of XM's purported concerns about the need for continued judicial oversight. *Id.* at 1105. A conclusive determination that specific performance is not warranted because certain terms of the Agreement might require interpretation would be "singularly inappropriate at this stage in the proceedings." *Goodman Mfg. Co. L.P.*, 1999 U.S. Dist. LEXIS 13418, at *32.

19

22623440

## CONCLUSION

For all of the foregoing reasons, Defendant XM's Motion to Dismiss Plaintiff's

First Amended Complaint should be denied.

Dated: December 10, 2007

Respectfully submitted,

  /s/ Robert H. Chandler

Molly S. Boast (MB-2350)
    (msboast@debevoise.com)
Robert H. Chandler (RC-9666)
    (rhchandler@debevoise.com)
**DEBEVOISE & PLIMPTON LLP**
919 Third Avenue
New York, NY 10022
(212) 909-6000

20