Jeffrey A. Mishkin (JM-8380)
Anthony J. Dreyer (AD-3571)
Peter S. Julian (PJ-3443)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
*Attorneys for Defendant XM Satellite Radio Inc.*


UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADVANCED GLOBAL TECHNOLOGY,
LLC,
                                                                          :

                                    Plaintiff,         :         No. 07 cv 3654 (JSR) (DCF)
                                                                                   ECF CASE
              - against -                                 :

XM SATELLITE RADIO INC.,                     :

                                    Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x



**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

# Table of Contents

*Page*

Table of Authorities ................................................................................................ ii

Preliminary Statement.............................................................................................1

Argument ..................................................................................................................2

I.      AGT's Allegations About AudioVox's Alleged "De Facto Exclusive Distribution
        Relationship" with XM Does Not Even State A Claim for Breach of the Agree-
        ment..........................................................................................................................2

II.     AGT's Allegations About the September 2007 Access to XM's Most Recent
        Technology Information Cannot Be Remedied by Equitable Relief. ...................4

III.    AGT's Allegations About Its Dire Financial Condition Absent Specific Perform-
        ance Do Not Render AGT's Remedy at Law Inadequate or Make Specific Per-
        formance Appropriate. ...........................................................................................6

IV.     AGT's Requested Specific Performance, If Granted, Would Embroil This Court
        in Continuous Supervision of, and Repeated Intervention in, the Parties' Business
        Decisions to Do Justice to Both Parties. .............................................................8

Conclusion ..............................................................................................................10

## Table of Authorities

### *Cases*                                                                   *Page*

*Advanced Global Tech., LLC v. XM Satellite Radio, Inc.*, No. 07 Civ. 3654 (JSR),
    2007 WL 3196208, at *3 (S.D.N.Y. Oct. 29, 2007) ........................................................8

*Crimson Semiconductor, Inc. v. Electornum*, 629 F. Supp. 903, 910 (S.D.N.Y.
    1986) ....................................................................................................................................2

*General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F.
    Supp. 1070, 1075 (S.D.N.Y. 1994) ...................................................................................7

*Gulbenkian v. Gulbenkian*, 147 F.2d 173, 175 (2d Cir. 1945) .......................................................9

*La Mirada Products Co. v. Wassall PLC*, 823 F. Supp. 138, 140-41 (S.D.N.Y.
    1993) ....................................................................................................................................7

*Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809 (S.D.N.Y. 1986) .......................7

*TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 637 (7th Cir. 2007) ..............................9

*Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) .......................................................4

*Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087 (S.D.N.Y.
    1989) ....................................................................................................................................6

*United States v. New York City Bd. of Educ.*, No. 96 Civ. 374 (RML), 2002 U.S.
    Dist LEXIS 23956, at *24-25 (E.D.N.Y. July 24, 2002) ...................................................7

*USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 493 (S.D.N.Y. 1989) .........................7

### *Statutes*

Fed. R. Civ. P. 12(b)(1) ................................................................................................................1

Fed. R. Civ. P. 12(b)(6) ................................................................................................................1

### *Other Authorities*

Restatement (Second) of Contracts § 362 cmt. a (2007) ...............................................................9

### *Preliminary Statement*

Defendant XM Satellite Radio Inc. ("XM") submits this reply memorandum of law in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the first amended complaint ("FAC") of plaintiff Advanced Global Technology, LLC ("AGT"). In opposing XM's motion, AGT makes no effort whatsoever to argue that it is entitled to specific performance on the basis of its allegations of past breaches of the Master License Agreement (the "Agreement"), including those related to the abandoned Sportscaster, for which this Court has already held that AGT has an adequate remedy at law. And AGT makes no attempt to argue that it is entitled to an injunction relating to XM's proposed merger with Sirius Satellite Radio, which this Court has already held to be too speculative to permit any relief. By its silence, AGT has conceded that these allegations, which were dismissed in August, do not support AGT's claim for the extraordinary equitable remedies it asks this Court to grant.

Indeed, AGT's opposition brief makes clear that there are only two questions on this motion. First, is AGT entitled to pursue a claim for a declaratory judgment on the basis of its allegation that AudioVox has a "de facto" exclusive relationship with XM for certain models of receivers at particular price points at which AGT would like to have positioned its (as yet undesigned and undeveloped) products? And second, is AGT entitled to pursue a claim for specific performance on the basis of its contention that the access to XM's most recent technology information, which XM allegedly provided to AGT in September 2007, came too late for AGT to incorporate that information into its 2008 products? For several reasons, the answer to both of these questions is "no", and AGT's amended complaint should therefore be dismissed with prejudice.

1

*Argument*

I.    **AGT's Allegations About AudioVox's Alleged "De Facto Exclusive Distribution Relationship" with XM Does Not Even State A Claim for Breach of the Agreement.**

AGT does not – because it knows that, consistent with truthfulness, it cannot – allege that AudioVox has an exclusive distributorship relationship with XM.  Indeed, AGT knows that AudioVox is not the exclusive distributor of XM receivers and that several companies, including Samsung, Delphi, Pioneer, Polk Audio and Jensen, compete in the manufacture and distribution of such receivers.  Rather, AGT artfully – but misleadingly – alleges that AudioVox has a "de facto" exclusive relationship with XM for certain "key volume models" (FAC ¶ 8) at particular price points that "AGT would have occupied at retail."  (Opp. Br. at 6-7).[1]

As XM explained in its moving brief, the allegation that AudioVox is currently the sole distributor of certain models of XM receivers at particular price points does not even state a claim for breach of the Agreement.  The Agreement is non-exclusive (FAC Ex. A §§ 3.1.1, 4.12), and AGT cannot allege that AudioVox is not entitled to make product proposals to XM and to distribute those receiver products XM approves.  Moreover, despite its conclusory assertion that it has "made proposals to XM on new products" (FAC ¶ 50), AGT cannot and does not allege that it has ever made a proposal, let alone submitted a product for type approval, to XM for a receiver in the same product category or in the same (unspecified) price point categories in which AudioVox is allegedly selling XM receiver models.  And AGT does not allege – because

---

[1]    AGT's reliance on *Crimson Semiconductor, Inc. v. Electornum*, 629 F. Supp, 903, 910 (S.D.N.Y. 1986), for the proposition that the characterization of the relationship between the parties is a factual issue that cannot be resolved on a motion to dismiss (Opp. Br. at 10-11), is misplaced.  Unlike that case, in which the defendant disputed the plaintiff's characterization of their relationship, here, for purposes of this motion, XM does not dispute AGT's characterization of the relationship between AudioVox and XM as a "de facto" exclusive relationship.  There is, therefore, no factual dispute precluding resolution of XM's motion to dismiss the amended complaint.

it cannot – that, even if AGT were to make such a specific product proposal, XM would be obligated to find a business need or consumer demand for an AGT product in the same product and price category as products already distributed by AudioVox or any other third party.

Absent these allegations, the bare assertion that AudioVox happens to be the only company presently distributing certain receiver models at certain price points fails to state a claim for breach of the Agreement. It would only be any future unreasonable withholding of approval by XM of AGT product designs or prototypes as a consequence of such a relationship that would arguably constitute a breach. As XM previously demonstrated, therefore, the declaratory judgment AGT seeks – that the "de facto exclusive distribution relationship" between AudioVox and XM breaches the Agreement – is overbroad and inappropriate. There would surely be no basis for a declaration prohibiting AudioVox from being the sole distributor of product models at price points for which AGT has not yet designed a product or for which AGT has not supplied a commercially viable prototype. The declaration sought by AGT would thus require a multitude of qualifications and exceptions. It therefore could not be crafted in a way that would put the parties on notice of the specific conduct that would constitute compliance and, in all events, would inevitably require repeated intervention by the Court in the parties' business decisions.

Moreover, until AGT has designed a receiver in the same product and price category as the categories for which AudioVox currently distributes XM receivers, and until XM unreasonably rejects that product despite there being an objective business need for two products in the same product and price category, AGT's complaint that AudioVox's "de facto" distribution relationship with XM will result in a breach of the Agreement is wholly speculative, and thus premature. Finally, of course, the allegation that XM has breached the Agreement by virtue of an alleged "de facto" exclusive arrangement with AudioVox could be remedied at law.

3

## II.    AGT's Allegations About the September 2007 Access to XM's Most Recent Technology Information Cannot Be Remedied by Equitable Relief.

The other new allegation with which AGT tries to salvage its claim for specific performance is its assertion that XM provided AGT with access to XM's most recent technology information in September 2007, supposedly too late for AGT to incorporate that information into its 2008 product designs.  AGT argues in its opposition brief that the significance of this assertion is found in its contention that, "[o]n information and belief, other distributors were given access to this technology months before it was made available to AGT." (Opp. Br. at 7; FAC ¶ 64)  But even assuming, for purposes of this motion, that AGT's allegations in this regard are true and that they state a claim for breach of the Agreement, AGT's sole remedy for this past grievance could only be the traditional remedy at law.  No amount of equitable relief can undo the past conduct that allegedly occurred in September 2007 or the previous months.

Moreover, to the extent AGT is not seeking relief with respect to the past, but is speculating that such allegedly unequal treatment may occur in the future, its claim is unripe. There is no alleged timetable for XM's development of additional technology information or new generations of chipsets during the remaining lifetime of the Agreement.  The parties and the Court would merely be speculating that XM may develop additional technology information that could be used in receivers that AGT might be interested and able to design, develop and distribute before October 2009 (the latest expiration date of the Agreement) or that, if such technology information were developed, XM would fail to provide AGT access to it on a "most favored nations" basis.  This Court should not "entertain a claim which is based upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998).

4

Further, while a court can construe the Agreement's "most favored nations" pro-
vision in hindsight in a damages action with particular circumstances in mind, that phrase is not
precise enough to permit the Court to issue an order of specific performance that informs a de-
fendant of the conduct required to comply in all future situations.  The parties obviously do not
agree on what constitutes equal access.  Must all product designers and manufacturers licensed
by XM be informed about new technology on the same day?  At the same hour?  By the same
XM personnel?  In the same location?  May XM respond to inquiries by individual designers or
manufacturers without providing the response to the inquirer's competitors?  May XM provide
technological assistance to a receiver developer that has made a specific proposal without shar-
ing that assistance with the developer's competitors?  Because antitrust concerns, not to mention
scheduling difficulties and travel logistics, would likely prevent XM from holding a joint meet-
ing of AGT and all its competitors in the same room at the same time to present information
about new chipset technology, there inevitably will be differences in the presentation of new
technology information to XM receiver designers, developers and manufacturers.  To the extent
AGT asserts that possible future differences in presentation will constitute "unequal access," it is
not possible to craft an order of specific performance that would set forth exactly what XM must
do to comply with the order and avoid contempt.

Because no equitable relief can remedy AGT's specific complaint about its access
to technology information in September 2007, and because any conjecture about future access is
both unripe speculation and sufficiently abstract and imprecise to render an order of specific per-
formance unworkable, AGT's allegations about the September 2007 presentation of technology
information do not entitle AGT to pursue a claim for specific performance, and its amended
complaint should be dismissed.

5

III.    **AGT's Allegations About Its Dire Financial Condition Absent Specific Performance Do Not Render AGT's Remedy at Law Inadequate or Make Specific Performance Appropriate.**

XM demonstrated in its moving brief that AGT's allegations that it was incorporated solely to distribute XM receiver products and that it might go out of business in the absence of the equitable relief it seeks does not render AGT's harm irreparable or its remedy at law inadequate. Whatever subjective business plans and goals AGT's founders may have had when they incorporated AGT – and, as previously noted, AGT represented in the Agreement that, at the time the Agreement was executed, AGT already was "a manufacturer and distributor of radio and data systems and components for use in various markets" (FAC Ex. A at 1) – the only contract AGT negotiated with XM was a three-year agreement, with a one-year renewal, which simply permits AGT to propose products to XM for XM's evaluation and testing, but does not guarantee AGT any particular number of licensed products or any particular amount of sales or revenues.[2]

AGT's reprised argument that specific performance is appropriate because damages would be impractical or too speculative to determine (Opp. Br. at 13-15) is as misplaced here as it was in opposition to XM's motion to dismiss AGT's original complaint. Courts and juries are frequently required to estimate damages where there is a lack of certainty, and "the mere necessity of making an informed approximation of damages should not preclude the ade-

---

[2]    AGT's reliance on *Travellers Int'l AG v. Trans World Airlines, Inc.*, 722 F. Supp. 1087 (S.D.N.Y. 1989), for the proposition that equitable relief might be available for the termination of a short-term contract (Opp. Br. at 11-12) is curious, since, in *Travellers*, the parties had a "longstanding course of dealings" over twenty years, which "provide[d] more than adequate direction to enable them to operate . . . in the future without continual judicial involvement." *Id.* at 1103-05. XM and AGT, of course, have no such longstanding course of amicable dealings to guide them; indeed, AGT complains that XM has never complied with some of the disputed provision of the Agreement.

6

quacy of a legal remedy." *General Textile Printing & Processing Corp. v. Expromtorg Int'l Group*, 862 F. Supp. 1070, 1075 (S.D.N.Y. 1994); *see also United States v. New York City Bd. of Educ.*, No. 96 Civ. 374 (RML), 2002 U.S. Dist LEXIS 23956, at *24-25 (E.D.N.Y. July 24, 2002) ("the mere impracticability of measuring damages is not enough to show the absence of a legal remedy"); *Litho Prestige v. News Am. Publ'g, Inc.*, 652 F. Supp. 804, 809 (S.D.N.Y. 1986) ("Defendant's termination [of the contract] may result in some costs which are difficult to quantify . . . but such costs may arise in any case where one party terminates a contract"). In *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488 (S.D.N.Y. 1989), a case on which AGT relies, the court denied equitable relief, stating that "the necessity in many cases of making an informed, perhaps rough, approximation of damages does not render the legal remedy inadequate." *Id.* at 493. And in *La Mirada Products Co. v. Wassall PLC*, 823 F. Supp. 138 (S.D.N.Y. 1993), another case on which AGT relies, the court acknowledged that a plaintiff "must allege facts to show that an action for breach of damages would be inadequate," and that "mere characterizations of difficulty [of proving damages] are not sufficient." *Id.* at 140-41 (citation omitted).[3] As this Court held in its order dismissing AGT's initial complaint, "nothing in the Complaint supports the argument that money damages to remedy the alleged breaches could not be calculated with certainty, espe-

---

[3]    The court in *La Mirada* also explained that "specific performance is usually limited to contracts for whose breach the traditional remedy is inappropriate because the unusual goods or services involved are difficult to value." *Id.* at 141. It ordered the defendant to specifically perform its agreement to place certain disputed funds into a security escrow account pending resolution of the parties' dispute as to those funds on the ground that there was "no way to measure the detriment to plaintiff of defendant's failure to fund the [escrow] account" pending resolution of the parties' dispute. *Id.* Otherwise put, it was impractical to calculate the value to the plaintiff of a fully funded security escrow account, the very purpose of which was to secure the plaintiff's ability to collect money from the defendant in the future. By contrast, there is nothing impractical about calculating the business losses AGT alleges flow from XM's conduct. That such a calculation may be an informed approximation does not render monetary damages inadequate.

cially since, as noted, damages are strictly limited to lost profits." *Advanced Global Tech., LLC v. XM Satellite Radio, Inc.*, No. 07 Civ. 3654 (JSR), 2007 WL 3196208, at *3 (S.D.N.Y. Oct. 29, 2007).

**IV.    AGT's Requested Specific Performance, If Granted, Would Embroil This Court in Continuous Supervision of, and Repeated Intervention in, the Parties' Business Decisions to Do Justice to Both Parties.**

Finally, AGT simply cannot escape the insurmountable problem that the terms of the Agreement it seeks to have specifically enforced are so laden with ambiguity that no order of specific performance could be written that would inform XM precisely what it must do to comply and avoid contempt. Even if all else were in its favor, this fatal flaw dooms AGT's amended complaint.

In its opposition papers, AGT asserts that the Agreement sets forth straightforward obligations, like advising AGT of any new development of technology "in a reasonable time frame" for AGT to prepare for integration and development, and meeting "periodically" with "a goal of at least once per month." (Opp. Br. at 17) But even if these provisions were sufficiently "straightforward" that they could be ordered to be specifically performed without constant recourse to the court for interpretation – and XM submits that they are not so straightforward – they are not the provisions of the Agreement for which AGT seeks specific performance. AGT seeks a judgment ordering XM:  (i) to provide "competitive" pricing for AGT products; (ii) to ensure AGT's guaranteed profit margin, by which AGT means that XM should be ordered, among other things, to act "reasonably" in determining whether a "business need" exists for a product proposed by AGT, and not "unduly" delay the evaluation and testing of any AGT product prototypes; (iii) to use "commercially reasonable efforts" to market AGT's products and "to coordinate such efforts" with AGT; (iv) to provide AGT "no less favorable access" to informa-

tion and technology and chipset pricing and availability than it provides to other third-party manufacturers and distributors; (v) to provide AGT "no less favorable subsidy payments and promotional support" than it provides to other third-party manufacturers and distributors; and (vi) not to withhold approval "unreasonably" of AGT's new products.

AGT's contention that courts often interpret such contractual terms (Opp. Br. at 18), ignores the well established principle that a contract may be certain enough to constitute a valid contract for purposes of a damages action and yet be too indefinite to be specifically enforced. *Gulbenkian v. Gulbenkian*, 147 F.2d 173, 175 (2d Cir. 1945); Restatement (Second) of Contracts § 362 cmt. a (2007) (contract terms may be "certain enough to provide the basis for the calculation of damages but not certain enough to permit the court to frame an order of specific performance . . . and to determine whether the resulting performance is in accord with what has been ordered"). Furthermore, as XM previously established, because of the availability of the contempt power for disobedience, it is equally "well settled that for the granting of specific performance the contract must be sufficiently certain in its terms to permit the decree to state with some exactness what the defendant must do." *Gulbenkian v. Gulbenkian*, 147 F.2d at 175; *accord TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d at 637 (requiring licensee to "make 'all reasonable efforts' to manufacture and market" licensed product too imprecise to order specific performance; "an order for specific performance is appropriate only when the terms of the contract are sufficiently specific to allow the precise drafting of such an order").

None of the provisions AGT seeks to enforce can be ordered to be specifically performed without continuous intervention by the Court to interpret the meaning of the provisions in the context of future situations. If, as XM has previously shown, a court cannot frame an order of specific performance with sufficient precision to inform the defendant exactly what

conduct is required to comply with the order, then specific performance is unavailable as a remedy.

### Conclusion

AGT's amended complaint, like its initial complaint, is nothing more than a transparent effort to avoid its agreement to arbitrate. AGT's allegations make clear that the parties have had difficulty in resolving their disputes amicably, as the Agreement contemplated. But if AGT has a complaint about XM's past performance under the Agreement that it cannot work out amicably, then AGT's remedy is at law, and through arbitration. The allegations of the amended complaint, even if true, fail to set forth any ground that would entitle AGT to the extraordinary equitable relief it seeks, and its amended complaint should therefore be dismissed with prejudice.

Dated:  December 17, 2007

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

/s/  Jeffrey A. Mishkin
Jeffrey A. Mishkin (JM-8380)
Anthony J. Dreyer (AD-3571)
Peter S. Julian (PJ-3443)
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
*Attorneys for Defendant*
    *XM Satellite Radio Inc.*